**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| THE CITY OF ROCHESTER, | ) | Case No. 6:23-cv-06061-FPG |
| | ) | |
| Plaintiff, | ) | Honorable Frank P. Geraci, Jr. |
| -against- | ) | |
| | ) | |
| SMITH & WESSON BRANDS, INC.; et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

| | | |
|---|---|---|
| THE CITY OF BUFFALO, | ) | Case No. 1:23-cv-00066-FPG |
| | ) | |
| Plaintiff, | ) | Honorable Frank P. Geraci, Jr. |
| -against- | ) | |
| | ) | |
| SMITH & WESSON BRANDS, INC.; et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

<u>**MEMORANDUM IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS
FOR FAILURE TO STATE A CLAIM UNDER RULE 12(b)(6)**</u>

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................ 2

BACKGROUND ................................................................................................. 5

STANDARD OF REVIEW .................................................................................. 7

ARGUMENT ...................................................................................................... 8

    I.      PLAINTIFFS' CLAIMS ARE BARRED BY PLCAA ........................................... 8

          A.      This Case Falls Within the Heartland of PLCAA Immunity. ..................... 8

          B.      This Suit Does Not Fall Within PLCAA's Predicate Exception. ............. 11

    II.     PLAINTIFFS' CLAIMS FAIL FOR LACK OF PROXIMATE CAUSATION UNDER NEW YORK LAW REGARDLESS OF PLCAA. ................................ 22

    III.    THE COMPLAINTS FAIL TO PLEAD ANY VIOLATIONS OF GBL 898. .... 24

          A.      Most of Defendants' Alleged Conduct Occurred in Other States, Beyond the Reach of GBL 898. ....................................................................... 25

          B.      None of the Manufacturer or Distributor Defendants' Alleged New York Conduct Violates GBL 898. ................................................................. 27

          C.      None of the Partially Unfinished Frame and Receiver Defendants' Alleged New York Conduct Violates GBL 898. ...................................................... 30

    IV.    IMPOSING LIABILITY AGAINST THE UNFINISHED FRAME OR RECEIVER DEFENDANTS WOULD VIOLATE DUE PROCESS. ................ 31

    V.     THE GBL 349 AND GBL 350 CLAIMS FAIL. .............................................. 32

          A.      Plaintiffs Lack Statutory Standing to Assert GBL 349 or 350 Claims. .... 33

          B.      Plaintiffs Do Not Identify Any Advertising by Most Defendants. ........... 34

          C.      Plaintiffs Do Not Allege Any New York Transactions in which a Consumer Was Deceived. ...................................................................... 34

          D.      The Advertising is Not False or Misleading. ........................................... 35

          E.      The Advertising Does Not Advocate Unlawful Conduct. ........................ 39

    VI.    IMPOSING LIABILITY FOR THE ALLEGED ADVERTISING WOULD VIOLATE THE FIRST AMENDMENT ............................................................ 42

          A.      The Complaints Do Not Satisfy the First Amendment Exception for False and Misleading Commercial Speech. .................................................... 43

          B.      The Complaints Do Not Satisfy the First Amendment Exception for Speech Advocating Unlawful Conduct ................................................................ 45

CONCLUSION .................................................................................................. 47

## <u>TABLE OF AUTHORITIES</u>

**Page**

CASES

*44 Liquormart, Inc. v. Rhode Island*,
  517 U.S. 484 (1996).................................................................................................42, 44

*Agudelo v. Recovo Mortg. Mgmt. LLC*,
  No. 22-CV-4004, 2025 WL 1674486 (E.D.N.Y. June 13, 2025)............................................34

*Anza v. Ideal Steel Supply Corp.*,
  547 U.S. 451 (2006).................................................................................................18, 21

*Ashcroft v. ACLU*,
  535 U.S. 564 (2002).......................................................................................................47

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).....................................................................................................7, 13

*Avon Prods. Inc. v. S.C. Johnson & Son, Inc.*,
  984 F. Supp. 768 (S.D.N.Y. 1997) ....................................................................................37

*Bank of America Corp. v. City of Miami*,
  581 U.S. 189 (2017).......................................................................................................18

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).........................................................................................................7

*Bible Believers v. Wayne Cnty.*,
  805 F.3d 228 (6th Cir. 2015) (en banc) ..............................................................................45

*Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris USA Inc.*,
  3 N.Y.3d 200 (2004) .......................................................................................................33

*Bolger v. Youngs Drug Prods. Corp.*,
  463 U.S. 60 (1983)..........................................................................................................47

*Bondi v. VanDerStok*,
  145 S. Ct. 857 (2025)..........................................................................................16, 31, 38

*Brandenburg v. Ohio*,
  395 U.S. 444 (1969)................................................................................................4, 45, 46

*Brown v. Ent. Merchants Ass'n,*
  564 U.S. 786 (2011)...................................................................................42, 46

*Camden Cnty. Bd. of Chosen Freeholders v. Beretta USA Corp.,*
  273 F.3d 536 (3d Cir. 2001) (per curiam).................................................12

*Carey v. Populations Servs. Int'l,*
  431 U.S. 678 (1977)...................................................................................44, 45

*Carolina Cas. Ins. Co. v. Capital Trucking, Inc.,*
  523 F. Supp. 3d 661 (S.D.N.Y. 2021).......................................................37

*City of Chicago v. Beretta U.S.A. Corp.,*
  821 N.E.2d 1099 (Ill. 2004)......................................................................12, 19

*City of New York v. Beretta U.S.A. Corp.,*
  524 F.3d 384 (2d Cir. 2008)................................................................10, 11, 12

*City of New York v. Exxon Mobil Corp.,*
  226 N.Y.S.3d 863 (N.Y. Sup. Ct. 2025)..................................................34

*City of New York v. Smokes-Spirits.Com, Inc.,*
  12 N.Y.3d 616 (2009).................................................................................33, 39

*City of Philadelphia v. Beretta U.S.A. Corp.,*
  277 F.3d 415 (3d Cir. 2002).......................................................... passim

*Coastal Abstract Serv., Inc. v. First. Am. Title Ins. Co.,*
  173 F.3d 725 (9th Cir. 1999) .....................................................................37

*Consol. Rail Corp. v. Gottshall,*
  512 U.S. 532 (1994)....................................................................................18

*Craig v. Boren,*
  429 U.S. 190 (1976)....................................................................................47

*Cucchiaro v. Cucchiaro,*
  627 N.Y.S.2d 224 (N.Y. Sup. Ct. Orange Cnty. 1995)..........................38

*Dial A Car, Inc. v. Transp., Inc.,*
  82 F.3d 484 (D.C. Cir. 1996) ..............................................................37, 38, 42

*District of Columbia v. Beretta, U.S.A. Corp.*,
   872 A.2d 633 (D.C. 2005) (en banc) .....................................................19

*District of Columbia v. Beretta U.S.A. Corp.*,
   940 A.2d 163 (D.C. 2008) ....................................................................10

*District of Columbia v. Heller*,
   554 U.S. 570 (2008).............................................................................29

*Dwyer v. Allbirds, Inc.*,
   598 F. Supp. 3d 137 (S.D.N.Y. 2022)....................................................36

*Edenfield v. Fane*,
   507 U.S. 761 (1993).............................................................................43

*Estados Unidos Mexicanos v. Smith & Wesson Brands, Inc.*,
   633 F. Supp. 3d 425 (D. Mass. 2022) ...................................................40

*FCC v. Fox*,
   567 U.S. 239 (2012)........................................................................31, 32

*Fink v. Time Warner Cable*,
   810 F. Supp. 2d 633 (S.D.N.Y. 2011)....................................................36

*Forni v. Ferguson*,
   232 A.D.2d 176 (N.Y. App. Div. 1st Dep't 1996)...................................24

*Ganim v. Smith & Wesson Corp.*,
   780 A.2d 98 (Conn. 2001) ....................................................................19

*Goshen v. Mut. Life Ins. Co. of New York*,
   98 N.Y.2d 314 (2002) ...........................................................................35

*Grand River Enters. Six Nations, Ltd. v. Boughton*,
   988 F.3d 114 (2d Cir. 2021)..................................................................25

*Greater New Orleans Broad. Ass'n v. United States*,
   527 U.S. 173 (1999).............................................................................42

*Groden v. Random House, Inc.*,
   61 F.3d 1045 (2d Cir. 1995)..................................................................37

*Hamilton v. Beretta U.S.A. Corp.*,
    96 N.Y.2d 222 (2001) ...................................................................................23, 24

*Healy v. Beer Inst., Inc.*,
    491 U.S. 324 (1989)........................................................................................25, 26

*Hemi Grp., LLC v. City of New York*,
    559 U.S. 1 (2010).............................................................................................18, 22

*Hess v. Indiana*,
    414 U.S. 105 (1973) (per curiam) ........................................................................46

*Holmes v. Sec. Inv. Prot. Corp.*,
    503 U.S. 258 (1992)....................................................................17, 20, 21, 22

*Ibanez v. Fla. Dep't of Bus. & Pro. Regul., Bd. of Acct.*,
    512 U.S. 136 (1994)...............................................................................................43

*Illinois Ass'n of Firearms Retailers v. City of Chicago*,
    961 F. Supp. 2d 928 (N.D. Ill. 2014) ....................................................................29

*In re Academy, Ltd.*,
    625 S.W.3d 19 (Tex. 2021)...................................................................................10

*In re Jamie J.*,
    89 N.E.3d 468 (N.Y. 2017)...................................................................................30

*In re R.M.J.*,
    455 U.S. 191 (1982)...............................................................................................43

*James v. Meow Media, Inc.*,
    300 F.3d 683 (6th Cir. 2002) ................................................................................46

*King v. New York City Emps. Ret. Sys.*,
    212 F. Supp. 3d 371 (E.D.N.Y. 2016) ..................................................................23

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014)........................................................................................17, 22

*Linmark Assocs., Inc. v. Twp. of Willingboro*,
    431 U.S. 85 (1977).................................................................................................43

*Liparota v. United States*,
    471 U.S. 419 (1985)..................................................................................13

*Lorillard Tobacco Co. v. Reilly*,
    533 U.S. 525 (2001)............................................................................42, 45

*McCarthy v. Sturm, Ruger & Co.*,
    916 F. Supp. 366 (S.D.N.Y. 1996) .......................................................41

*McCoy v. Stewart*,
    282 F.3d 626 (9th Cir. 2002) ................................................................46

*Merrill v. Navegar, Inc.*,
    26 Cal. 4th 465 (2001) ..........................................................................41

*Mogull v. Pete & Gerry's Organics, LLC*,
    588 F. Supp. 3d 448 (S.D.N.Y. 2022)..................................................36

*Nat'l Shooting Sports Found., Inc. v. James*,
    144 F.4th 98 (2d Cir. 2025) ...............................................13, 23, 25, 26

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    597 U.S. 1 (2022)..................................................................................41

*New York v. Arm or Ally, LLC*,
    718 F. Supp. 3d 310 (S.D.N.Y. 2024)..................................................12

*Olivia N. v. Nat'l Broad. Co.*,
    126 Cal. App. 3d 488 (1981) ...............................................................46

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
    575 U.S. 175 (2015)........................................................................38, 42

*Orlander v. Staples, Inc.*,
    802 F.3d 289 (2d Cir. 2015)............................................................23, 39

*Penelas v. Arms Tech., Inc.*,
    778 So. 2d 1042 (Fla. Dist. Ct. App. 2001) .........................................12

*People ex rel. Spitzer v. Sturm, Ruger & Co.*,
    309 A.D.2d 91 (N.Y. App. Div. 1st Dep't 2003)....................3, 19, 23, 24

*People ex rel. Spitzer v. Sturm, Ruger & Co.*,
    761 N.Y.S.2d 192 (2003) ........................................................................................................12

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*,
    413 U.S. 376 (1973) ..............................................................................................................45

*R.A.V. v. City of St. Paul*,
    505 U.S. 377 .........................................................................................................................43

*Radich v. Guerrero*,
    No. 1:14-CV-00020, 2016 WL 1212437 (D. N. Mar. I. Mar. 28, 2016) ...............................29

*Rehaif v. United States*,
    588 U.S. 225 (2019) .........................................................................................................13, 14

*Rothstein v. UBS AG*,
    708 F.3d 82 (2d Cir. 2013) ......................................................................................................7

*Ruan v. United States*,
    597 U.S. 450 (2022) ...............................................................................................................13

*S. Pacific Co. v. Darnell-Taenzer Co.*,
    245 U.S. 531 (1918) ...............................................................................................................17

*Sanders v. Acclaim Entm't, Inc.*,
    188 F. Supp. 2d 1264 (D. Colo. 2002) ...................................................................................47

*Sandoz Pharma. Corp. v. Richardson-Vicks, Inc.*,
    902 F.2d 222 (3d Cir. 1990) ...................................................................................................37

*Screws v. United States*,
    325 U.S. 91 (1945) .................................................................................................................30

*Skidmore v. Swift & Co.*,
    323 U.S. 134 (1944) ..........................................................................................................16, 30

*Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*,
    605 U.S. 280 (2025) ....................................................................................................... passim

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011) ...............................................................................................................42

*Spagnola v. Chubb Corp.*,
    574 F.3d 64 (2d Cir. 2009)................................................................................23

*Teixeira v. Cnty. of Alameda*,
    873 F.3d 670 (9th Cir. 2017) ..........................................................................29

*Thompson v. W. States Med. Ctr.*,
    535 U.S. 357 (2002)........................................................................................42

*Trimarco v. Klein*,
    56 N.Y.2d 98 (1982) .......................................................................................14

*Trs. of Amherst Coll. v. Ritch*,
    151 N.Y. 282 (1897).......................................................................................38

*United States v. Penn. Indus. Chem. Corp.*,
    411 U.S. 655 (1973)........................................................................................17

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
    425 U.S. 748 (1976)........................................................................................43

*Williams v. Crane*,
    No. 2:14-CV-241 TS, 2015 WL 7176370 (D. Utah Nov. 13, 2015) .....................................14

*Zauderer v. Off. of Disciplinary Couns. of Supreme Ct. of Ohio*,
    471 U.S. 626 (1985)........................................................................................43

## STATUTES

18 U.S.C. § 921(a)(3)...................................................................................................15

GBL 349.......................................................................................................... passim

GBL 350.......................................................................................................... passim

GBL 898.......................................................................................................... passim

NYPL § 240.45 ...........................................................................................................12

Protection of Lawful Commerce in Arms Act, 15 U.S.C. §§ 7901–03 (PLCAA) ............... passim

## RULES

Federal Rule of Civil Procedure 12(b)(6) ...................................................................1, 7

REGULATIONS

27 C.F.R. § 478.12(c).................................................................................................16

OTHER AUTHORITIES

*Are "80%" or "unfinished" receivers illegal?*, Bureau of Alcohol, Tobacco,
     Firearms & Explosives (Apr. 6, 2020), https://bit.ly/2nlfssN ................................15

H.R. REP. NO. 109-124 (2005) .................................................................................10

Letter from Intervenor United States Department of Justice, *New York v. Arm or
     Ally*, No. 24-773 (2d Cir. Apr. 21, 2025), Doc. 133.1 .......................................17

Mem. of Law in Supp. of Defs.' Mot. for Summ. J. & in Opp'n to Pls.' Mot. for
     Summ. J., Doc. 98 at 11, *City of Syracuse v. ATF*, No. 20-cv-6885 (S.D.N.Y.
     Jan. 29, 2021)....................................................................................................16

RESTATEMENT (THIRD) OF TORTS: LIAB. FOR ECON. HARM § 8 Comment G (2020)...................12

Timothy D. Lytton, *Tort Claims Against Gun Manufacturers for Crime-Related
     Injuries*, 65 Mo. L. Rev. 1, 6–50 (2000) ..............................................................9

U.S. CONST., Amendment V......................................................................................31

Vivan S. Chu, CONG. RSCH. SERV. R42871, *The Protection of Lawful Commerce
     in Arms Act: An Overview of Limiting Tort Liability of Gun Manufacturers*
     (2012).................................................................................................................9

Defendants Smith & Wesson Brands, Inc. ("Smith & Wesson"); Beretta U.S.A. Corp. ("Beretta")[1]; Bushmaster Firearms Industries, Inc. ("Bushmaster"); Colt's Manufacturing Company, LLC ("Colt's"); Glock, Inc. ("Glock"); Strassell's Machine, Inc. d/b/a/ Hi-Point Firearms ("Hi-Point"); Kel-Tec CNC Industries, Inc. ("Kel-Tec"); O.F. Mossberg & Sons, Incorporated ("Mossberg"); RemArms, LLC ("RemArms"); Savage Arms, Inc. ("Savage"); SIG Sauer, Inc. ("Sig Sauer"); Springfield Armory, Inc. ("Springfield"); Sturm, Ruger & Co., Inc. ("Ruger"); and Taurus Holdings, Inc., a/k/a/ Taurus International Manufacturing, Inc.[2] (Taurus) (collectively referred to as the Manufacturer Defendants"); Bangers, L.P. ("Bangers"); RSR Group, Inc. ("RSR"); Vintage Firearms, LLC ("Vintage"); and Wolcott Guns Inc. ("Wolcott") (collectively referred to as the "Distributor Defendants"); and Arm or Ally, LLC ("Arm or Ally"); Brownells, Inc. ("Brownells"); GS Performance, LLC ("GS Performance"); JSD Supply ("JSD"); KM Tactical, LLC ("KM Tactical"); Primary Arms, LLC ("Primary Arms"); Rainier Arms, LLC ("Rainier"); Rock Slide USA, LLC ("Rock Slide"); and Salvo Technologies, Inc. ("Salvo") (collectively referred to as the "Unfinished Frame and Receiver Defendants") respectfully submit this consolidated Memorandum of Law in Support of their Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6)

---

[1] The Complaints allege that Beretta not only manufactures firearms, but also operates a retail store in New York City. Accordingly, it is included in both the "Manufacturer" and "Distributor" defendant groups.

[2] The Complaints attempt to sue, as a single entity, "Taurus Holdings, Inc. a/k/a Taurus International Manufacturing, Inc." Rochester Compl. ¶ 65; Buffalo Compl. ¶ 66. Taurus Holdings, Inc. and Taurus International Manufacturing, Inc., are separate Georgia corporations, neither of which is "also known as" the other. The entity that "manufactured, assembled, and/or imported firearms which were marketed, distributed, and/or sold in the United States," as alleged in the Complaints (Rochester Compl. ¶ 65, Buffalo Compl. ¶ 66) is Taurus International Manufacturing, Inc. To the extent either or both entities are properly before this Court, both entities join in this motion.

## INTRODUCTION

Plaintiffs, the municipal governments of Rochester and Buffalo, seek to hold the firearms industry liable for attenuated harms they claim to have suffered from third-party criminals independently misusing firearms. Two decades ago, a bipartisan Congress enacted a statute, the Protection of Lawful Commerce in Arms Act, 15 U.S.C. §§ 7901–03 (PLCAA), to prohibit exactly this type of claim. In that statute, Congress declared that firearm companies "are not, and should not, be liable for the harm caused by those who criminally or unlawfully misuse firearm products . . . that function as designed and intended." 15 U.S.C. § 7901(a)(5). Even if such claims against the industry are ultimately unsuccessful, they inflict enormous damage by imposing millions of dollars in legal costs through discovery and other proceedings. Thus, to protect the industry against lawfare—where the process itself becomes the punishment—Congress decreed that such claims may not even be "brought" in any court, and that any existing claims had to be "immediately dismissed" at the threshold. *Id*. § 7902(a), (b).

As the Supreme Court recently held in a unanimous decision, PLCAA provides a robust "immunity" that must be vigorously enforced at the motion-to-dismiss stage. *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280, 299 (2025). After all, the "core purpose" of the statute was to "halt a flurry of lawsuits attempting to make gun manufacturers pay for the downstream harms resulting from misuse of their products." *Id*. at 298. While the statute contains some narrow "exception[s]," courts must be careful not to construe them in "such a capacious way" that they would "swallow most of the rule." *Id*. at 299. That is exactly what Buffalo and Rochester are trying to do here, attempting to bring claims under one of PLCAA's exceptions in a way that would effectively destroy the immunity that Congress created.

As relevant here, the so-called "predicate exception" allows firearm companies to be sued only if they "knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought." 15 U.S.C .§ 7903(5)(A)(iii). Two features of that exception ensure that it does not "swallow the rule" as the Supreme Court warned. First, it allows suit only if a firearm company "knowingly" violated the law. *Id*. Thus, if a company has engaged in business activity that it did not *know* was unlawful, it cannot be sued. Second, even if a company did commit a "knowing" violation, it still cannot be sued unless that violation was a "proximate cause" of the plaintiff's harm. *Id*. This limitation is especially critical because, at the time PLCAA was enacted, multiple courts had already held that the harms alleged by various state and local governments were *not* proximately caused by firearm companies, since those harms were too remote, indirect, and derivative under traditional tort principles. Congress sought to uphold that understanding, and to guard against any "maverick judicial officer" who might "expand civil liability" for such attenuated claims. *Id*. § 7901(a)(7).

Against that backdrop, Plaintiffs' complaints fail as a matter of law and must be dismissed for several reasons. *First*, and dispositively, this is exactly the type of suit PLCAA bars at the threshold. Plaintiffs do not allege any facts showing any Defendant *knowingly* violated any predicate statute. And even if they did, none the harms Plaintiffs allege were "proximately caused" by any such violation. If this Court were to hold otherwise, it would contradict a wall of precedent holding that firearm companies are *not* the proximate cause of harms to state and local governments stemming from third-party criminal violence—including a watershed New York precedent issued right before PLCAA's enactment. *People ex rel. Spitzer v. Sturm, Ruger & Co*., 309 A.D.2d 91, 103 (N.Y. App. Div. 1st Dep't 2003) (dismissing nuisance claim for lack of proximate cause because government's harms were "far too remote" from alleged violations).

*Second*, even if Plaintiffs could overcome PLCAA, their state-law claims would still fail for lack of proximate cause under New York law, and for several other reasons as well. To start, GBL 898 applies only to conduct in New York, yet Plaintiffs rely extensively on alleged conduct elsewhere, including the lawful sale of firearms in *other* States that are later smuggled into New York by third parties. As a matter of both statutory interpretation and federalism, New York law cannot impose liability on Defendants' out-of-state conduct that was legal where it occurred. Their limited conduct alleged in New York, meanwhile, is mostly commonplace and  lawful—like maintaining a storefront or distributing common firearms in New York. Such benign firearm commerce does not violate GBL 898, nor would the Second Amendment allow it to be prohibited.

Similarly, Plaintiffs fail to allege the essential elements of their deceptive-business-practices and false-advertising claims under GBL 349 and 350. Plaintiffs do not even have statutory standing to bring such claims, since their injuries are wholly derivative. They fail to allege deception regarding transactions occurring in New York. And they fail to show anyone was deceived *anywhere*, as they do not identify any false or misleading statement made by any Defendant at all. Accordingly, Plaintiffs fall far short of showing any violation of GBL 349 or 350.

*Finally*, to the extent New York law would penalize Defendants for their alleged marketing activity, it would violate the First Amendment. It is well established that the First Amendment protects truthful and non-misleading advertising that does not incite unlawful activity. But Plaintiffs fail to show that any of Defendants' advertising is false or misleading in any way, or that it meets the high bar for incitement under *Brandenburg v. Ohio*, 395 U.S. 444 (1969). Instead, at bottom, Plaintiffs take issue with the *viewpoint* of Defendants' advertising—that firearm ownership is proper and can even be righteous and noble. But the First Amendment squarely prohibits punishing speakers for expressing that type of viewpoint, even in commercial speech.

## BACKGROUND

Rochester and Buffalo filed their Complaints seeking to place the blame for violence in their cities on the firearms industry. Plaintiffs' theory is that Defendants could do more to prevent the firearms they sell from ultimately ending up in the wrong hands, where they are criminally misused by third parties—and that their supposed failure to do more to prevent this third-party violence should make them liable for the harm the Plaintiffs allegedly sustain as a result.

In particular, the Complaints allege that "Defendants knew or should have known that (a) some of the firearms they manufacture and/or distribute would be diverted into the hands of those who would violate the law, and (b) they could take steps to reduce the number of firearms that fall into the hands of criminals by changing their merchandising practices." Rochester Compl. ¶ 26; Buffalo Compl. ¶ 27.[3]

Notably, these allegations are not tied to any of the Manufacturer or Distributor Defendants' alleged conduct within the City of Rochester or the City of Buffalo—or even within the State of New York. Instead, the Complaints highlight that most of the firearms recovered following crimes in New York were originally purchased outside New York, in States with less burdensome regulations on firearms. *See, e.g.*, Rochester Compl. ¶¶ 131–33 ("74% of all guns recovered by law enforcement come from out of state."); Buffalo Compl. ¶¶ 131–33 (same); Rochester Compl. ¶ 175 ("Handguns manufactured, imported or distributed by Defendants are acquired in states and cities where gun regulations are lax, diverted to the illegal market in New York, and used to cause injury, death or the threat thereof to residents of the City . . . ."); Buffalo

---

[3] Although the City of Rochester and the City of Buffalo each filed separate Complaints, they contain largely identical allegations, with no differences material to this motion. The arguments for dismissal apply equally to both complaints.

Compl. ¶ 166 (same). Plaintiffs offer only sparse allegations about any conduct within the State of New York, limited to such mundane business activity as maintaining a storefront.

Plaintiffs' claims against the Unfinished Frame or Receiver Defendants are best described as an attack on the federal firearm regulatory regime, as each claim turns on Defendants having sold partially unfinished frames and receivers that were not, at the time, considered to be "firearms" under federal law. Given the (often explicit) assurances from federal regulators that their products were not firearms, the Complaints do not allege any facts showing that the relevant Defendants believed that selling such items required them to comply with regulations that applied to "firearms." Rather, at worst, the Complaints suggest that these Defendants followed the advice of federal regulators from the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") on a question about which the ATF later changed its mind.

Plaintiffs also target Defendants' alleged marketing tactics, suggesting that their advertisements are false, misleading, and promote unlawful conduct. In support, they cite just a handful of advertisements, from a small subset of Defendants, without identifying anything in those ads that is objectively false or misleading. Rochester Compl. ¶ 205; Buffalo Compl. ¶ 196. Nor do Plaintiffs identify any marketing that contains any references to, much less glorification of, criminals or criminal activity. Instead, Plaintiffs allege that Defendants' advertisements promote a "connection" between their products and the military and law enforcement. Rochester Compl. ¶ 205; Buffalo Compl. ¶ 196. With respect to the Unfinished Frame or Receiver Defendants, Plaintiffs assert that by advertising their products, they impliedly conveyed to consumers the false legal conclusion that their products did not meet the definition of a "firearm" under federal law, Rochester Compl. ¶¶ 287–89; Buffalo Compl. ¶¶ 279–81.

Although Plaintiffs assert in vague and conclusory terms that "Defendants' Conduct" "Directly Harms" them (Rochester Compl. pp. 169–80; Buffalo Compl. pp. 162–76), they do not allege any facts showing an actual "direct" connection between any allegedly unlawful action of Defendants and any particular injury suffered by the municipal governments of Buffalo or Rochester.

## <u>STANDARD OF REVIEW</u>

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* To meet this standard, a pleading must be comprised of more than "'labels and conclusions'" or "'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 555, 557). Although the Court accepts all factual allegations in a complaint as true, it is "not required to credit conclusory allegations or legal conclusions couched as factual allegations." *Rothstein v. UBS AG*, 708 F.3d 82, 94 (2d Cir. 2013).

## ARGUMENT

Plaintiffs' claims fail at every level. Under federal law, they are barred at the threshold by PLCAA. And under state law, they fail on their own terms because they fail to plead any facts that would satisfy the essential elements of their New York causes of action. Indeed, to the extent New York law could be contorted to impose liability on Defendants for their truthful and non-misleading advertising or their ordinary commerce in firearm products, it would violate several provisions of the federal Constitution. For all these reasons, Plaintiffs' claims should be dismissed in their entirety.

## I.   PLAINTIFFS' CLAIMS ARE BARRED BY PLCAA

Congress enacted PLCAA to prohibit precisely the type of claims asserted in this case. PLCAA generally bars any "qualified civil liability action" from being "brought" in "any Federal or State court," including any claim "against a manufacturer or seller of a [firearm]" based on harms "resulting from the criminal or unlawful misuse of a [firearm] by . . . a third party." 15 U.S.C. §§ 7902(a), 7903(5)(A). Any such claims thus must "be immediately dismissed," unless they fall within one of PLCAA's narrow exceptions. *Id*. § 7902(b). Because Plaintiffs' claims fall easily within the definition of a "qualified civil liability action," and because none of them qualifies for any PLCAA exceptions, Plaintiffs' case fails at the threshold.

### A.   This Case Falls Within the Heartland of PLCAA Immunity.

PLCAA generally bars any "qualified civil liability action," which is broadly defined to include claims "brought by any person against a manufacturer or seller of a qualified product" seeking relief for any harms "resulting from the criminal or unlawful misuse of a qualified product by the person or a third party. . . . ." *Id*. § 7903(5)(A). Plaintiffs' claims clearly fit that definition.

8

To start, covered "person[s]" include "any governmental entity" acting as a plaintiff, which covers both of the municipal governments that are Plaintiffs here. *Id*. § 7903(3). "Firearm[s]" are "qualified product[s]," and the Complaints allege that nearly all Defendants are either "manufacturers" or "seller[s]" of firearms.[4]  Rochester Compl. ¶¶ 50–83; Buffalo Compl. ¶¶ 51–83. All of Plaintiffs' alleged injuries "result[] from" the "criminal or unlawful misuse of" firearms by "third part[ies]." 15 U.S.C. § 7903(5)(A). As the Complaints acknowledge, Plaintiffs' injuries flow from "unlawful possession, transportation and disposition of firearms and the utilization of guns in the commission of an offense" by third parties. Rochester Compl. ¶ 1; Buffalo Compl. ¶ 1. In other words, Plaintiffs' damages are all caused by deliberate acts of third-party criminals. Thus, PLCAA applies by its plain terms.

History confirms that this case falls within the very core of suits that PLCAA was designed to prohibit. "PLCAA was considered and passed at a time when victims of shooting incidents," and many government entities, "brought civil suits seeking damages and injunctive relief against out-of-state manufacturers and sellers of firearms." Vivan S. Chu, CONG. RSCH. SERV. R42871, *The Protection of Lawful Commerce in Arms Act: An Overview of Limiting Tort Liability of Gun Manufacturers* 1 (2012). Plaintiffs invoked a broad range of legal theories, including "strict liability," "public nuisance," "negligent marketing," and "deceptive trade practices." Timothy D. Lytton, *Tort Claims Against Gun Manufacturers for Crime-Related Injuries*, 65 Mo. L. Rev. 1, 6–50 (2000). Congress recognized that even if these claims did not ultimately prevail, they still posed

---

[4] While Defendants KM Tactical and Rock Slide are neither "manufacturers" nor "seller[s]" of "qualified products," the same alleged facts that defeat proximate cause under PLCAA's federal standard also defeat proximate causation under New York law. *See infra* 21–23.

an existential threat to the firearms industry, which was "in danger of being overwhelmed by the cost of defending itself against these suits." H.R. Rep. No. 109-124, at 12 (2005) ("House Report").

Congress enacted PLCAA in direct response to these concerns. To avoid ruinous litigation costs, the statute did not just confer a defense against liability, but provided that covered claims could not even be "brought," and that any pending claims had to be "immediately dismissed." 15 U.S.C. § 7902(a), (b). The express statutory purpose was to "*prohibit causes of action*" against the firearms industry based on claims stemming from "the criminal or unlawful misuse of firearm products or ammunition products by others when the product functioned as designed and intended." *Id*. § 7901(b)(1) (emphasis added). Thus, as the Supreme Court has recognized, the statute confers a threshold statutory "immunity" that is appropriately resolved at the motion-to-dismiss stage. *Smith & Wesson*, 605 U.S. at 299. Indeed, if covered claims could *not* be immediately dismissed on the pleadings, then the "core purpose" of PLCAA's statutory immunity would be defeated, because the industry would still have to face a "flurry of lawsuits" that could subject them to the costs and burdens of litigation regardless of the ultimate outcome. *Id*. at 298.

Unsurprisingly, courts routinely apply PLCAA to dismiss cases like this one, brought by governmental plaintiffs against many of the same defendants here. *See, e.g.*, *Smith & Wesson*, 605 U.S. at 285 (dismissing aiding-and-abetting claim brought by Mexico); *City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384, 398 (2d Cir. 2008) (dismissing public-nuisance claim brought by New York City); *District of Columbia v. Beretta U.S.A. Corp.*, 940 A.2d 163, 169 (D.C. 2008) (dismissing statutory claim brought by D.C. government); *cf. In re Academy, Ltd.*, 625 S.W.3d 19, 35–36 (Tex. 2021) (granting mandamus, recognizing that allowing case to proceed past motion to dismiss would effectively destroy PLCAA immunity). This Court should do the same, as Plaintiffs do not satisfy any of PLCAA's narrow exceptions. As the Supreme Court has admonished, the

10

exceptions should not be read to be so "capacious" that they would "swallow most of the rule" barring suits based on "a third-party's criminal use of [a] company's product." *Smith & Wesson*, 605 U.S. at 298–99.

### B. This Suit Does Not Fall Within PLCAA's Predicate Exception.

PLCAA generally requires immediate dismissal of the claims to which it applies, subject only to certain narrow exceptions defined in 15 U.S.C. § 7903(5). Most of these exceptions are plainly inapplicable here—for example, Plaintiffs do not assert claims "for negligent entrustment or negligence per se," allege that any of the Defendants have been "convicted under section 924(h) of Title 18, or a comparable State felony law," or seek to bring "an action for breach of contract or warranty." *Id*. § 7903(5)(A)(i)–(ii), (iv). Based on the Complaint, however, it appears that Plaintiffs intend to rely on the so-called "predicate exception," which provides an exception to PLCAA immunity if "a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought." *Id*. § 7903(5)(A)(iii). Despite their efforts to suggest otherwise, though, none of Plaintiffs' claims fit within PLCAA's narrow predicate exception, and all must be dismissed.

### 1. Most of Plaintiffs' claims are not based on a valid predicate statute.

PLCAA's predicate exception applies only to violations of "statute[s] applicable to the sale or marketing" of firearms. *Id*. § 7903(5)(A)(iii). Importantly, that does not include all statutes that are merely "capable of being applied" to firearms. *Beretta*, 524 F.3d at 400. Instead, the predicate exception applies only to statutes that (a) "expressly regulate firearms," (b) "courts have applied to the sale and marketing of firearms," or (c) "clearly can be said to implicate the purchase and sale of firearms." *Id*. at 404. When considering whether a statute falls within the second category,

the question is not just whether the statute has ever been applied in a case involving firearms, but whether "state courts . . . apply [the] statute . . . to the type of [firearm manufacturer or seller] conduct that the [plaintiff] complains of." *Id*. at 400.

Plaintiffs' common-law public-nuisance claim plainly does not qualify. To start, the predicate exception applies only to violations of a "State or Federal *statute*"—alleging common-law liability is insufficient. Nor could Plaintiffs rescue their public-nuisance claim by reframing it as one based on New York's criminal nuisance statute, NYPL § 240.45: The Second Circuit has already held NYPL § 240.45 "does not fall within the predicate exception to the claim restricting provisions of the PLCAA." *Beretta*, 524 F.3d at 400.[5]

Plaintiffs' marketing claims, based on GBL 349 and 350, fare no better. Neither statute "expressly regulate[s] firearms," and New York courts have not applied these laws to the sale and marketing of firearms. *See New York v. Arm or Ally, LLC*, 718 F. Supp. 3d 310, 330 n.10 (S.D.N.Y. 2024) (finding no "case in which a court applied General Business Law Sections 349 and 350 to the sale and marketing of firearms"), *motion to certify appeal granted*, 2024 WL 2270351 (S.D.N.Y. May 20, 2024). Nor is there anything else about GBL 349 and 350 that would

---

[5] In any event, Plaintiffs also fail to state a claim for public nuisance. The overwhelming weight of authority holds that selling and manufacturing lawful products (including firearms) cannot give rise to public-nuisance liability. RESTATEMENT (THIRD) OF TORTS: LIAB. FOR ECON. HARM § 8 cmt. G (2020) (noting that public-nuisance claims "against the makers of products that have caused harm, such as tobacco, firearms, and lead paint" have been "rejected by most courts . . . because the common law of public nuisance is an inapt vehicle"); *see also, e.g., City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1116 (Ill. 2004) (rejecting public-nuisance claim against firearms manufacturers); *City of Philadelphia v. Beretta U.S.A. Corp.*, 277 F.3d 415, 420–22 (3d Cir. 2002) (same); *Camden Cnty. Bd. of Chosen Freeholders v. Beretta USA Corp.*, 273 F.3d 536, 541 (3d Cir. 2001) (per curiam) (same); *People ex rel. Spitzer v. Sturm, Ruger & Co.*, 761 N.Y.S.2d 192, 196 (2003) (same); *Penelas v. Arms Tech., Inc.*, 778 So. 2d 1042, 1044–45 (Fla. Dist. Ct. App. 2001) (same).

"clearly . . . implicate" firearms. They are simply general marketing and consumer-protection statutes.

In sum, because the common-law nuisance claim (Count II) and the marketing claims (Counts III and IV) are not based on the violation of any qualifying predicate statute, they must be dismissed for that reason alone.[6]

### 2.    Plaintiffs fail to allege facts showing any "knowing" violation of law.

Even if Plaintiffs alleged a predicate violation, they still would still fail to satisfy PLCAA's predicate exception because they do not allege facts showing that any Defendant *knowingly* violated any predicate statute. *See Iqbal*, 556 U.S. at 678 (conclusory assertions not enough).

The Supreme Court has repeatedly held that "knowingly," when used in this manner, requires "showing that the defendant knew his conduct to be unauthorized by statute or regulations." *Liparota v. United States*, 471 U.S. 419, 420, 425 (1985) (interpreting statute imposing penalties on "whoever knowingly uses . . . authorization cards in any manner not authorized by [the statute] or the regulations"); *see also Ruan v. United States,* 597 U.S. 450, 454 (2022) (interpreting statute making it a federal crime "for any person knowingly or intentionally" to "manufacture, distribute, or dispense . . . a controlled substance" "[e]xcept as authorized"); *Rehaif v. United States*, 588 U.S. 225, 229 (2019) (interpreting statute imposing heightened penalties on anyone who "knowingly violates" certain provisions). That is, where the law requires a "knowing" violation, knowledge of the *unlawfulness* of the action is critical. *Liparota*, 471 U.S. at 426.

---

[6] While the Second Circuit recently held that GBL 898 is not preempted by PLCAA because it can serve as a predicate statute for purposes of the predicate exception, *Nat'l Shooting Sports Found., Inc. v. James*, 144 F.4th 98, 111 (2d Cir. 2025), Defendants respectfully disagree and preserve for appeal the argument that GBL 898 is preempted by PLCAA.

Plaintiffs do not allege any facts showing that any Defendant "knowingly" violated any predicate statute. Instead, they purport to allege that "[d]efendants [h]ave [k]nowledge of the [d]iversion of [h]andguns to the [i]llegal [m]arket." Rochester Compl. p. 86; Buffalo Compl. p. 78. For example, they broadly allege that "the gun industry is aware of the means by which firearms are diverted from the legal to the illegal market" and that Defendants know of additional steps they could take to reduce such diversion. Rochester Compl. ¶¶ 190–98; Buffalo Compl. ¶¶ 181–89. But alleging that Defendants know some small portion of firearms ultimately end up in criminal hands does not show that Defendants *knowingly* violated any law. *See Smith & Wesson*, 605 U.S. at 292 (ordinary merchant generally not legally culpable "even if he knows that in some fraction of cases [criminal] misuse will occur"). The problem is particularly acute for Plaintiffs' GBL 898 claims, which require that Defendants engaged in "conduct either unlawful in itself or unreasonable under all the circumstances." GBL 898-b(1). To the extent this statute tries to substitute a *negligence* standard of "unreasonableness" in place of PLCAA's "knowledge" standard, it cannot serve as a viable predicate statute.

At best, to establish a "knowing" violation of GLB 898, Plaintiffs must show Defendants somehow *knew* their conduct was "unreasonable under all the circumstances." *See Rehaif*, 588 U.S. at 229 ("knowing" violation requires "a culpable mental state regarding each of the statutory elements," including legal status). But Plaintiffs offer no facts to suggest Defendants ever "knew" their conduct was unreasonable. Nor could they, since they allege that essentially the entire firearms industry has operated the same way. Such adherence to industry standards generally shows that conduct is *not* unreasonable. *Trimarco v. Klein*, 56 N.Y.2d 98, 105–06 (1982) ("[W]hen proof of an accepted practice is accompanied by evidence that the defendant conformed to it, this may establish due care."); *Williams v. Crane*, No. 2:14-CV-241 TS, 2015 WL 7176370, at *1 (D.

14

Utah Nov. 13, 2015) ("[I]ndustry standards may represent a consensus regarding what a reasonable person in a particular industry would do"). Plaintiffs fail to allege facts showing that any Defendant *knew* that the firearms industry was the exception, and that their industry-standard conduct would later be judged unlawfully "unreasonable" under GBL 898.

Indeed, the lack of a knowing violation is especially clear here given PLCAA's recognition that firearms are "heavily regulated by Federal, State, and local laws." 15 U.S.C. § 7901(a)(4). To the extent Defendants *complied* with the multitude of laws specifically governing how firearms are made and sold, they could not have *known* that their conduct was unreasonable.

Plaintiffs' allegations as to the Unfinished Frame or Receiver Defendants are also inadequate to show a "knowing" violation of any law. In fact, the sum total of Plaintiffs' allegations on this front is that each of these defendants sold their partially unfinished frame and receiver products, which the Complaints characterize as "firearms"—without complying with laws that govern "firearms." *See, e.g.*, Rochester Compl. ¶ 275; Buffalo Compl. ¶ 266.

But Defendants had every reason to believe those restrictions *did not apply* to their products. Under federal law, as well as under some of the New York laws at issue here, a firearm is defined as "any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive" or "the frame or receiver of any such weapon." 18 U.S.C. § 921(a)(3); *see also* GBL 898-a(6). For years, ATF, the agency charged with administering the federal regime, held that such unfinished products were not firearms because they "have not reached the 'stage of manufacture' which would result in the classification of a firearm according to the [Gun Control Act]." *See Are "80%" or "unfinished" receivers illegal?*, Bureau of Alcohol, Tobacco, Firearms & Explosives (Apr. 6, 2020), https://bit.ly/2nlfssN. The agency even took the position in litigation that "unfinished frames or receivers that have not yet

15

reached a critical stage of manufacturing . . . are *not firearms* within the meaning of the GCA." Mem. of Law in Supp. of Defs.' Mot. for Summ. J. & in Opp'n to Pls.' Mot. for Summ. J., Doc. 98 at 11, *City of Syracuse v. ATF*, No. 20-cv-6885 (S.D.N.Y. Jan. 29, 2021).

In addition to those general regulatory pronouncements, ATF specifically determined that the Polymer80 PF940 unfinished frame, which Plaintiffs allege several Defendants sold (*see* Rochester Compl. ¶¶ 309, 327, 341, 355, 367, 402, 460; Buffalo Compl. ¶ 301, 319, 333, 347, 359, 394, 452), was "not sufficiently complete to be classified as the frame or receiver of a firearm and thus . . . not . . . a 'firearm' as defined in the GCA." Letter from Michael R. Curtis, Chief, Firearms Tech. Indus. Serv. Branch, ATF, to Jason Davis, The Law Offices of Davis & Assoc., at 4 (Jan. 18, 2017).

On August 24, 2022, ATF changed its longstanding approach in a rulemaking that "sought to expand [the prior] definition" of "firearms," *Bondi v. VanDerStok*, 145 S. Ct. 857, 864 (2025), to include even  "partially complete . . . or nonfunctional frame[s] or receiver[s]." 27 C.F.R. § 478.12(c). At that time, the Unfinished Frame and Receiver Defendants immediately complied. But before that—in the period of time covered by the allegations in the Complaints here—the incontrovertible fact is that Defendants not only had every reason to believe that selling these products was lawful, they had affirmative assurances from the ATF on this point. *See VanDerStok*, 145 S. Ct. at 876 (Sotomayor, J., concurring) (explaining that a regulated entity can "eliminate uncertainty" about whether their product is a firearm "by seeking clarification from the agency" as Polymer80 did). The Supreme Court has long recognized that such agency interpretations "while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which . . . litigants may properly resort for guidance." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). Not only does such guidance prevent any

16

possible showing of a "knowing" mental state on the part of Defendants, it would be offensive to "traditional notions of fairness" to seek to hold Defendants liable for conduct that was affirmatively approved by the relevant federal agency. *United States v. Penn. Indus. Chem. Corp.*, 411 U.S. 655, 674 (1973); *cf.* Letter from Intervenor United States Department of Justice, *New York v. Arm or Ally*, No. 24-773 (2d Cir. Apr. 21, 2025), Doc. 133.1 ("[T]he Supreme Court's decision in *VanDerStok* . . . should not serve as a basis for punishing gun manufacturers for conduct that the [ATF] considered lawful at the time of the sales.").

### 3. Plaintiffs' alleged injuries were not proximately caused by any alleged predicate violation.

Even if Plaintiffs could show that Defendants knowingly violated some predicate statute, the facts alleged make clear that no such violation was a "proximate cause of the harm" allegedly suffered by the municipal governments of Buffalo or Rochester. 15 U.S.C. § 7903(5)(A)(iii). In adopting a strict federal proximate-cause requirement as a component of PLCAA's statutory immunity, Congress rejected the more flexible proximate-cause standard that some modern courts have adopted, which Congress viewed as improperly deviating from "hundreds of years of the common law." 15 U.S.C. § 7901(a)(7).

As the Supreme Court has explained, the traditional requirement of proximate cause under federal law requires a "direct relation between the injury asserted and the injurious conduct alleged." *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992). Indeed, the "general" rule has long been that proximate cause does not permit recovery for an injury that is "beyond the first step" of a causal chain. *Id.* at 271 (quoting *S. Pacific Co. v. Darnell-Taenzer Co.*, 245 U.S. 531, 533 (1918)). Under this standard, the law does not permit a "judicial remedy" for "every conceivable harm that can be traced to alleged wrongdoing." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132 (2014) (quotation omitted). After all, illegal acts always

"cause ripples of harm [that] flow far beyond" their immediate object. *Bank of America Corp. v. City of Miami*, 581 U.S. 189, 202 (2017). But liability has never followed "wherever those ripples travel." *Id*. Instead, liability is limited by direct—or proximate—cause.

In identifying sufficiently direct harm, the Supreme Court has emphasized that "foreseeability alone does not ensure the close connection that proximate cause requires." *Bank of America*, 581 U.S. at 202; *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 12 (2010). "If one takes a broad enough view, *all* consequences of a negligent act, no matter how far removed in time or space, may be foreseen. Conditioning liability on foreseeability, therefore, is hardly a condition at all." *Consol. Rail Corp. v. Gottshall*, 512 U.S. 532, 552–53 (1994). The "central question" is thus "whether the alleged violation led directly to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006). And where the "theory of liability rests . . . [on] separate actions carried out by separate parties" who caused the injury, the answer is no. *Hemi*, 559 U.S. at 11 (emphasis omitted).

In particular, when a state or city government claims harm as a result of third-party criminals misusing firearms, companies that manufacture or sell firearms are not a proximate cause because they do not directly cause the government's harm. Indeed, shortly before PLCAA's enactment in 2005, several court decisions held that proximate cause was lacking and rejected virtually identical claims brought by other state and city governments against the firearms industry.

In *City of Philadelphia v. Beretta U.S.A.*, 277 F.3d 415 (3d Cir. 2002), the Third Circuit dismissed a suit brought by the City of Philadelphia and non-profit groups, holding that their claims "failed for lack of proximate cause because their injuries are too remote from the gun manufacturers' alleged conduct." *Id*. at 422–23. The court emphasized that "[t]he causal connection between the gun manufacturers' conduct and the plaintiffs' injuries is attenuated and

18

weak," and that, "if we allowed this action, it would be difficult to apportion damages to avoid multiple recoveries and the district court would be faced with apportioning liability among, at minimum, the various gun manufacturers, the distributors, the dealers, the re-sellers, and the shooter." *Id*. at 426.

Likewise, in *Spitzer*, a New York appellate court dismissed New York State's statutory nuisance claim as "far too remote" from the conduct of the firearms industry. 309 A.D.2d at 103. The State alleged that firearm companies—many of the same ones here—created a "public nuisance, because they manufacture, distribute and market handguns allegedly in a manner that knowingly places a disproportionate number of handguns in the possession of people who use them unlawfully." *Id*. at 93. But the court held proximate cause was lacking because the companies' conduct was "far removed from the downstream, unlawful use of handguns" by third parties who Defendants did not "control." *Id*.

The high courts of Connecticut, Illinois, and the District of Columbia all reached the same conclusion. *See Ganim v. Smith & Wesson Corp*., 780 A.2d 98, 123 (Conn. 2001) (city's claim against firearm companies was too "indirect, remote, and derivative" to be viable); *Chicago v. Beretta, U.S.A. Corp*., 821 N.E.2d 1099, 1136 (Ill. 2004) (firearm companies' conduct was "so remote from the [City's] resulting injury that legal cause was not established"); *District of Columbia v. Beretta, U.S.A. Corp*., 872 A.2d 633, 638 (D.C. 2005) (en banc) (dismissing nuisance claim against firearm companies due to "the sheer number of causal links, and resulting attenuation, that underlie the District's claim of injury").

When Congress enacted PLCAA, it was well aware of these cases rejecting claims against firearms companies for lack of proximate cause. Indeed, Congress viewed such claims as invalid because they are based on "tenuous claim[s] of causality," punctuated by "many" steps that

separate the companies' conduct from any harm to the government. House Report at 13. The House Report described the typical chain of causation that Congress viewed as too attenuated: (1) Manufacturers lawfully "produce the firearms"; (2) then "sell them to federally licensed distributors"; (3) who "sell them to federally licensed dealers"; (4) after which, "some of the firearms are diverted by third parties into an illegal gun market"; (5) where "these firearms are obtained by people who are not licensed to have them"; (6) then are used "in criminal acts that do harm"; (7) which then "the city or county must spend resources combatting." *Id*.

Even removing several steps from this causal chain does not change the indirect nature of the theory: If a dealer sells a firearm to a customer subject to a proper background check, who then independently uses it to commit a crime, causing injuries to a victim, leading to city government costs, there are still multiple steps—including an independent intervening criminal act—that separate the dealer from the city's harm. That is just as true for an Unfinished Frame or Receiver Defendant who sold an item that was, at the time, not regulated as a firearm to a lawful purchaser who used the item to make their own firearm and then chose to use that firearm to commit a crime.

To prevent such attenuated chains of causation, PLCAA immunity applies except in the narrow circumstance where a company knowingly commits a particular statutory "violation" that proximately causes a particular injury: The statute requires that the "*violation* [be] a proximate cause," not merely that a company engaged in some *non-violative* conduct that proximately caused injury to the plaintiff. 15 U.S.C. § 7903(5)(A)(iii) (emphasis added).

Here, Plaintiffs do not even attempt to show that any particular violation caused them "direct" harm. *Holmes*, 503 U.S. at 268. Instead, they allege facts making clear that the chain of causation is *indirect*. The core of their theory is that "Defendants knew or should have known that (a) some of the firearms they manufacture and/or distribute would be diverted into the hands of

those who would violate the law, and (b) they could take steps to reduce the number of firearms that fall into the hands of criminals by changing their merchandising practices." Rochester Compl. ¶ 26; Buffalo Compl. ¶ 27. And they say Defendants should be liable for failing to take "measures" to "help ensure that the guns sold and distributed by Defendants do not find their way into a secondary illegal market," and for failing to "monitor, supervise or otherwise regulate the sale and distribution of their guns by their downstream distributors or dealer-customers," leading to violence and, in turn, leading to costs borne by the municipal governments. Rochester Compl. ¶¶ 27–28; Buffalo Compl. ¶¶ 28–29. That is the definition of indirect causation.

Indeed, the alleged causal chain here involves exactly the type of attenuation that defeats proximate cause. For example, a classic sign that a causal chain is too attenuated is that ascertaining damages and liability would be unworkable. *Anza*, 547 U.S. at 458–60. After all, "the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent factors." *Holmes*, 503 U.S. at 269. Just so here. Plaintiffs have gathered a broad collection of Defendants in this case, but that list barely scratches the surface of the long list of alleged bad actors—including unscrupulous dealers, straw purchasers, weapons smugglers, and violent criminals—who have contributed to Plaintiffs' alleged injuries. There is no way to apportion fault among all these actors, or to isolate the supposed causal role Defendants play in those alleged injuries, much less the causal role Defendants' alleged *statutory violations* play. *See City of Philadelphia*, 277 F.3d at 426.

The problem is compounded by the nature of Plaintiffs' alleged injuries, which are derivative rather than direct: The city governments of Buffalo and Rochester are not direct victims of violence committed by criminals wielding firearms, but rather allege that they must spend "law enforcement resources" to combat violence committed against *others* who are the criminals' direct

victims. Rochester Compl. ¶ 514; Buffalo Compl. ¶ 508. Where a plaintiff asserts such derivative injuries, the direct victims are "better situated plaintiffs" who can bring more appropriate claims. *Hemi*, 559 U.S. at 11–12; *Holmes*, 503 U.S. at 269–70. Thus, an "alleged harm" is "ordinarily" too attenuated "if the harm is purely derivative of the misfortunes visited upon a third person by the defendant's acts." *Lexmark*, 572 U.S. at 133. And that is clearly the case here. Victims in Buffalo or Rochester can sue the criminals who actually injure or threaten them. That is not only the traditional common-law rule, *City of Philadelphia*, 277 F.3d at 424–25 (discussing the City's "derivative injuries"); it is also the basic policy judgment Congress made in PLCAA. *See* 15 U.S.C. § 7901(a)(5).

Finally, since the lack of proximate cause here is readily apparent from the facts Plaintiffs themselves have alleged, dismissal on the pleadings is perfectly appropriate. "[L]ike any other element of a cause of action, [proximate cause] must be adequately alleged at the pleading stage in order for the case to proceed." *Lexmark*, 572 U.S. at 134 n.6. Thus, "[i]f a plaintiff's allegations, taken as true, are insufficient to establish proximate causation, then the complaint must be dismissed." *Id*. After all, if the facts alleged in the complaint cannot establish proximate cause as a matter of law, then the plaintiff is not "entitled to an opportunity to prove them." *Id*. Indeed, enforcing the proximate-cause requirement here on a motion to dismiss is essential to respecting the threshold statutory "immunity" that PLCAA provides, since allowing the case to proceed to discovery would impose exactly the type of litigation burdens that the statute was designed to prevent. *Smith & Wesson*, 605 U.S. at 299.

## II.   PLAINTIFFS' CLAIMS FAIL FOR LACK OF PROXIMATE CAUSATION UNDER NEW YORK LAW REGARDLESS OF PLCAA.

Even if the lack of proximate cause here did not bar Plaintiffs' claims under PLCAA, it would independently bar their claims under New York state law.

New York law has long required proximate cause for common-law nuisance claims. *Spitzer*, 309 A.D.2d at 104. New York courts have imposed this requirement because even if a plaintiff can "prove defendants caused or contributed to the nuisance," liability should not follow "no matter how far removed" from defendants' conduct. *Id*. at 103–04. Instead, "a line must eventually be drawn since there will be many instances in which a party may have contributed in some remote way and yet it is inappropriate to subject that party to tort liability." *Id*. The same principles readily apply to GBL 898, which is simply "New York's gun-related public nuisance statute." *Nat'l Shooting Sports Found., Inc. v. James*, 144 F.4th 98, 102 (2d Cir. 2025) ("*NSSF*"). Proximate cause is thus required for GBL 898.

Proximate cause is also a requirement for claims under GBL 349 and 350. Both claims require that Plaintiffs establish three elements:  "(1) the act or practice was consumer-oriented; (2) the act or practice was misleading in a material respect; and (3) the plaintiff was injured as a result." *Spagnola v. Chubb Corp*., 574 F.3d 64, 74 (2d Cir. 2009) (interpreting GBL 349); *see also Orlander v. Staples, Inc*., 802 F.3d 289, 300 (2d Cir. 2015) (same for GBL 350). "The third requirement, causation, requires that the act complained of be the proximate cause of the harm alleged." *King v. New York City Emps. Ret. Sys*., 212 F. Supp. 3d 371, 407 (E.D.N.Y. 2016).

Because Plaintiffs fail to allege facts supporting proximate cause, *see supra* 16–21, their claims fail even if PLCAA did not apply. It is equally clear under New York law as under federal law that Plaintiffs' alleged causal chain is far too remote. In *Hamilton v. Beretta U.S.A. Corp*., the New York Court of Appeals made clear that "broad liability . . . should not be imposed" on the firearms industry "without a . . . tangible showing that defendants were a direct link in the causal chain that resulted in plaintiffs' injuries." 96 N.Y.2d 222, 234 (2001). No such showing can be made where, as here, "the connection between defendants, the criminal wrongdoers and plaintiffs

23

is remote, running through several links in a chain consisting of at least the manufacturer, the federally licensed distributor or wholesaler, and the first retailer" and also "most often includes numerous subsequent legal purchasers or even a thief." *Id.*

Most importantly, Defendants "certainly had no control over the criminal conduct of [any] third party." *Forni v. Ferguson*, 232 A.D.2d 176, 177 (N.Y. App. Div. 1st Dep't 1996). As the New York appellate court recognized in *Spitzer*, in those circumstances, the court cannot "fairly hold defendants accountable for" the alleged harm from that conduct. *Spitzer*, 309 A.D.2d at 103. In *Spitzer*, claims against firearm "manufacturers, wholesalers and retailers" thus failed for lack of proximate cause. *Id.* at 92, 103. So too here.

## III.   THE COMPLAINTS FAIL TO PLEAD ANY VIOLATIONS OF GBL 898.

GBL 898 has two central provisions, both contained within GBL 898-b:  (1) "No gun industry member, by conduct either unlawful in itself or unreasonable under all the circumstances shall knowingly or recklessly create, maintain or contribute to a condition in New York state that endangers the safety or health of the public through the sale, manufacturing, importing or marketing of a [firearm]." (2) "All gun industry members who manufacture, market, import or offer for wholesale or retail sale any [firearm] in New York state shall establish and utilize reasonable controls and procedures to prevent its [firearms] from being possessed, used, marketed or sold unlawfully in New York state." GBL 898-b-(1)–(2).

Although the statute necessarily targets conduct in New York, Plaintiffs' allegations largely focus on out-of-state conduct or fail to identify where any alleged wrongdoing occurred. The limited New York conduct alleged, meanwhile, mostly consists of nothing more than the simple sale of firearms—a constitutionally protected activity that cannot on its own form the basis for GBL 898 liability. Plaintiffs thus fail to plead that any Defendant violated GBL 898.

### A.    Most of Defendants' Alleged Conduct Occurred in Other States, Beyond the Reach of GBL 898.

Although New York "sought to create a pathway to hold gun industry members civilly liable for their own illegal or unreasonable conduct where that conduct contributed to a public health crisis of gun violence," *NSSF*, 144 F.4th at 105, New York was inherently limited to imposing such liability based on conduct within its own jurisdiction. After all, under the federal Constitution, the Dormant Commerce Clause "precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State." *Id*. at 113 (quoting *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989)). Thus, a state statute violates the Dormant Commerce Clause if it "has the practical effect of extraterritorial control of commerce occurring entirely outside the boundaries of the state in question." *Id*. (quoting *Grand River Enters. Six Nations, Ltd. v. Boughton*, 988 F.3d 114, 123 (2d Cir. 2021)).

GBL 898 thus applies only to claims involving relevant conduct (i.e., the manufacture, import, sale, or marketing of firearms) occurring *within New York*. It cannot be used to regulate conduct that took place wholly outside New York's boundaries.

Yet *virtually all* of the alleged conduct in the Complaints—design, manufacture, and sale—occurred entirely in other States. Indeed, the Complaints emphasize that most of the firearms put to criminal use that are recovered in New York are purchased *outside of New York*, in states with less burdensome regulations, and only later smuggled or "diverted" by third-party criminals into the illegal secondary market in New York. *See, e.g.*, Rochester Compl. ¶¶ 131–33 ("74% of all guns recovered by law enforcement came from out of state . . . and 86% of all handguns recovered in New York crime scenes came into New York from out of state."); Buffalo Compl. ¶¶ 131–33 (same); Rochester Compl. ¶ 175 ("Handguns manufactured, imported or distributed by Defendants

25

are acquired in states and cities where gun regulations are lax, diverted to the illegal market in New York, and used to cause injury, death or the threat thereof to residents of the City . . . ."); Buffalo Compl. ¶ 166 (same). Plaintiffs also claim that Defendants "oversupply states with weak handgun controls and restrictions, such as certain states along the I-95 corridor, with substantially more handguns than will be purchased by legitimate purchasers in those states." Rochester Compl. ¶ 131; Buffalo Compl. ¶ 131. According to Plaintiffs, this leads "the oversupply" to "be sold to prohibited purchasers in states, counties and cities . . . which have strong restrictions on the purchase and ownership of firearms." Rochester Compl. ¶ 131; Buffalo Compl. ¶ 131.

These allegations might plausibly plead that Defendants' conduct ultimately has effects within the State of New York even when it occurs entirely in other States. But such in-state *effects* are not enough to bring out-of-state *conduct* within the scope of GBL 898. Otherwise, GBL 898 would plainly run afoul of the Dormant Commerce Clause, which "precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State." *Healy*, 491 U.S. at 336. Plaintiffs' theory, for example, would purport to penalize Defendants under New York law for allegedly selling too many firearms in "Florida, Georgia, North and South Carolina, Pennsylvania, Virginia, and Ohio," even if those sales were entirely lawful in the States where they occurred  Rochester Compl. ¶ 132; Buffalo Compl. ¶ 132. The Constitution does not tolerate attempts by one state to arrogate to itself power to directly regulate transactions in other jurisdictions.

Interpreting GBL 898 in this way would empower New York to assert "extraterritorial control of commerce occurring entirely outside the boundaries of the state." *NSSF*, 144 F.4th at 105 (quotation omitted). After all, the only way for a "gun industry member" to avoid liability under this reading of GBL 898 would be to comply with *New York's* firearm rules even when they

are engaged in business activity in other States with less burdensome regulations. That cannot be a correct reading of New York law, and it would be flagrantly unconstitutional. The Court should reject Plaintiffs' attempts to hold Defendants liable under GBL 898 for their out-of-state conduct.

**B.     None of the Manufacturer or Distributor Defendants' Alleged New York Conduct Violates GBL 898.**

Although GBL 898 can only be applied to New York conduct, the Complaints offer only sparse allegations about Defendants' conduct within New York. None of the alleged conduct in New York by Manufacturer or Distributor Defendants is unlawful or even "unreasonable," and thus none of it comes within GBL 898. Specifically, the Complaints allege that:

- "[E]ach of the Defendants regularly did business, and/or solicited business and/or engaged in other persistent courses of conduct within the State of New York," Rochester Compl. ¶ 41; Buffalo Compl. ¶ 42;

- "Defendants, at the time of placing their parts into the stream of commerce, could have foreseen, realized, expected and/or anticipated that the product might eventually be found in New York by reason of its nature and Defendants' business practices," Rochester Compl. ¶ 46; Buffalo Compl. ¶ 47;

- "Beretta operates a gallery in New York located at 718 Madison Avenue, New York, NY 10065," Rochester Compl. ¶ 51; Buffalo Compl. ¶ 52;

- "RSR has a location at 20 Cedarfield Commons, Rochester, NY 14612," Rochester Compl. ¶ 81; Buffalo Compl. ¶ 81;

- Defendants Vintage Firearms LLC, Wolcott Guns Inc., and Gun Center Inc. each "marketed, distributed, and/or sold firearms in New York," Rochester Compl. ¶¶ 80, 82–83; Buffalo Compl. ¶¶ 80, 82–83;

- Certain Defendants are headquartered and/or incorporated in New York, Rochester Compl. ¶¶ 59, 80, 82–83; Buffalo Compl. ¶¶ 60, 80, 82–83;

- Many of Defendants' websites list dealers or distributors within New York, Rochester Compl. ¶¶ 50–51, 53–55, 57–65, 79; Buffalo Compl. ¶¶ 51–52, 54–56, 58–66, 79;

- "Each Defendant has sold, and continues to sell, manufacture, assemble, import, distribute, and/or market 'Qualified Products' in the City and New York State," Rochester Compl. ¶¶ 533, 556; Buffalo Compl. ¶¶ 527, 550.

None of this alleged conduct is either "unlawful in itself or unreasonable under all the circumstances," nor do any of these allegations show that any defendant has failed to "establish and utilize reasonable controls and procedures to prevent its qualified products from being possessed, used, marketed or sold unlawfully in New York state." GBL 898-b-2.

To the contrary, Plaintiffs do not allege that any of the alleged problems with Defendants' merchandising practices are problems *in New York* specifically—they do not claim, for example, that any illegal sales at gun shows (Rochester Compl. ¶¶ 116–19; Buffalo Compl. ¶¶ 116–19) took place in New York, that any of the so-called "non-stocking" or "kitchen-table" dealers that Defendants have purportedly "sold through" (Rochester Compl. ¶¶ 120–22; Buffalo Compl. ¶¶ 120–22) are located in New York, that any of the small minority of dealers who "are corrupt" and who Defendants allegedly "should not do business with" (Rochester Compl. ¶¶ 129–30; Buffalo Compl. ¶¶ 129–30) are in New York, or that any of the licensed firearms dealers "with poor security arrangements" or who "falsely report thefts to conceal trafficking" are in New York (Rochester Compl. ¶ 131; Buffalo Compl. ¶ 131). Instead, Plaintiffs assert only that some of the firearms initially sold through such means are eventually "diverted to the secondary market in New

28

York," regardless of where they originated. Plaintiffs also notably fail to allege that any of the Manufacturer or Distributor Defendants' conduct within the State violates any of the extensive federal, state, or local regulations on firearms.

In short, Plaintiffs allege nothing more than the distribution and sale of firearms within New York, without alleging anything problematic about those sales. Particularly coupled with Plaintiffs' allegations that the overwhelming majority of firearms recovered from crime scenes in New York originate in other states, Plaintiffs provide no reason to believe that any of their alleged injuries are caused by unlawful or unreasonable practices within New York. Plaintiffs thus fail to allege anything that could fall within GBL 898's prohibitions.

Indeed, to the extent GBL 898 could be interpreted to prohibit the mundane commercial behavior the Manufacturer and Distributor Defendants allegedly engage in within New York, it would violate the Second Amendment. While New York may be able to "impos[e] conditions and qualifications on the commercial sale of arms," *District of Columbia v. Heller*, 554 U.S. 570, 626–27 (2008), it certainly cannot ban the sale of firearms outright. *See, e.g.*, *Illinois Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d 928, 947 (N.D. Ill. 2014) (holding Chicago ordinances "which ban gun sales and transfers other than inheritance . . . unconstitutional under the Second Amendment"); *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) ("[T]he core Second Amendment right to keep and bear arms . . . 'wouldn't mean much' without the ability to acquire arms.") (abrogated in part on other grounds); *Radich v. Guerrero*, No. 1:14-CV-00020, 2016 WL 1212437, at *7 (D. N. Mar. I. Mar. 28, 2016) ("If the Second Amendment individual right to keep and bear a handgun for self-defense is to have any meaning, it must protect an eligible individual's right to purchase a handgun, as well as the complimentary right to sell handguns."). Yet interpreting the New York conduct alleged in the Complaint—merely lawfully selling firearms

29

in New York or placing them into the stream of commerce expecting that they might eventually enter New York—as violating GBL 898 would amount to just such a ban. The Court should not interpret GBL 898 to raise this significant constitutional problem, and should dismiss Plaintiffs' claims based on the simple sale of firearms in New York. *See In re Jamie J.*, 89 N.E.3d 468, 471 (N.Y. 2017) (under New York law, "canon of constitutional avoidance" requires courts to "construe the statute, if possible, to avoid" constitutional concerns).

C. **None of the Partially Unfinished Frame and Receiver Defendants' Alleged New York Conduct Violates GBL 898.**

Plaintiffs claim that the Partially Unfinished Frame and Receiver Defendants violated GBL 898 by selling unfinished products that qualified as "firearm[s]," while failing to comply with regulations that govern "firearm" sales. As discussed above, however, prior to the ATF's changing the definition of "firearm" in August 2022, and the Supreme Court's finally settling the legality of that change in 2025, Defendants had every reason to trust that the definition excluded their products. *See Skidmore*, 323 U.S. at 140. As soon as ATF changed the definition of "firearm" to include certain partially unfinished frames and receivers, the relevant Defendants immediately complied. And the Complaints do not allege any facts showing that they made any unlawful sales of unfinished products *after* ATF changed its regulatory guidance in August 2022.

The fact that Defendants previously sold unfinished frames and receivers without complying with laws restricting the transfer of "firearms" does not show that their conduct was "unlawful or unreasonable under all the circumstances" *at the time*. Again, fundamental notions of fairness prevent retroactively applying the federal definition of "firearm" that was later *expanded* to cover their products. This is not a case in which Defendants acted in "open defiance . . . of a [legal] requirement which ha[d] been made specific and definite," *Screws v. United States*, 325 U.S. 91, 105 (1945) (plurality op.), but rather one in which they had their legal

30

activities declared unlawful only later. And even if that situation could, somehow, constitute a violation of the statute itself, it could not possibly be a "knowing" violation under PLCAA for reasons laid out above.

## IV.  IMPOSING LIABILITY AGAINST THE UNFINISHED FRAME OR RECEIVER DEFENDANTS WOULD VIOLATE DUE PROCESS.

The Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. CONST., amend. V. "[E]ssential to the protections provided by the Due Process Clause" is the "fundamental principle . . . that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox*, 567 U.S. 239, 253 (2012). The claims against the Unfinished Frame or Receiver Defendants all contravene this fundamental principle because each rests, directly or indirectly, on their having sold "firearms" without complying with relevant legal restrictions on firearm sales before the ATF "expand[ed]" its definition of "firearms," *VanDerStok*, 145 S. Ct. at 864, and when, as discussed above, the Defendants had assurances from ATF that their products were not "firearms" and not subject to those restrictions.

In his concurrence in *VanDerStok*, Justice Kavanaugh highlighted the risk of exactly this sort of ex post facto attack on compliance with the prior regulatory position of the agency. He emphasized that the Government had stated at oral argument that it would "likely" not charge someone for failing to conduct a background check where the individual was unaware that the item being sold was a firearm for which a background check was required. *VanDerStok*, 145 S. Ct. at 877 (Kavanaugh, J., concurring). And he warned that, "if the Government were to charge a background-check violation against an individual who was unaware that he was violating the law, that defendant might have a due process argument based on lack of fair notice." *Id.*

This case demonstrates that Justice Kavanaugh's concerns were unfortunately not hypothetical, but his solution is a sound one; these claims should be dismissed as contrary to due process. A law that fails to give fair notice to the regulated parties is concerning because it permits "those enforcing the law . . . [to] act in an arbitrary or discriminatory way." *Fox*, 567 U.S. at 253. And that is plainly the case here. Throughout the Complaints, Buffalo and Rochester attempt to tie a number of criminal acts by third parties to the conduct of the Unfinished Frame or Receiver Defendants, solely because those Defendants sold products through a process that was understood by all actors to be lawful at the time. If New York law permits such enforcement based on conduct that only appears unlawful in the rearview mirror, then New York law is incompatible with due process.

And just as in *Fox*, policing these bounds carefully is particularly important in this case, because the sale of "firearms," as the Complaints allege these items were, is protected by the Second Amendment. *See supra* 28–29. Suits like this, aimed at chilling constitutionally protected activity by making compliance with the law today no safeguard against a prosecution tomorrow, are doubly pernicious. *Cf. Fox*, 567 U.S. at 253–54 ("When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech.").

## V.    THE GBL 349 AND GBL 350 CLAIMS FAIL.

Finally, Plaintiffs assert claims for deceptive business practices in violation of GBL 349 and 350, which prohibit "deceptive acts or practices" and "false advertising," respectively. Rochester Compl. ¶¶ 560–79; Buffalo Compl. ¶¶ 554–73. The Complaints advance two theories as to why the Defendants' advertising runs afoul of these provisions:  First, they suggest the advertisements are false or misleading. Second, they suggest the advertising illegally encourages unlawful violence. Both theories are wrong—Plaintiffs fail to identify anything false or misleading

32

in Defendants' advertising or any facts to support their claim that Defendants' advertising encourages unlawful conduct. But Plaintiffs' claims also fail for three even more fundamental reasons:  (1) they lack standing to bring GBL 349 or 350 claims; (2) they fail to plead *any* advertising by many of the Defendants; and (3) they fail to allege that their damages were caused by transactions in New York in which the consumer was deceived.

### A.     Plaintiffs Lack Statutory Standing to Assert GBL 349 or 350 Claims.

New York courts have long held "that allegations of indirect or derivative injuries will not suffice" to create statutory standing for a false or deceptive marketing claim. *City of New York v. Smokes-Spirits.Com, Inc*., 12 N.Y.3d 616, 623 (2009). In *Smokes-Spirits*, the New York Court of Appeals rejected a GBL 349 claim brought by the City of New York as derivative, and thus barred, because "had the allegedly deceived consumers not been improperly induced to purchase defendants' cigarettes then the City would have no claim." *Id*. at 622. Similarly, in *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris USA Inc*., 3 N.Y.3d 200 (2004), the New York Court of Appeals rejected an insurer's GBL 349 claim because the insurer's alleged injury was "indirect"— and thus not compensable—"because the losses it experienced arose wholly as a result of smoking related illnesses suffered by [its] subscribers." *Id*. at 207.

Just so here. As discussed above, Plaintiffs' injuries are all derivative. Indeed, they are even more derivative than those in *Smokes-Spirits* or *Blue Cross*:  the alleged injuries to Plaintiffs require not just that firearms consumers be deceived, but that some allegedly deceived consumers go on to injure others through criminal misuse of firearms they purchase. Plaintiffs' alleged injuries are thus not actionable under GBL 349 and 350, and the claims should be dismissed.

**B.      Plaintiffs Do Not Identify Any Advertising by Most Defendants.**

While Plaintiffs assert their marketing claims against all Defendants, they fail to identify *any* advertisements by many of the Defendants,[7] instead relying on a handful of examples from a few Defendants, plus broad allegations about advertising by "[g]un manufacturers" or "sellers" in general. *See* Rochester Compl. ¶¶ 201, 205; Buffalo Compl. ¶¶ 192, 196. That type of group pleading is improper. Plaintiffs do not (and cannot) assert that the Defendants advertised collectively, produced identical (or materially identical) advertisements, or otherwise bear communal responsibility for any alleged instances of false or misleading advertising. And without pointing to *particular* advertising by each Defendant that is allegedly false or misleading, Plaintiffs fail to "give each defendant fair notice of the conduct underlying the claims." *Agudelo v. Recovo Mortg. Mgmt. LLC*, No. 22-CV-4004, 2025 WL 1674486, at *11 (E.D.N.Y. June 13, 2025) (dismissing claims where "pervasive group pleading in the [complaint] render[ed] it impossible to discern who did what"). The GBL 349 and 350 claims asserted against these Defendants should be dismissed for this reason, as well.

**C.      Plaintiffs Do Not Allege Any New York Transactions in which a Consumer Was Deceived.**

As a final threshold problem, Plaintiffs fail to allege that their injuries were caused by *New York* transactions in which a consumer was deceived by Defendants' advertising. Instead, as

---

[7] Specifically, Plaintiffs do not identify advertisements from any of the Distributor Defendants (Bangers, RSR, Vintage, and Wolcott) or from Manufacturer Defendants Beretta, Colt's, Glock, Hi-Point, Kel-Tec, Mossberg, RemArms, Savage Arms, Springfield, or Taurus. Plaintiffs similarly fail to allege any advertisement or other statement made by Unfinished Frame or Receiver Defendant Primary Arms. The sole advertisement cited by Defendant Ruger, meanwhile, is from 2010 (Rochester Compl. ¶ 205; Buffalo Compl. ¶ 196)—meaning the three-year statute of limitations for any GBL 349 or 350 claim based on this ad has long since run. *See, e.g.*, *City of New York v. Exxon Mobil Corp.*, 226 N.Y.S.3d 863, 883 (N.Y. Sup. Ct. 2025).

discussed above, Plaintiffs focus extensively on injuries caused by alleged out-of-state transactions. *See supra* 24–26. But those transactions cannot form the basis of any claims under GBL 349 or 350—New York law is clear that "the transaction in which the consumer is deceived must occur in New York." *Goshen v. Mut. Life Ins. Co. of New York*, 98 N.Y.2d 314, 324 (2002). A contrary interpretation, after all, "would tread on the ability of other states to regulate their own markets and enforce their own consumer protection laws." *Id.* at 325. Yet Plaintiffs fail to allege that any of the allegedly deceptive advertising was seen by consumers in New York, much less that it motivated transactions in New York that proceeded to cause injuries to Plaintiffs. This, too, provides an independent basis to dismiss Plaintiffs' GBL 349 and 350 claims.

### D.    The Advertising is Not False or Misleading.

The handful of Defendants' advertisements Plaintiffs do cite consist of accurate, non-misleading factual assertions paired with inactionable (and constitutionally protected) opinion, none of which can support liability under GBL 349 or 350.

Plaintiffs' primary theory of falsity appears to be that "the promotion of an association between Defendants' products and military and law enforcement personnel is false, unfair, deceptive, and unlawful." Rochester Compl. ¶¶ 566, 576; Buffalo Compl. ¶¶ 560, 570. But the ads at issue simply suggest the advertised products were similar to those lawfully and properly used by the military and police—a reality that even the Plaintiffs' own allegations acknowledge. For example, the Complaints cite a Smith & Wesson ad depicting a rifle as "the chosen one" that is "selected by professionals," alongside "the insignia of police, sheriff, highway patrol, and other law enforcement." Rochester Compl. ¶ 205; Buffalo Compl. ¶ 196. They go on to allege that "only a small percentage of Smith & Wesson's overall sales are to law enforcement, and those appear to be mostly handguns, not rifles." Rochester Compl. ¶ 205; Buffalo Compl. ¶ 196. But that

allegation confirms that Smith & Wesson *does* sell rifles to law enforcement, as the ad suggests. Similarly, Plaintiffs cite Sig Sauer's claim that the original version of one of its products was "conceived for the demands of the Special Operations community" (Rochester Compl. ¶ 205; Buffalo Compl. ¶ 196), but do not even allege that this explanation of the origin of the product is untrue. Plaintiffs thus fail to identify anything false or misleading in these ads, or any of the other ads they cite.

Instead, Plaintiffs pivot to citing inactionable opinions, like a Bushmaster ad that "depicts an AR-15 with the caption, 'Consider your mancard reissued'" and a Smith & Wesson ad depicting a rifle as "Pure Adrenaline." Rochester Compl. ¶ 205; Buffalo Compl. ¶ 196. Such "subjective claim[s] about a product that cannot be proven either true or false" are not actionable under GBL 349 or 350. *Mogull v. Pete & Gerry's Organics, LLC*, 588 F. Supp. 3d 448, 453–54 (S.D.N.Y. 2022) (cleaned up). Nor are other "vague and non-specific" statements. *Dwyer v. Allbirds, Inc.*, 598 F. Supp. 3d 137, 154 (S.D.N.Y. 2022). After all, the idea that purchasing an AR-15 would make the consumer's "status at the top of the testosterone food chain . . . irrevocable," and similar statements (Rochester Compl. ¶ 205; Buffalo Compl. ¶ 196), are exactly the type of "generalized or exaggerated statements which a reasonable consumer would not interpret as a factual claim upon which he could rely." *Fink v. Time Warner Cable*, 810 F. Supp. 2d 633, 644 (S.D.N.Y. 2011). It is thus classic "non-actionable puffery." *Id*.

Nor are the statements attributable to the Partially Unfinished Frame or Receiver Defendants actionably false or misleading. Plaintiffs claim that these Defendants "misrepresent[ed] directly or by implication, in their advertising and elsewhere, that it is legal for consumers to buy and possess these products, that only completed guns need to be sold by a dealer with an FFL" and made several other statements regarding the legality of their products with which

the Plaintiffs disagree. Rochester Compl. ¶¶ 563, 573; Buffalo Compl. ¶¶ 567, 557. But each of the statements Plaintiffs identify are simply statements of the Defendants' opinion as to the status of the law surrounding their products. For example, the Plaintiffs cite a statement on Salvo's website that it "does NOT sell firearms." Rochester Compl. ¶ 336; Buffalo Compl. ¶ 328. But that statement was merely an assertion that the items Salvo sold were not, in its view, firearms under federal law—as indeed, the ATF had at the time determined they were not.

It is a fundamental legal principle that statements of opinion are not actionable as false or misleading statements under GBL 349 or 350. *See Groden v. Random House, Inc.*, 61 F.3d 1045, 1051 (2d Cir. 1995) (Lanham Act); *see also Avon Prods. Inc. v. S.C. Johnson & Son, Inc.*, 984 F. Supp. 768, 800 (S.D.N.Y. 1997) (Sotomayor, J.) (noting the same standards control Lanham Act claims and claims under GBL 349 and 350). That is no less true of statements of legal opinion. "It is well settled that fraud cannot be predicated upon misrepresentations of law or misrepresentations as to matters of law." *Carolina Cas. Ins. Co. v. Capital Trucking, Inc.*, 523 F. Supp. 3d 661, 680 (S.D.N.Y. 2021). "Absent a clear and unambiguous ruling from a court or agency of competent jurisdiction, statements by laypersons that purport to interpret the meaning of a statue or regulation are opinion statements, and not statements of fact." *Coastal Abstract Serv., Inc. v. First. Am. Title Ins. Co.*, 173 F.3d 725, 731 (9th Cir. 1999). As such, courts have declined to find fraud in cases closely analogous to this one, such as where a taxi company asserted that it was "authorized" under D.C. law to provide certain services, *Dial A Car, Inc. v. Transp., Inc.*, 82 F.3d 484, 488 (D.C. Cir. 1996), or where a cough-syrup manufacturer labeled an ingredient "inactive" despite FDA regulations treating it as "active," *Sandoz Pharma. Corp. v. Richardson-Vicks, Inc.*, 902 F.2d 222 (3d Cir. 1990). As the D.C. Circuit explained, it would be "unthinkable" to treat statements on such legal issues as actionable because defendants would then become liable "for failing to

37

anticipate the *court's* subsequent interpretation" of the law. *Dial A Car*, 82 F.3d at 489.

That is precisely what Plaintiffs are trying to do in this case. Every single alleged statement by the Unfinished Frame or Receiver Defendants was made in the absence of any determination that their products were firearms. Far from it, in fact, because the ATF's prior determinations provided assurances that their products *were not* firearms. Even when the Supreme Court eventually (two and a half years later) held that "at least some" unfinished items and parts kits could be properly designated as "firearms," it declined to hold specifically that each of the items about which Defendants made assertions are properly so categorized. *VanDerStok*, 145 S. Ct. at 869. "To simplify their content only a bit," *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 186 (2015), statements by these Defendants that their products were legal or that they did "NOT sell firearms" (*see* Rochester Compl. ¶ 336; Buffalo Compl. ¶ 328), amount to nothing more than the "sincere statement of pure opinion" that "we believe we are obeying the law," *Omnicare*, 575 U.S. at 186.

It is manifestly unfair to try to hold the Unfinished Frame or Receiver Defendants liable for past statements that tracked ATF guidance, just because they turned out to be incorrect (or rather, were *made* incorrect by a change in the law). Indeed, for more than 100 years, New York courts have roundly rejected imposing liability for this type of statement about the law that later turns out to be incorrect. *See Trs. of Amherst Coll. v. Ritch*, 151 N.Y. 282, 322 (1897) ("[O]ne who neither withholds nor misstates the facts cannot be adjudged guilty of fraud simply because the courts finally decide the law to be other than he claimed it to be."); *Cucchiaro v. Cucchiaro*, 627 N.Y.S.2d 224, 229 (N.Y. Sup. Ct. Orange Cnty. 1995) ("[L]iability cannot be founded upon an erroneous opinion of the status of the law"). To hold otherwise "would make nearly every unsuccessful litigant guilty of fraud." *Amherst College*, 151 N.Y. at 322.

38

### E.     The Advertising Does Not Advocate Unlawful Conduct.

Plaintiffs also assert that the Defendants' advertising runs afoul of GBL 349 and 350 because it supposedly encourages unlawful conduct. But New York courts have not applied GBL 349 or 350 to prohibit advertising advocating or encouraging unlawful conduct. Although some courts interpreting *other* consumer-protection statutes addressing "unfair" business practices have interpreted them to cover such advertising, GBL 349 and 350 do not broadly prohibit "unfair" business practices. Instead, they are targeted more specifically at "deceptive" practices (GBL 349) or "false" advertisements (GBL 350). Each thus requires that the plaintiff identify conduct or an advertisement that was "materially misleading." *Smokes-Spirits*, 12 N.Y.3d at 621 (interpreting GBL 349); *Orlander*, 802 F.3d at 300 (same for GBL 350). Because Plaintiffs have failed to identify anything false or misleading about the advertisements at issue, *see supra* 34–37, their GBL 349 and 350 claims necessarily fail.

Even if Plaintiffs were right that GBL 349 and 350 prohibit the promotion of illegal conduct, however, they fail to plausibly allege that any Defendant encouraged or promoted illegal conduct. For example, the Complaints allege that some Defendants "knowingly market[ed], advertis[ed], and promot[ed] AR-15-style assault weapons for civilians to use to carry out massive, military-style combat missions against their perceived enemies," and that all Defendants "directed their marketing and advertising to the illegal secondary criminal market, as well as to the public at large." Rochester Compl. ¶¶ 564–65, 574–75; Buffalo Compl. ¶¶ 558–59, 568–69. But the Complaints offer no factual allegations to support those conclusory claims. None of the ads reproduced or quoted in the Complaints contain any language promoting any illegal conduct, nor do they depict—much less glorify—criminals or criminal acts. To the contrary, two of the ads depict recreational target practice, one ad depicts what appears to be five members of the military

working in a warzone, and the remaining ads simply depict the firearms themselves, without showing any potential uses. Rochester Compl. ¶ 205; Buffalo Compl. ¶ 196. As the Complaints emphasize, many of the ads associate the firearms at issue with the military and law enforcement— but far from promoting criminal conduct, such an association promotes the *lawful* use of guns. After all, while the police and military obviously use firearms, they are expected to do so legally. Regardless of any advertising by Defendants, "[t]he public is fully aware that the police and military use firearms." *Estados Unidos Mexicanos v. Smith & Wesson Brands, Inc*., 633 F. Supp. 3d 425, 453 (D. Mass. 2022), *rev'd and remanded*, 91 F.4th 511 (1st Cir. 2024), *rev'd and remanded*, 605 U.S. 280. And "[a]n image depicting an officer's *lawful* use of a firearm does not suggest to the reasonable consumer that they should engage in *criminal*, 'combat-like' conduct." *Id*. at 453–54 (emphasis added).

Plaintiffs also suggest, at times, that certain Defendants "use the imagery of first-person shooter video games to market their products," or otherwise "enter into licensing agreements to have their weapon featured in first-person shooter video games," claiming that these ads "mimic first-person shooter video games popular with children." Rochester Compl. ¶¶ 29, 205; Buffalo Compl. ¶¶ 30, 196. But "first-person shooter" imagery in ads simply reflects how customers would actually experience using the product, including for lawful purposes such as target shooting (the activity actually depicted in the "first-person shooter" ads Plaintiffs reproduce, Rochester Compl. ¶ 205; Buffalo Compl. ¶ 196). Plaintiffs do not claim that any of these ads depict or glorify criminal conduct. And in any event, video games' popularity is not limited to "children"—video games are extraordinarily popular among many adults, as well. Any supposed connection to video games falls far short of encouraging unlawful use of firearms.

Finally, Plaintiffs contend that Defendants' marketing "emphasizes firearm characteristics

such as their high capacity and ease of concealment, which appeals to prospective purchasers who have criminal intent." Rochester Compl. ¶¶ 1, 31, 523, 551; Buffalo Compl. ¶¶ 1, 32, 517, 545. Plaintiffs do not identify any ads that emphasize any firearms' "ease of concealment," and none of the ads cited in the Complaints even reference the possibility of concealing firearms. Regardless, Plaintiffs fail to explain how truthfully advertising the characteristics of the products at issue, including their capacity, uniquely appeals to criminals—target shooting, for example, is a popular recreational activity whose participants also value those characteristics. And individuals focused on other lawful uses, such as personal or home defense, might also be interested in such products, or in products that can easily be concealed. Indeed, "the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home," and "the vast majority of States" issue concealed-carry permits. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 10, 13 (2022).

Courts have thus long rejected the contention that firearms manufacturers or sellers should face liability for "highlight[ing] their [weapons'] destructive capabilities," even where doing so could make weapons "attractive to criminals." *McCarthy v. Sturm, Ruger & Co.*, 916 F. Supp. 366, 369 (S.D.N.Y. 1996), *aff'd*, 119 F.3d 148 (2d Cir. 1997). Courts have even declined to impose liability for advertisements highlighting gun features alleged to appeal *primarily* to criminals, such as "excellent resistance to fingerprints." *Merrill v. Navegar, Inc.*, 26 Cal. 4th 465, 471 (2001). The advertisements identified in the Complaints do not even approach that line. Defendants' advertising the ordinary features of their firearms, for perfectly lawful purposes, does not even remotely encourage or promote illegal conduct. A contrary interpretation would open up all sorts of manufacturers to similar claims: car makers for advertising that "encourages" speeding, or beer companies for ads that "promote" public intoxication. GBL 349 and 350 do not extend so far.

And for the reasons already laid out above, the Partially Unfinished Frame and Receiver Defendants cannot be considered to have advocated unlawful conduct or misled their consumers when they were making opinion statements about a legal question and asserting that, in their view, they were following the law. While the Supreme Court has subsequently held that, in fact, some of these unfinished items can now be classed as firearms, that does "not show that the law was clear at the time [Defendants] made the alleged misstatements." *Dial A Car*, 82 F.3d at 489; *see also Omnicare*, 575 U.S. at 186 (explaining that opinions of legality remain unactionable opinions "regardless whether [a plaintiff] can ultimately prove the belief wrong").

## VI.    IMPOSING LIABILITY FOR THE ALLEGED ADVERTISING WOULD VIOLATE THE FIRST AMENDMENT.

Even if Plaintiffs could somehow establish a cause of action under GBL 898, 349, or 350 based on the advertising discussed in the Complaint, it would violate the First Amendment. The Supreme Court has long held that the First Amendment protects the advertising of lawful products, including dangerous ones. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 577 (2011); *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 377 (2002); *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 571 (2001); *Greater New Orleans Broad. Ass'n v. United States*, 527 U.S. 173, 194 (1999). That holds true even where the advertisements highlight product features that make them dangerous. *See, e.g.*, *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 492 (1996) (protecting advertisements emphasizing "bargain prices for liquor," which could be read to encourage binge drinking).

To be sure, there are narrow exceptions for false advertising or for incitement of unlawful conduct. But Plaintiffs' allegations fall far short of satisfying either exception, and "new categories of unprotected speech may not be added to the list" based on the idea that "certain speech is too harmful to be tolerated." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 791 (2011). Because the speech at issue here is fully protected under the First Amendment, all claims based on the

42

Defendants' speech must be dismissed.

### A.  The Complaints Do Not Satisfy the First Amendment Exception for False and Misleading Commercial Speech.

Governments may "prevent the dissemination of commercial speech that is false, deceptive, or misleading." *Zauderer v. Off. of Disciplinary Couns. of Supreme Ct. of Ohio*, 471 U.S. 626, 638 (1985). But because so much speech can be labeled "misleading" (especially by those who disagree with it), courts strictly police this exception, and do not allow plaintiffs to rely on the "rote invocation of the words 'potentially misleading.'" *Ibanez v. Fla. Dep't of Bus. & Pro. Regul., Bd. of Acct.*, 512 U.S. 136, 146 (1994); *see also Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 765 (1976). To pass First Amendment muster, plaintiffs must identify specific features of an advertisement that are "inherently misleading" to consumers or that "ha[ve] proved to be misleading in practice." *In re R.M.J.*, 455 U.S. 191, 207 (1982); *accord Edenfield v. Fane*, 507 U.S. 761, 774 (1993). Plaintiffs cannot do so here.

First, as noted above, the Complaints do not identify anything false or misleading about any of Defendants' advertisements. Nor is there anything in the Complaints suggesting that anyone who saw the ads would be misled about the features of the products in question. To the contrary, Plaintiffs' complaint seems to be that the ads *accurately* describe the products' features. This alone forecloses liability on this basis.

Second, the exception for false or misleading commercial speech does not apply when the alleged falsity does not concern a "commercial aspect" of the advertising, but rather targets advertising based on its underlying *viewpoint. See Linmark Assocs., Inc. v. Twp. of Willingboro*, 431 U.S. 85, 96 (1977); *see also, e.g., R.A.V. v. City of St. Paul*, 505 U.S. 377, 388–89 (state may restrict advertising that poses "risk of fraud," but "may not prohibit only that commercial advertising that depicts men in a demeaning fashion"). That is, advertising cannot be censored

based on the "ideas conveyed [or the] form of expression." *Carey v. Populations Servs. Int'l*, 431 U.S. 678, 701 n.28 (1977). For example, while a seller of contraceptives could face suit for falsely advertising the price or efficacy of its products, it could not face suit for distributing advertisements containing supposedly "false" statements about the morality or social utility of contraception. *Id*. Whereas the former implicates empirical facts about the product, the latter touches on matters of social and political concern that fall in the heartland of First Amendment protection.

Here, Plaintiffs take no issue with the commercial aspects of the Defendants' advertising. They do not claim that Defendants deceived their customers about the prices or features of their products, nor do they claim that the ads sow disinformation inhibiting a "fair bargaining process." *44 Liquormart*, 517 U.S. at 501. Rather, Plaintiffs take issue with the viewpoint of Defendants' speech, by attacking the alleged underlying message that firearm ownership, and ownership of the firearms being advertised in particular, is lawful and proper, and can even be righteous and noble. Plaintiffs presumably disagree with that view—but that is not the type of message that the First Amendment allows the state to deem "false" as a matter of law.

The bottom line is that Plaintiffs would prefer that firearms not be readily available. But whether such products should be owned or used by private citizens is a matter of opinion—a hotly contested political question—and acceptable answers to that question cannot be dictated by the State. Where an advertisement merely promotes "the availability of products" that are "not only entirely legal . . . but constitutionally protected," it cannot be subject to censorship based on the State's view that the products should not be purchased or used. *Carey*, 431 U.S. at 701 & n.28.[8]

---

[8] For the same reasons, Plaintiffs' allegations that "[e]xtremist imagery" has appeared on unspecified "merchandise" at industry conventions or in "advertisements by major gun manufacturers" (Rochester Compl. ¶ 205; Buffalo Compl. ¶ 196) does nothing to support their claims. To the contrary, these allegations only confirm that Plaintiffs impermissibly seek to impose

### B.    The Complaints Do Not Satisfy the First Amendment Exception for Speech Advocating Unlawful Conduct.

The Complaints also fail to allege any facts showing that the Defendants' advertising falls within the First Amendment exception for the advocacy of unlawful conduct. The First Amendment allows the state to prohibit certain commercial speech if it actively proposes unlawful transactions. For instance, the government can prohibit newspaper ads "proposing a sale of narcotics or soliciting prostitutes." *Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels*., 413 U.S. 376, 388 (1973). But the ads at issue here promote activity—selling and owning firearms—that is not just legal, but is also constitutionally protected.

Outside of the context of proposing an illegal transaction, truthful commercial speech is protected by the First Amendment unless it amounts to "incitement." *See Carey*, 431 U.S. at 701; *see also Reilly*, 533 U.S. at 579 (Thomas, J., concurring in part and concurring in judgment). And that exception is exceedingly narrow. The plaintiff must show that: (1) the speaker advocated "lawless action," (2) "the speaker intends that his speech will result in . . . lawless action," and (3) "the imminent use of . . . lawless action is the likely result." *Bible Believers v. Wayne Cnty*., 805 F.3d 228, 246 (6th Cir. 2015) (en banc) (citing *Brandenburg*, 395 U.S. 444). Here, the allegations do not even arguably amount to incitement under any of the three prongs.

First, as noted above, none of the advertising discussed in the Complaints says a single word supporting unlawful conduct. As to accompanying visuals, the U.S. Supreme Court has squarely rejected the view that merely depicting the use of firearms can be censored because it

---

liability based on viewpoint, not based on anything false or misleading in the advertisements at issue.

implicitly encourages violence in the abstract. *See, e.g.*, *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794 (2011) (striking down a restriction on selling violent video games).

Second, the Complaints do not (and cannot) allege facts plausibly showing that the Defendants *intended* for their advertising to incite violence. At best, they allege that these Defendants "knew" some of their products would be diverted to, and ultimately misused by, criminals. Rochester Compl. ¶ 26; Buffalo Compl. ¶ 27. But, in the same way, breweries, distilleries, and car makers know that, even though they do not intend their products to be used illegally, some customers will do so. Nevertheless, those companies are not liable for truthfully advertising their products, including showing people drinking and cars on race tracks. Nor would it be sufficient to establish that any Defendants engaged in "reckless" or "unreasonable" marketing, as GBL 898 purports to allow. GBL 898-b(1). Courts routinely reject such theories. *See, e.g.*, *Olivia N. v. Nat'l Broad. Co.*, 126 Cal. App. 3d 488, 495 (1981) (holding that "the First Amendment bars appellant's claim where no incitement is alleged," even where speech inspired later crimes).

Third, incitement is limited to the advocacy of "imminent lawless action." *Brandenburg*, 395 U.S. at 448–49 (finding no incitement where a Klansman advocated the "moral necessity for a resort to force and violence"); *Hess v. Indiana*, 414 U.S. 105, 107, 109 (1973) (per curiam) (finding no incitement where a protester yelled "[w]e'll take the f[***]ing street later"). For the First Amendment exception to apply, there must be "temporal imminence" between the speech at issue and the resulting unlawful activity. *See James v. Meow Media, Inc.*, 300 F.3d 683, 698 (6th Cir. 2002). Thus, even express advocacy of unlawful conduct does not amount to incitement if it calls for such conduct at some "indefinite future time." *McCoy v. Stewart*, 282 F.3d 626, 631 (9th Cir. 2002). The ads at issue clearly fall on the protected side of this line, since the Complaints

nowhere allege that any Defendant's advertising created any threat of imminent violence. To the contrary, Plaintiffs' entire theory rests on an attenuated chain between Defendants' mostly out-of-state conduct and third-party crimes committed in New York. *See supra* 16–21, 24–26.

Plaintiffs cannot sidestep these requirements by suggesting the ads might "prey on young men's insecurities" or otherwise appeal to "young people." Rochester Compl. ¶ 29; Buffalo Compl. ¶ 30. Just as the obscenity test looks to the effect of speech on the "average person, rather than a particularly susceptible or sensitive person," *Ashcroft v. ACLU*, 535 U.S. 564, 575 (2002), so does the incitement test. *Sanders v. Acclaim Entm't, Inc.*, 188 F. Supp. 2d 1264, 1281 (D. Colo. 2002). After all, the government may not "reduce the adult population . . . to reading only what is fit for children." *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 73 (1983). Nor does the Constitution countenance a speech restriction based on the idea that "young men" are susceptible to influence, as Plaintiffs suggest—such sex-based stereotypes are barred by the Equal Protection Clause (*see Craig v. Boren*, 429 U.S. 190, 201 & 208 n.22 (1976)), and cannot justify infringing on speech.

For all these reasons, applying GBL 898, 349, or 350 to penalize Defendants' truthful and non-misleading advertising would violate the First Amendment.

## **<u>CONCLUSION</u>**

Defendants respectfully request that the Court dismiss the Complaints with prejudice.

Dated: September 25, 2025

*/s/ David H. Thompson*
David H. Thompson (admitted PHV)
Brian W. Barnes (admitted PHV)
COOPER & KIRK, PLLC
1523 New Hampshire Ave. NW
Washington, DC 20036
Telephone: (202) 220-9600
Email: dthompson@cooperkirk.com
　　　bbarnes@cooperkirk.com

*Counsel for Brownells, Inc., Primary Arms, LLC, Salvo Technologies, Inc., and Rock Slide USA, LLC*

*/s/ Robert L. Joyce*
Robert L. Joyce
LITTLETON JOYCE UGHETTA & KELLY, LLP
4 Manhattanville Road, Suite 202
Purchase, NY 10577
Telephone: (914) 417-3400
Email: robert.joyce@littletonjoyce.com

*Counsel for Defendant Sig Sauer, Inc.*

*/s/ Robert M. Schechter*
Robert M. Schechter
TILEM & ASSOCIATES, PC
188 East Post Road, Suite 300
White Plains, NY 10601
Telephone: (914) 833-9785
Email: Rschechter@tilemlawfirm.com

*Counsel for JSD Supply*

*/s/ Noel J. Francisco*
Noel J. Francisco (admitted PHV)
Anthony J. Dick (admitted PHV)
JONES DAY
51 Louisiana Ave. NW
Washington, DC 20001
Telephone: (202) 879-3939
Email: njfrancisco@jonesday.com
　　　ajdick@jonesday.com

Andrew Lelling (admitted PHV)
JONES DAY
100 High Street
Boston, MA 02110
Telephone: (617) 449-6856
Email: alelling@jonesday.com

Kelly Holt Rodriguez (PHV forthcoming)
JONES DAY
90 S 7th St.
Minneapolis, MN 55402
Telephone: (612) 217-8855
Email: kholt@jonesday.com

Barry Nelson Covert
LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware Ave.
Suite 120
Buffalo, NY 14202
Telephone: (716) 849-1333
Email: bcovert@lglaw.com

*Counsel for Smith & Wesson Brands, Inc.*

*/s/ Gregory J. Mascitti*
Gregory J. Mascitti
MCCARTER & ENGLISH, LLP
250 West 55th Street, 13th Floor
New York, NY 10019
Telephone: (212) 609-6800
Email: gmascitti@mccarter.com

*Counsel for RemArms, LLC*

48

/s/ Darlene L. Donald
Darlene L. Donald
LAW OFFICES OF DARLENE L. DONALD
510 N. Rogers Ave., Apt. 1
Endicott, NY 13760
Telephone: (315) 727-4607
Email: darlenedonald@hotmail.com

Scott L. Braum (PHV forthcoming)
Timothy R. Rudd (PHV forthcoming)
BRAUM | RUDD
812 East Franklin Street
Dayton, OH 45459
Telephone: (937) 396-0089
Email: slb@braumrudd.com
      trr@braumrudd.com

*Counsel for Defendant Vintage Firearms, LLC*

/s/ James B. Vogts
James B. Vogts (admitted PHV)
SWANSON, MARTIN & BELL, LLP
330 N. Wabash, Suite 3300
Chicago, IL 60611
Telephone: (312) 222-8517
Email: jvogts@smbtrials.com

Meghan M. Brown
GOLDBERG SEGALLA LLP
665 Main Street
Suite 400
Buffalo, NY 14203
Telephone: (716) 566-5400
Email: mbrown@goldbergsegalla.com

*Counsel for Sturm, Ruger & Co., Inc.*

/s/ Scott C. Allan
Christopher Renzulli
Scott C. Allan
RENZULLI LAW FIRM, LLP
One North Broadway, Suite 1005
White Plains, NY 10601
Telephone: (914) 285-0700
Email: crenzulli@renzullilaw.com
      sallan@renzullilaw.com

*Counsel for Glock, Inc; Strassell's Machine, Inc. d/b/a Hi-Point Firearms; Kel-Tec CNC Industries, Inc.; O.F. Mossberg & Sons, Incorporated; Springfield Armory, Inc.; Bangers, L.P., n/k/a Iron Valley™ Supply Co.; and RSR Group, Inc.*

/s/ John F. Weeks IV
John F. Weeks IV (admitted PHV)
SMITH, GAMBRELL & RUSSELL, LLP
1105 West Peachtree Street NE, Suite 1000
Atlanta, GA 30309
Telephone: (404) 815-3500
Email: jweeks@sgrlaw.com

John G. McCarthy
SMITH, GAMBRELL & RUSSELL, LLP
1301 Avenue of the Americas, 15th Floor
New York, NY 10019
Telephone: (212) 907-9700
Email: jmccarthy@sgrlaw.com

*Counsel for Taurus Holdings, Inc.*

/s/ Steven A. Friedman
Steven A. Friedman
SQUIRE PATTON BOGGS (US) LLP
127 Public Square
1000 Key Tower
Cleveland, OH 44114
Telephone: (216) 479-8500
Email: steven.friedman@squirepb.com

Keith Bradley (admitted PHV)
SQUIRE PATTON BOGS LLP (CO)
717 17th Street
Suite 1825
Denver, CO 80202
Telephone: (303) 830-1776
Email: keith.bradley@squirepb.com

Daniel C. Harkins (admitted PHV)
SQUIRE PATTON BOGGS (NYC)
1120 Avenue of the Americas
13th Floor
New York, NY 10036
Telephone: (212) 872-9890
Email: daniel.harkins@nelsonmullins.com

Mark D. Sheridan
SQUIRE PATTON BOGS LLP (NJ)
382 Springfield Avenue
Suite 300
Summit, NJ 07901
Telephone: (973) 848-5600
Email: mark.sheridan@squirepb.com

*Counsel for Beretta U.S.A. Corp.*

/s/ Anthony M. Pisciotti
Anthony M. Pisciotti
Danny C. Lallis
Ryan L. Erdreich
PISCIOTTI LALLIS ERDREICH
445 Hamilton Avenue
Suite 1102
White Plains, NY 10601
Telephone: (914) 287-7711
Email: apisciotti@pisciotti.com
        dlallis@pisciotti.com
        rerdreich@pisciotti.com

*Counsel for Bushmaster Firearms Industries,
Inc., GS Performance, LLC, Savage Arms,
Inc., and Colt's Manufacturing Company, LLC*

/s/ Christopher M. Chiafullo
Christopher M. Chiafullo
THE CHIAFULLO GROUP, LLP
FFLGUARD, LLC
30 Union Street, Suite 87
Elizabeth, NJ 07202
Telephone: (808) 335-4731 x706
Email: chris@chiafullo.group

*Counsel for Rainier Arms, LLC and Wolcott
Guns Inc.*

/s/ Steven J. Harfenist
Steven J. Harfenist
HARFENIST KRAUT & PERLSTEIN LLP
3000 Marcus Avenue
Suite 2E1
Lake Success, NY 11042
Telephone: (516) 355-9600
Email: sharfenist@hkplaw.com

*Counsel for Arm or Ally, LLC*

*/s/ Matthew D. Fender*
Matthew D. Fender
MCGUIRE WOODS LLP
800 East Canal Street
Gateway Plaza
Richmond, VA 23219
Telephone: (804) 775-1076
Email: mfender@mcguirewoods.com

Philip A. Goldstein
MCGUIREWOODS LLP
1251 Avenue of the Americas
20th Floor
New York, NY 10020
Telephone: (212) 548-2167
Email: pagoldstein@mcguirewoods.com

Jason H. Cowley (PHV pending)
MCGUIREWOODS LLP
201 North Tryon Street
Suite 3000
Charlotte, NC 28202
Telephone: (704) 343-2030
Email: jcowley@mcguirewoods.com

Jonathan Y. Ellis (PHV pending)
H. Brent McKnight, Jr. (PHV pending)
MCGUIREWOODS LLP
501 Fayetteville St., Suite 500
Raleigh, NC 27601
Telephone: (919) 755-6600
Email: jellis@mcguirewoods.com
         bmcknight@mcguirewoods.com

*Counsel for KM Tactical, LLC*