**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE CITY OF ROCHESTER | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) Case No. 23-cv-06061-FPG |
| SMITH & WESSON BRANDS, INC.; | ) |
| GLOCK, INC.; STURM, RUGER & CO., | ) **JURY TRIAL DEMANDED** |
| INC., AND TAURUS INTERNATIONAL | ) |
| MANUFACTURING, INC., | ) |
| | ) |
| Defendants. | ) |
| | ) |

## FIRST AMENDED COMPLAINT

Plaintiff, the City of Rochester, New York ("the City"), by and through its attorneys, and for its first amended complaint against Defendants Smith & Wesson Brands, Inc. ("Smith & Wesson"), Glock, Inc. ("Glock"), Sturm, Ruger & Co., Inc. ("Ruger"), and Taurus International Manufacturing, Inc. ("Taurus"), alleges as follows:

## INTRODUCTION

1.      Rochester, like many cities in America, suffers from a persistent scourge of gun violence and gun crime. This scourge leaves in its wake stolen lives, physical wounds, and life-long trauma for survivors, families, and communities. As a report by one local organization explained, gun violence steals a community's "sense of safety."[1]

---

[1] Common Ground Health, *Spotlight: The Community Impact of Gun Violence in Rochester, NY* at 1 (Apr. 1, 2025), https://commongroundhealth.org/news/articles/gun-violence-has-far-reaching-effects-on-individuals-families-and-the-community.

2.      Defendants Smith & Wesson, Glock, Ruger, and Taurus, are leading manufacturers of firearms distributed and sold throughout the United States. In recent years, Defendants jointly account for over 40 percent of all identified crime guns recovered in Rochester.

3.      It is undeniable that firearms manufactured and distributed by the Defendants cause vast harm in Rochester. It is also clear—based on years of research and other evidence—that changes to the way that firearms are distributed and sold would significantly decrease the level of gun violence and gun crime in Rochester and elsewhere in the state of New York.

4.      Given Defendants' substantial size and market share, adopting well-established distribution and sales controls would reduce the diversion of guns into the illegal secondary market, saving numerous lives and reducing gun-related crime in Rochester and elsewhere across New York.

5.      Yet Defendants have chosen not to take these basic steps. Instead, they have adopted a "hear no evil, see no evil" approach while claiming that they have no power or responsibility over their products once those products leave their factories. This claim is false. As Defendants' own business practices and publicly available data show, Defendants have the capability to monitor and control how their products are sold.

6.      Modern gun manufacturers, like major manufacturers of all retail products, develop and use myriad tools and techniques to control how their products are marketed, distributed, and sold, so they can maximize profit. This same capability can be used to prevent the diversion of firearms into the illegal firearms market.

7.      This is not only a basic requirement of corporate responsibility; it is the law of New York State. In 2021, the New York Legislature declared that the flow of illegal guns into New York communities constitutes a public nuisance. 2021 Sess. Law News of N.Y. Ch. 237 (S. 7196).

The Legislature further found that "those responsible for the illegal or unreasonable sale, manufacture, distribution, importing or marketing of firearms may be held liable for the public nuisance caused by such activities." *Id.* § 1. To effectuate this legislative determination, the State enacted New York General Business Law §§ 898-a-e ("Section 898"), which requires every company selling firearms into New York to "establish and utilize reasonable controls and procedures to prevent its qualified products from being possessed, used, marketed or sold unlawfully in New York state." N.Y. Gen. Bus. Law § 898-b(2). "Reasonable controls and procedures" are defined to include policies and business practices designed to prevent theft, as well as sales to straw purchasers, traffickers, persons prohibited from possessing firearms, or persons at risk of injuring themselves or others. *Id.* § 898-a(2).

8.      After Section 898 went into effect, three of the Defendants, along with other members of the industry, sued New York seeking to permanently enjoin the law. The Second Circuit rejected the facial challenge, and Section 898 has remained the law of the State for over four years.[2] Yet Defendants have knowingly and intentionally refused to comply with it by failing to adopt reasonable controls and procedures to prevent their guns from being sold, possessed, and used unlawfully in the State.

9.      Specifically, and upon information and belief, each of the Defendants has failed to: (i) leverage data readily available to them to identify the small minority of federally licensed gun dealers in Monroe County and elsewhere in New York State that sell large and/or disproportionate numbers of crime guns (i.e. guns recovered by law enforcement in connection with a criminal investigation), as well as the local dealers that have a history of repeatedly violating firearm regulations (together, "High-Risk New York Dealers"); (ii) require, as a matter of contractual

---

[2] *Nat'l Shooting Sports Found., Inc. ("NSSF") et al. v. James*, 144 F.4th 98 (2d Cir. 2025).

agreement, that wholesalers and retail dealers selling guns their in or into New York report such information upstream to Defendants; (iii) engage in corrective action against High-Risk New York Dealers, up to and including ceasing distribution to such dealers; (iv) ensure that the retail dealers that sell their products have established reasonable controls and procedures to prevent theft, as well as sales to straw purchasers, gun traffickers, prohibited individuals or persons at risk of injuring themselves or others; and/or (v) implement alternative measures that would be reasonably effective at preventing theft, straw purchases, and other sales to traffickers or prohibited persons.

10.     In other words, despite having the capacity to monitor, identify, and address problematic retailers in the distribution chain for their firearms, Defendants make no meaningful effort to curb sales practices that fuel the illegal secondary market.

11.     Although Defendants claim they do not, or cannot, know who the problematic dealers are, the reality is that they have access to non-public information that would enable them to identify the local problem dealers that feed Rochester's crime gun market. Specifically, all New York dealers are required to maintain records of traces initiated by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and there is nothing stopping Defendants from requiring that retailers that sell their products provide them with this information. Additionally, Defendants themselves have access to certain information regarding the traces that ATF runs using Defendants' own acquisition and disposition records via ATF's NTC Connect Program, as further explained below. And there is no reason why Defendants cannot require the dealers that sell their products to report the results of their federal and state inspections.

12.     Publicly available information demonstrates that the subgroup of the most problematic dealers is quite small. Thirty-two percent of the crime guns recovered by the Rochester Police Department and successfully traced to a source retail dealer from 2012 to 2022 were sold

by just 30 dealers—a mere 1.4 percent of all dealers to which at least one crime gun was traced over that same period.[3] Of the guns sold by those 30 dealers and later recovered by Rochester police, the majority were sold by dealers in Monroe County, and two-thirds were sold by dealers in New York State.[4]

13.    Defendants' exercise of reasonable controls over the distribution of their firearms to this small subset of problematic dealers in Monroe County and New York State would meaningfully reduce the supply of illicit crime guns in Rochester.

14.    But adopting reasonable controls over their distribution system is anathema to Defendants because they believe that it will hurt their bottom line. In fact, a predecessor entity of one Defendant—Smith & Wesson—actually agreed to adopt controls over its distribution channels in a settlement agreement with the United States government back in 2000. But an industry boycott led the company to abandon that promise.

15.    All Defendants have also been aware of both the feasibility and salutary potential of adopting such controls over their distribution channels for decades. In addition to the Smith & Wesson 2000 settlement agreement, the United States Department of Justice explained in a report issued that same year: "[t]he firearms industry can make a significant contribution to public safety by adopting measures to police its own distribution chain," including by "identify[ing] and refus[ing] to supply dealers and distributors that have a pattern of selling guns to criminals and straw purchasers."[5] And as a federal court judge found in 2003, after a lengthy trial that included the four Defendants in this complaint, firearms "manufacturers and distributors. . . can, through

---

[3] Brady, *Uncovering the Truth About Rochester Crime Guns* ("Rochester Report") at 17, 19 (2023), https://www.cityofrochester.gov/sites/default/files/migrated/uploadedFiles-IMAGES-Communications-Miscellaneous-MD-Rochester-Trace-Report-v12-Redacted-FINAL-FOR-MEDIA.pdf
[4] *Id.*
[5] U.S. Dep't of Justice, *Gun Violence Reduction: National Integrated Firearms Violence Reduction Strategy*, Industry Self-Policing (Jan. 18, 2001), https://www.justice.gov/archive/opd/gunviolence.htm.

the use of handgun traces and other sources of information, substantially reduce the number of firearms leaking into the illegal secondary market and ultimately into the hands of criminals in New York."[6]

16.     All Defendants have nevertheless made clear, in various contexts and as outlined in further detail below, that they do not believe they have any responsibility to "micromanage" or oversee in any meaningful way the retailers that sell their firearms.[7] Taurus says it perhaps most directly, with respect to its "independent" retailers: "we are not responsible in any manner for any of their policies or practices."[8] Defendants' posture in this regard is particularly reckless given the commonsense and well-established fact that exercising reasonable control over their supply chain would reduce the frequency with which their firearms are used in crimes.

17.     To be sure, the criminals who misuse firearms in shootings and other crimes must be held accountable by the criminal justice system. At the same time, gun manufacturers also have a critically important role to play in preventing the diversion of the products into criminals' hands and thereby reducing gun-related crime. And in New York State, since 2021, the law has explicitly required gun manufacturers to assume this role and implement reasonable controls and procedures to prevent the diversion of their products to the criminal market.

18.     Rochester is experiencing, and will continue to experience, the entirely predictable result of Defendants' failure to do so: the continuing scourge of large numbers of firearms being used in crimes, including those associated with murders and other crimes of violence, often

---

[6] *Nat'l Assoc. for the Advancement of Colored People v. AcuSport, Inc*., 271 F.Supp.2d 435, 449-50 (E.D.N.Y. 2003).
[7] Decl. of Susan Cupero on Behalf of Smith & Wesson at ¶ 13, *NSSF v. Raoul*, No. 3:23-cv-02791 (S.D. Ill. Sept. 15, 2023), Dkt. No. 27-2 (declaration of the Vice President of Sales of Smith & Wesson Sales, Company, an affiliate of Defendant Smith & Wesson).
[8] Taurus, *Terms & Conditions* (effective Jan. 7, 2019), https://www.taurususa.com/terms-conditions/.

6

committed by persons who could never legally acquire a conventional firearm in the first place.[9] These illegal guns are also used to facilitate the illegal drug trade in Rochester.

19.    Defendants' failure to follow New York law results in Rochester being forced to expend significant additional resources on policing, first-responders, the criminal justice system, funding intervention groups, and providing services to victims. As just one example, in FY2024, the Mayor's Office spent nearly $4 million out of the City budget to fund the Office of Violence Prevention.[10] The City is also damaged by the diminution of public and private property value and lost wages of victims and offenders.

20.    For these reasons and as further outlined below, Plaintiff the City of Rochester asserts claims for statutory and common law public nuisance against Defendants, arising from their failure to comply with the New York statutory mandate to exercise reasonable controls and procedures over the distribution of their firearms into New York State and the City of Rochester. Rochester seeks damages, abatement, costs, and injunctive relief.

## JURISDICTION AND VENUE

21.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and each Defendant, and the amount in controversy exceeds $75,000. Diversity of citizenship exists because Plaintiff is a municipal corporation organized under the laws of the State of New York, and Defendants are corporations

---

[9] *See* Panagiotis Argitis, *'I Will Use everything We Have': Evans Declares Gun Violence Emergency Order*, ROCHESTERFIRST (July 21, 2022), https://www.rochesterfirst.com/rochester/watch-live-mayor-evans-rpd-chief-smith-address-gun-violence-in-rochester/; Jim Tortora, *Rochester City Officials Addressed Gun Violence Crime, in Rochester*, ROCHESTERFIRST (Sept. 30, 2022), https://www.rochesterfirst.com/news/rochester-mayor-evans-to-address-city-violence/; Jim Tortora, *Rochester Up to 50 Homicides Days After Extension of State of Emergency Over Gun Violence*, WHAM 13 (Aug. 21, 2022), https://13wham.com/news/local/rochester-up-to-50-homicides-days-after-extension-of-state-of-emergency-over-gun-violence.
[10] Mayor's Office, *FY2025-2026 Budget*, Appropriation by Activity (Aug. 14, 2025), https://stories.opengov.com/rochesterny/5f57c78a-ba3b-4c36-bc5a-02b19c048fbc/published/Otuahkc21?currentPageId=675b031f75900c8a1fb5a55c.

organized under the law of Nevada, Georgia, and Delaware, with principal places of business in Tennessee, Georgia, and Connecticut.[11]

22.    This Court has personal jurisdiction over each Defendant because Defendants are firearm manufacturers that design, market, and distribute their products for sale throughout the United States, including in New York. Each Defendant places large volumes of firearms worth millions of dollars into the national and regional stream of commerce with the expectation and intent that their products will be sold, possessed, and used in New York. Defendants cultivate and support dealer networks that serve New York consumers, market their products to New York residents, and derive substantial revenue from firearms that enter and circulate within this State. Plaintiff's injuries arise directly from Defendants' conduct directed toward New York and this District. The exercise of personal jurisdiction over Defendants therefore fully and easily comports with due process.

23.    Venue is proper in the Western District of New York under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred within this District, including the sale, distribution, trafficking, criminal use, recovery, and resulting harm associated with Defendants' firearms in the City of Rochester and Monroe County.

**PARTIES**

**I.    Plaintiff.**

24.    Plaintiff the City of Rochester is a municipal corporation organized under the laws of the State of New York.

---

[11] Although the original complaint was removed to federal court based on federal question jurisdiction under 28 U.S.C. § 1331 and federal officer jurisdiction under 28 U.S.C. § 1442(a)(1), nothing in this Amended Complaint should be construed as adopting or affirming the bases for removal. Plaintiff expressly reserves all rights to contest, dispute, or challenge any jurisdictional arguments premised on federal-officer status or related federal defenses.

## II.    Defendants.

25.    Defendant Smith & Wesson Brands, Inc. is a corporation organized and existing under the laws of the State of Nevada, with its principal place of business in Tennessee located at 1852 Proffitt Springs Road, Maryville, TN 37801; its registered agent is Corporation Service Company, 112 North Curry Street, Carson City, NV 89703. At all times relevant to this action, Smith & Wesson manufactured, assembled, and/or imported firearms that were marketed, distributed, and/or sold in New York State, and that were distributed, marketed, sold, and/or possessed within the City. According to Smith & Wesson's website, it has 21 dealers located within 50 miles of Rochester.[12] Upon information and belief, additional dealers within Monroe County sell Smith & Wesson firearms.

26.    Defendant Glock, Inc. is a corporation organized and existing under the laws of the State of Georgia, with its principal place of business in Georgia located at 6000 Highlands Parkway SE, Smyrna, GA 30082; its registered agent is Carlos Guevara c/o 6000 Highlands Pkwy, Attn: Legal Dept., Smyrna, GA, 30082. At all times relevant to this action, Glock manufactured, assembled, and/or imported firearms that were marketed, distributed, and/or sold in New York State, and that were distributed, marketed, sold and/or possessed within the City. According to Glock's website it has 21 dealers located within 50 miles of Rochester.[13] Upon information and belief, additional dealers located within Monroe County sell Glock firearms.

27.    Defendant Sturm, Ruger & Co., Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal executive offices in Connecticut, located at 1 Lacey Place, Southport, CT 06890; its registered agent is The Corporation Trust Company at

---

[12] *Dealer Locator*, SMITH & WESSON, https://www.smith-wesson.com/dealer-locator?location=14602 (last visited Jan. 20, 2026) (filtered by dealers within 50 miles of Rochester, NY).
[13] *Dealer Locator*, GLOCK, INC., https://us.glock.com/en/dealer-locator-usa (last visited Jan. 20, 2026) (filtered by dealers within 50 miles of Rochester, NY).

Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801. At all times relevant to this action, Ruger manufactured, assembled, and/or imported firearms that were marketed, distributed, and/or sold in New York State, and that were distributed, marketed, sold, and/or possessed within the City. According to Ruger's website, it has seven retailers located within 50 miles of Rochester.[14] Upon information and belief, additional dealers located within Monroe County sell Ruger firearms.

28.     Defendant Taurus International Manufacturing, Inc. is a corporation organized and existing under the laws of the State of Georgia, with its principal place of business in Georgia, located at 100 Taurus Way, Bainbridge, GA 39817; its registered agent is Thomas Conger at 218 E. Water Street, Bainbridge, GA 39817. Taurus International Manufacturing, Inc., is a subsidiary of Taurus Holdings, Inc., a corporation organized and existing under the laws of the State of Georgia, which in turn is a subsidiary of Taurus Armas S.A., a Brazilian company. At all times relevant to this action, Taurus manufactured, assembled, and/or imported firearms that were marketed, distributed, and/or sold in New York State and that were distributed, marketed, sold, and/or possessed within the City. According to Taurus's website, it has one dealer located within 50 miles of Rochester.[15] Upon information and belief, additional dealers located within Monroe County sell Taurus firearms.

---

[14] *Retailer Locator*, RUGER, https://www.ruger.com/dataProcess/retailerLocator/ (last visited Jan. 20, 2026) (filtered by dealers within 50 miles of a Rochester, NY zip code).
[15] *Dealer Locator*, TAURUS USA, https://www.taurususa.com/dealer-locator (last visited Jan. 20, 2026) (filtered by dealers within 50 miles of Rochester, NY).

## FACTUAL ALLEGATIONS

**I.  Gun Violence Is an Epidemic Greatly Harming the City and its Residents.**

29.    Every year, nearly 47,000 people in the United States are killed with guns[16] and nearly 97,000 more are shot and wounded.[17] According to a national poll, an estimated 8 million people have been shot and wounded in their lifetimes.[18] Tragically, guns are the number one killer of children and teenagers ages 1 to 19 in the United States.[19] More than 4,400 children and teens, ages 0 to 19, are shot and killed every year, and nearly 2,900 of these shootings are homicides.[20]

30.    The most recent nationwide reporting further establishes that firearm-related harm remains a substantial and ongoing public-safety problem. Publicly available federal data and public health analyses reflecting 2024 trends show that, while certain categories of firearm violence fluctuated year-to-year, the overall incidence of gun deaths remained high, including sustained levels of firearm suicides and continued widespread criminal use of firearms.[21] The United States

---

[16] Yearly average is based on five years of data available via the Centers for Disease Control and Prevention, National Center for Health Statistics. CDC WONDER Online Database, Provisional Mortality Statistics, Multiple Cause of Death (2020 to 2024), https://wonder.cdc.gov/mcd-icd10-provisional.html (accessed Dec. 16, 2025).

[17] Estimated annual total based on analysis of 2020 nonfatal firearm injury data available via the Agency for Healthcare Research and Quality's (AHRQ) Healthcare Cost and Utilization Project (HCUP), https://hcup-us.ahrq.gov/.

[18] SurveyUSA, *Results of SurveyUSA Market Research Study #24554* at question 31 (Dec. 11, 2018), https://bit.ly/2ExxpyZ (stating that four percent of American adults reported being shot and injured during their lifetime).

[19] Based on analysis of 2024 data available via the Centers for Disease Control and Prevention, National Center for Health Statistics. CDC WONDER Online Database, Provisional Mortality Statistics, Multiple Cause of Death, Injury Mechanism & All Other Leading Causes (ages 1 to 19), https://wonder.cdc.gov/mcd-icd10-provisional.html (accessed Dec. 16, 2025).

[20] Yearly averages based on analysis of 2020-2024 data available via Centers for Disease Control and Prevention, National Center for Health Statistics, CDC WONDER Online Database, Provisional Mortality Statistics, Multiple Cause of Death (ages 0 to 19), https://wonder.cdc.gov/mcd-icd10-provisional.html (accessed December 16, 2025). Homicide includes legal interventions.

[21] *See* John Gramlich, *What the Data Says About Gun Deaths in the U.S.*, PEW RESEARCH CENTER (Mar. 5, 2025), https://www.pewresearch.org/short-reads/2025/03/05/what-the-data-says-about-gun-deaths-in-the-us/; Jennifer Mascia & Chip Brownlee, *Newest CDC Data Confirms Gun Deaths Fell in 2024, But*

remains an outlier among industrialized nations in the prevalence and consequences of gun violence. The gun death rate in the United States is 13 times higher than in comparable high-income countries, and the gun homicide rate is 26 times higher than that of other high-income countries.[22] This stark international comparison underscores the severity and abnormality of the firearm-related harms described above.

31.    Rochester is not immune to this epidemic. State and local law-enforcement data show that Rochester has experienced significant levels of firearm-related crime over recent years, including shootings and homicides, resulting in ongoing and substantial public-safety harms to the City and its residents. During the five-year period between 2021 and 2025, Rochester experienced 1,211 shooting incidents, involving 1,426 shooting victims, 218 of whom were killed.[23] Black residents of Rochester are disproportionally impacted by gun violence, making up approximately 83 percent of the victims between 2021 and 2025.[24]  And the median age of shooting victims in Rochester for that period ranged from 27 to 30-years-old.[25] Unsurprisingly, homicides with firearms comprised the vast majority of all homicides in Rochester from 2021 to 2025.[26]

32.    These statistics do not capture the full impact of gun violence and other gun-related crime on the City and its residents. In addition to the lives stolen and physical wounds inflicted on victims who survive, gun violence and other gun crime negatively affect the mental and emotional

---

*Were    Still    Higher    Than    Before    the    Pandemic*, THE TRACE (July    29,    2025), https://www.thetrace.org/2025/07/gun-deaths-suicide-homicide-data-cdc/.

[22] Based on an analysis of the most recent year of gun deaths (2015 to 2019) and gun homicides (2013 to 2019) by country, GunPolicy.org (accessed Jan. 7, 2022).

[23] Based on analysis of 2021 to 2025 data available via Rochester Police Department's Open Data Portal, RPD    Open    Data    Portal,    Rochester,    NY    Shooting    Victims,    https://data-rpdny.opendata.arcgis.com/pages/shooting-victims (accessed Jan. 10, 2026).

[24] *Id.*

[25] *Id.*

[26] Based on analysis of 2021 to 2025 data available via Rochester Police Department's Open Data Portal. RPD    Open    Data    Portal,    Rochester,    NY    Homicides,    https://data-rpdny.opendata.arcgis.com/pages/homicide-victims (accessed Jan. 10, 2026).

health, employment, and economic stability of the Rochester communities it permeates. As explained by a recent report issued by a community health organization serving Rochester: "[G]un violence traumatizes individuals, families and the community. These incidents steal their sense of safety. They often have lasting mental and emotional health issues. Gun violence can also disrupt employment and harm economic well-being. Victims may lose income or jobs as they recover. Some even lose their jobs because employers fear being victimized as well. Families throughout the community struggle to pay for care and/or funeral costs after a shooting. More broadly, gun violence feeds a cycle of community disinvestment, which itself can lead to more violence."[27]

33.    In recognition of the ongoing and severe gun violence crisis plaguing the City, Rochester Mayor Malik D. Evans declared a Local State of Emergency in July 2022, which he has renewed every month since, including most recently on January 6, 2026.[28]

34.    According to publicized data from the ATF, Rochester routinely ranks as one of the top three cities in New York State for the number of firearms recovered by law enforcement.[29]

35.    Data maintained by the Rochester Police Department demonstrates that the Department recovered thousands of firearms in the past five years: 520 in 2021; 603 in 2022; 567 in 2023; 567 in 2024 and 367 in 2025 as of August 31, 2025. Although crime gun recoveries in Rochester have declined recently from the spike experienced during the COVID-19 pandemic,

---

[27] Common Ground Health, *Spotlight: The Community Impact of Gun Violence in Rochester, NY* at 1 (Apr. 1, 2025), https://media.cmsmax.com/ravk3pgz5ktlujs1r08ci/gunviolencespotlight-compressed.pdf.

[28] Proclamation of a Local State of Emergency Pursuant to Exec. L. § 24 (Jan. 6, 2026), https://www.cityofrochester.gov/sites/default/files/2026-01/January%202026%20Gun%20Violence%20Emergency%20Proclamation_1.pdf.

[29] *See* ATF, *Firearms Trace Data: New York – 2020* (calendar year), https://www.atf.gov/resource-center/firearms-trace-data-new-york-2020 (last accessed Jan. 10, 2026); ATF, *Firearms Trace Data: New York – 2021* (calendar year), https://www.atf.gov/resource-center/firearms-trace-data-2021/firearms-trace-data-new-york-2021 (last accessed Jan. 10, 2026); ATF, *Firearms Trace Data: New York – 2022* (calendar year), https://www.atf.gov/resource-center/firearms-trace-data-new-york-2022 (last accessed Jan. 10, 2026); ATF, *Firearms Trace Data: New York – 2023* (calendar year), https://www.atf.gov/resource-center/firearms-trace-data-new-york-2023 (last accessed Jan. 10, 2026).

they remain at or near pre-pandemic levels. And though there were over 150 different manufacturers identified among the recovered guns, as well as home-made ghost guns, the four Defendants alone make up over 40 percent of all identified crime guns recovered in the City:

| Manufacturer | 2021 | 2022 | 2023 | 2024 | 2025 Up to 8/31/25 |
|---|---|---|---|---|---|
| Glock | 60 | 75 | 57 | 63 | 43 |
| Taurus | 68 | 78 | 61 | 68 | 41 |
| Smith & Wesson | 59 | 57 | 40 | 57 | 28 |
| Ruger | 45 | 44 | 45 | 40 | 29 |
| Total firearms recovered and traced to a known manufacturer[30] | 512 | 594 | 557 | 554 | 356 |

36.     In recent years, guns manufactured and distributed by Defendants have been recovered by the Rochester Police Department in connection with myriad crimes, including homicides, aggravated assault, sexual assaults, robberies, burglaries, and drug-related crimes.

37.     For example, a Glock pistol recovered by the Rochester Police Department was used by a 16-year-old boy to kill an 18-year-old in August 2023; a Smith & Wesson pistol was recovered by the Rochester Police Department in connection with an aggravated assault in September 2023; a Ruger was used to commit a robbery in Rochester in January 2023, less than two months after it was purchased; and a Taurus was used to kill a man on State Street in Rochester

---

[30] Subtracting the "unknown" category, but including ghost guns.

in March 2022. According to the investigative files of the Rochester Police Department, each of these pistols was sold by a New York dealer.

## II. A Small Number of Dealers in Monroe County and New York State Supply a Disproportionate Share of Crime Guns Recovered in Rochester.

38.     The vast majority of crime guns originate in the legal retail market. Diversion from the legal retail market supplies the criminal demand for firearms.[31]

39.     Principal channels of diversion include straw sales, multiple-gun transactions, and off-the-books sales by licensed dealers.[32] Straw sales are unlawful sales in which a dealer sells a firearm to an individual acting as a proxy for another, often prohibited, true buyer. Dealers that complete straw sales too often  fail to detect or choose to ignore well-known red flags that the sale is illegal, such as bulk purchases of the same or similar firearms, in-store communication between the buyer and another individual about which gun(s) to purchase, payment in cash, or apparent lack of knowledge on the buyer's part about the gun(s) being purchased.

40.     Data published in 2023 demonstrates that a small number of federally licensed firearm retailers ("FFLs") in New York State, and Monroe County in particular, supply a disproportionate share of crime guns recovered in Rochester.

41.     The report, which analyzed firearm recoveries between 2012 and 2022, looked at over 5,000 firearms recovered in Rochester that were successfully traced to an FFL (the "Rochester Report").[33]

---

[31] *See* ATF, *National Firearms Commerce and Trafficking Assessment* ("NFTCA"), Volume II: "Crime Guns—Part III: Crime Guns Recovered and Traced Within the United States and Its Territories" at 2-5, 16 (Mar. 27, 2024), https://www.atf.gov/firearms/docs/report/nfcta-volume-ii-part-iii-crime-guns-recovered-and-traced-us/download.

[32] ATF, *NFTCA*, Volume III: "Firearms Trafficking Investigations—Part III: Firearm Trafficking Channels and Methods Used" at 2 (Apr. 4, 2024), https://www.atf.gov/firearms/docs/report/nfcta-volume-iii-part-iii/download.

[33] Rochester Report, *supra* note 3, at 3-4.

42.    The Rochester Report connected these 5,053 recovered guns to 2,193 FFLs, but only 495 of these FFLs had more than one crime gun traced to them during the report period.[34] In other words, only about one-quarter of the dealers identified by Rochester were repeat sources of crime guns in the City.

43.    Furthermore, an even smaller minority of FFLs sold the majority of the guns subsequently recovered by Rochester police in connection with crime and successfully traced to dealers. Specifically, just ten percent of the identified dealers—approximately 219 dealers—sold 55 percent of the crime guns in the dataset that were traced to dealers.[35] An even smaller subgroup of 30 dealers—or a mere 1.4 percent of the total identified dealers—accounted for *32 percent* of the crime guns in the dataset that were successfully traced to an FFL.[36]

44.    Of the 1,626 guns sold by those 30 federally licensed gun dealers and later recovered by Rochester police, the majority were sold by dealers in New York State. Specifically, 866 were sold by local dealers in Monroe County and an additional 216 were sold by dealers elsewhere in New York State.[37]

45.    Similarly, only 20 FFLs sold more than 20 crime guns recovered in Rochester during the report period, and 18 of those 20 FFLs were located in New York State.[38]

46.    Data from 2023 onwards demonstrate that local gun stores continue to be a significant source of crime guns recovered in Rochester.[39]

---

[34] *Id.* at 17.
[35] *Id.* at 17, 19.
[36] *Id.*
[37] *Id*. at 19.
[38] *Id*. at 17.
[39] Although the City is aware of the identities of the dealers that are the top sources of crime guns in Rochester, it is not publicly identifying them here based on guidance previously received from the ATF.

47.    These statistics correspond with research into firearms trafficking, which confirms that many firearms trafficking rings operate locally.[40]

48.    In fact, Monroe County is the top source county in the United States for all crime guns recovered in New York State. During just the first nine months of 2025, law enforcement throughout New York State recovered 708 guns originally sourced from dealers in Monroe County.[41] Rochester itself was the second top source city for all guns recovered and traced in New York State between 2017 and 2021.[42]

49.    Incident reports from the Rochester police demonstrate that the sources of recovered crime guns are both large and small firearms retailers. For example, the Glock gun used to kill a 16-year-old boy in August 2023 in the Maplewood area of Rochester was bought at a big-box local dealer. While the Taurus gun used to shoot a man on State Street in Rochester in March 2022 came from a small local dealer.

---

[40] *See, e.g.*, Brady et al., *Unchecked, Unaccountable, Deadly: A Handful of Gun Dealers Are Fueling Pennsylvania's Gun Violence* at 4-5 (2025), https://assets.bradyunited.org/production/files/PA_Report_100825.pdf; Glenn Thrush & Katie Benner, *6 Gun Shops, 11,000 'Crime Guns': A Rare Peek at the Pipeline*, N.Y. TIMES (published Apr. 28, 2022, updated June 22, 2023), https://www.nytimes.com/2022/04/28/us/politics/gun-shops-weapons-resell.html; City of Chicago, *Gun Trace Report* at 4 (2017), https://www.chicago.gov/content/dam/city/depts/mayor/Press%20Room/Press%20Releases/2017/October/GTR2017.pdf.
[41] New York State Police, *New York State Crime Gun Report* (Jan. 1, 2025 to March 31, 2025), https://troopers.ny.gov/system/files/documents/2025/08/nysp-quarterly-crime-gun-report-q12025.pdf; New York State Police, *New York State Crime Gun Report* (April 1, 2025 to June 30, 2025), https://troopers.ny.gov/system/files/documents/2025/08/nysp-quarterly-crime-gun-report-q22025.pdf; New York State Police, *New York State Crime Gun Report* (July 1, 2025 to Sept. 30, 2025), https://troopers.ny.gov/system/files/documents/2025/12/nysp-quarterly-crime-gun-report-q3-2025.pdf.
[42] ATF, *NFTCA*, Volume II, New York State Report at 3 (2024), https://www.atf.gov/firearms/docs/report/new-york-state-report/download.

50.    This real-world experience corresponds with years of research demonstrating that a firearm dealer's business practices, not its volume of sales, are the main determinant of whether and how illegal diversion of firearms occurs.[43]

a.    For example, New York City reached litigation settlements with federally licensed gun dealers that were frequent sources of crime guns recovered in the city and that had been discovered to be engaging in illegal gun sales in the early 2000s. The settlements included commitments by these dealers to change their business practices and agreement to submit to oversight by a special master. A study regarding a subset of these dealers revealed that the odds of the New York City Police Department recovering a gun sold by one of the studied dealers plummeted by 84.2 percent following the settled lawsuits.[44]

b.    Similarly, following law enforcement stings against firearms dealers suspected of conducting large numbers of illegal gun sales, the cities of Chicago, Detroit, and Gary, Indiana, filed lawsuits against dealers implicated in the stings. Researchers found that the police stings and lawsuits were associated with a rapid 61.8 percent decrease in Chicago's supply of new crime guns sold by in-state dealers and a more gradual reduction of new crime guns sold by in-state retailers and recovered in Detroit.[45]

---

[43]Anthony A. Braga et al., *Interpreting the Empirical Evidence on Illegal Gun Market Dynamics*, J. URB. HEALTH: BULL. N.Y. ACAD. MED. 779, 785-86, 791 (2012), https://pmc.ncbi.nlm.nih.gov/articles/PMC3462834; *see also* Memorandum from Chairwoman Carolyn B. Maloney to Members of the Committee on Oversight and Reform (July 27, 2022), https://oversightdemocrats.house.gov/sites/evo-subsites/democrats-oversight.house.gov/files/2022.07.27%20Supplemental%20MEMO%20for%20the%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%20FC%20Gun%20Manufacturer%20Hearing.pdf [https://perma.cc/WMB2-4WB2].

[44] Daniel W. Webster & Jon S. Vernick, *Spurring Responsible Firearms Sales Practices through Litigation: The Impact of New York City's Lawsuits Against Gun Dealers on Interstate Gun Trafficking*, in REDUCING GUN VIOLENCE IN AMERICA: INFORMING POLICY WITH EVIDENCE AND ANALYSIS, 123-32 (Daniel W. Webster & Jon S. Vernick, Eds., Johns Hopkins University Press 2013), https://muse.jhu.edu/chapter/757455/pdf/download.

[45] Daniel W. Webster et al., *Effects of undercover police stings of gun dealers on the supply of new guns to criminals*, 12(4) INJ. PREVENTION 225, 229 (2006), https://pmc.ncbi.nlm.nih.gov/articles/PMC2586780/pdf/225.pdf.

51.    Relatedly, a recent study into data from Columbus, Ohio, has shown that "spatial proximity to negligent gun dealers increases the risk for homicide."[46] That is, the researchers identified a relationship between homicide rates and local dealers that have been cited for noncompliance with regulations governing their sales practices.

52.    Thus, while it is possible that some of the top sellers of Rochester crime guns attain that distinction in part as a function of the volume of firearms they sell, it is unlikely that volume alone accounts for the outsized segment of crime guns traced to them.

53.    As detailed below, Defendants have known for decades that exercising greater control over their distribution channels would decrease crime in New York. Moreover, Defendants have access to or could obtain information that would enable them to: (a) identify the High-Risk New York Dealers that supply large or disproportionate shares of Rochester's crime guns and (b) engage in corrective action against those dealers, up to and including ceasing distribution to them.

### III.  Defendants Have Known for Decades That Their Distribution Practices Cause Harm in New York State, and the Mechanisms by Which They Could Decrease Such Harms.

54.    Defendants, who jointly and individually comprise a significant portion of the firearms market in New York State, are particularly well-positioned to monitor and control how their products are sold downstream to prevent diversion to the illegal market, but they refuse to do so.

55.    For over two decades, Defendants have known that their failures to exercise reasonable controls over the distribution of their deadly products have contributed to the rates of gun violence in New York State.

---

[46] Richard Stansfield et al., *Licensed firearm dealers, legal compliance, and local homicide: A case study*, 22(2) CRIMINOLOGY & PUB. POL'Y 323, 335 (2023), https://onlinelibrary.wiley.com/doi/epdf/10.1111/1745-9133.12621. "Negligent" is used by the study authors here to refer to dealers that have been found by ATF to be noncompliant with federal regulations.

56.     In 1999, each Defendant here, or its predecessor entity, was sued (along with other gun industry members) for public nuisance arising from its contributions to gun violence in New York State.[47]

57.     During a six-week trial in 2003, the court heard extensive evidence presented by the plaintiff National Association for the Advancement of Colored People ("NAACP"), including "technical statistical and other studies with the aid of qualified experts from the fields of statistics, merchandising, and criminology; large data sources; extensive video depositions; government reports; and other proof."[48]

58.     On the basis of such evidence, the court concluded that the defendants, including the four manufacturers named here, "are responsible for the creation of a public nuisance and could—voluntarily and through easily implemented changes in marketing and more discriminating control of the sales practices of those to whom they sell their guns—substantially reduce the harm occasioned by the diversion of guns to the illegal market and by the criminal possession and use of those guns."[49]

59.     The court elaborated: "The manufacturers and distributors. . . can, through the use of handgun traces and other sources of information, substantially reduce the number of firearms leaking into the illegal secondary market and ultimately into the hands of criminals in New York. A responsible and consistent program of monitoring their own sales practices, enforcing good practices by contract, and the entirely practicable supervision of sales of their products by the companies to which they sell could keep thousands of handguns from diversion into criminal use

---

[47] *See NAACP v. AcuSport, Inc.*, Nos. 99-cv-3999, 99-cv-7037 (E.D.N.Y.).
[48] *NAACP v. AcuSport, Inc.*, 271 F.Supp.2d 435, 449 (E.D.N.Y. 2003).
[49] *Id.* at 446.

in New York. This supervision and control if voluntarily undertaken would be consistent with that of other industries involved with dangerous products."[50]

60.     Ultimately, that court dismissed the case after trial, despite finding that the plaintiff had proven the legal responsibility of the defendants there for contributing to the public nuisance of gun violence in New York State. The court dismissed the case because the plaintiff had failed to establish that it suffered a special injury different in kind from the harm suffered by the public, as required for a private action for public nuisance under the governing common law principles.[51] Defendants thus escaped legal accountability for the violent consequences of their irresponsible practices, but that did not erase their knowledge of the harm that their own conduct causes and the mechanisms by which they could significantly reduce gun violence in New York State.

61.     Two years later, Congress enacted the Protection of Lawful Commerce in Arms Act (PLCAA), 15 U.S.C. § 7901 *et seq,* which provides gun manufacturers with significant protection from civil liability, unless, among other exceptions, the manufacturer knowingly violated a state or federal law applicable to the sale or marketing of firearms. *See* 15 U.S.C. § 7903(5)(A)(iii). Consequently, Defendants here and other members of the industry acted on the assumption that they are broadly insulated from accountability for their failure to monitor their distribution channels for over two decades.

62.     During those two decades since the *NAACP* trial, there has been no meaningful change in the connection between the distribution practices of gun manufacturers and the downstream violence and other gun-related crimes perpetrated with their products.

63.     Even before the *NAACP* trial, as part of a litigation settlement agreement entered into by a corporate predecessor of Defendant Smith & Wesson in March 2000 in relation to other

---

[50] *Id.* at 449-50.
[51] *Id*. at 449-51.

cases, the manufacturer agreed to reform its practices to, among other ends, "reduce the criminal misuse of firearms, [and] combat the illegal acquisition, possession and trafficking of firearms."[52] As part of that settlement, the company agreed to exercise increased control over its distribution chain, including by selling its guns only to authorized distributors and dealers that agree in writing to (a) maintain electronic records of all ATF trace requests and report traces of Smith & Wesson guns to the manufacturer; (b) implement a security plan meeting enumerated criteria; and (c) require all employees to attend annual training regarding firearms sales, including on how to recognize straw purchasers or other signs that a firearm may be diverted.[53] The company further agreed to implement an enforcement system against authorized distributors and dealers that violate the terms of their agreements with the manufacturer.[54] And, the company agreed to a process of "Corporate responsibility" whereby it would take remedial steps, up to and including termination, with respect to dealers or distributors identified as having a disproportionate number of crime guns traced to that dealer or distributor.[55] Ultimately, the settlement agreement was not enforced and the company abandoned its reforms.

64.    Moreover, public reports issued by the federal government as early as the year 2000 put Defendants on notice of the connection between distribution practices and the diversion of firearms. That year, the ATF reported that a tiny minority of problematic licensed dealers accounted for a majority of traced crime guns: "Only 1.2 percent of dealers in 1998 were associated with 10 or more traces. These approximately 1,000 dealers accounted for well over 50 percent of

---

[52] *Smith & Wesson Agreement* at 1, 7-17 (Mar. 17, 2000), https://www.justice.gov/archive/opd/AppendixD.html.
[53] *See id.* at 9-11.
[54] *See id.* at 13.
[55] *Id*. at 16-17.

the traces to current retail dealers that year."[56] The same ATF report further revealed that approximately 5 percent of retail dealers, excluding pawnbrokers, accounted for nearly 90 percent of crime guns recovered and traced in 1998.[57] And, one year later, the U.S. Department of Justice outlined steps that manufacturers can take to reduce the downstream diversion of their guns. As part of a comprehensive report on gun violence reduction strategies, the DOJ called on manufacturers to exercise responsibility over their distribution chains: "The firearms industry can make a significant contribution to public safety by adopting measures to police its own distribution chain. In many industries, such as the fertilizer and explosives industries, manufacturers impose extensive controls on their dealers and distributors. Gun manufacturers and importers could substantially reduce the illegal supply of guns by taking similar steps to control the chain of distribution for firearms. To properly control the distribution of firearms, gun manufacturers and importers should: identify and refuse to supply dealers and distributors that have a pattern of selling guns to criminals and straw purchasers; develop a continual training program for dealers and distributors covering compliance with firearms laws, identifying straw purchase scenarios and securing inventory; and develop a code of conduct for dealers and distributors, requiring them to implement inventory, store security, policy and record keeping measures to keep guns out of the wrong hands[.]"[58]

65.    Now, as then, there are a slate of well-established, evidence-based practices that, if implemented, would reduce the diversion of Defendants' guns into the illicit market. These practices include, but are not limited to:

---

[56]ATF, *Commerce in Firearms in the United States* at 23-24 (Feb. 2000), https://www.nycourts.gov/reporter/webdocs/020400report.pdf.
[57] *Id.* at 23 tbl. 13.
[58] U.S. Dep't of Justice, *Gun Violence Reducton: National Integrated Firearms Violence Reduction Strategy*, Industry Self-Policing (Jan. 18, 2001), https://www.justice.gov/archive/opd/gunviolence.htm.

a. Leveraging data readily available to gun manufacturers to identify the small minority of dealers that sell large and/or disproportionate numbers of crime guns and/or have been repeatedly cited for violations of firearms regulations by ATF or other law enforcement officials;

b. Requiring, as a matter of contractual agreement, that wholesalers and retail dealers that sell Defendants' guns report such data upstream to Defendants;

c. Engaging in corrective action against dealers that sell large and/or disproportionate numbers of crime guns and/or repeatedly violate firearms regulations, up to and including ceasing distribution to such dealers; and

d. Ensuring that all dealers selling Defendants' guns have established reasonable controls and procedures to prevent theft, as well as sales to straw purchasers, traffickers, prohibited individuals or persons at risk of injuring themselves or others.

66.     Now, as then, if Defendants designed and implemented reasonable controls and procedures over the distribution of their lethal products by retailers in New York—as is now expressly required by New York statutory law—"the public nuisance in [Rochester] from handguns sold by defendants would be sharply reduced, lives would be saved, and many gun injuries avoided."[59]

## IV. The ATF's Crime Gun Tracing Process Can Provide Defendants with Information About the Retail Sellers of Its Guns That Are Recovered by Law Enforcement.

67.     When a federal, state, or local law enforcement agency recovers a firearm, it can request the assistance of the ATF in "tracing" the firearm from the company that manufactured it down through the distribution chain and to the first retail sale. A firearm trace by ATF enables the

---

[59] *NAACP*, 271 F. Supp. 2d at 524.

agency that recovered the firearm to learn the identity of the retail dealer that sold the gun and the individual who purchased it.

68.    In this way, the ATF trace database tracks recovered firearms through the primary market—from manufacture or importation, through distribution and retail sale, to the first lawful purchaser. As manufacturers and distributors of firearms, Defendants participate in this tracing system.

69.    By receiving trace requests from the ATF, a manufacturer learns which specific firearms sold by it were recovered in connection with crimes and to which specific wholesalers or retailers it directly sold those guns. Although not all recovered crime guns are traced by ATF—for instance, if a recovered crime gun was sold by a dealer as part of a multiple-gun transaction that the dealer reported to ATF as required by federal law, ATF can use its own internal records to identify the retail purchaser—the aggregate of traces that ATF does perform can reveal which dealers and distributors frequently sell crime guns. Large or disproportionate trace activity attributable to a wholesaler or a retailer to which the manufacturer sells directly therefore serves as a reliable indicator warranting further scrutiny by the manufacturer.

70.    In fact, since 2000, and until it was terminated in 2025, the ATF's Demand Letter 2 program flagged retailers who frequently sold guns that were quickly recovered by law enforcement. Specifically, dealers that, within the same calendar year, had either 10 or (beginning in 2018) 25 or more firearms traced back to them within 3 years of sale—a short "time to crime" that indicates likely trafficking—received Demand 2 letters from the ATF. Demand 2 letters put the receiving retailers on notice of their high volume of suspect sales.

71.    Defendants could leverage data available to them about law enforcement recovery of their guns to identify the subset of problem dealers in New York State from which their guns are most frequently diverted, for purposes of reducing harm to public health and safety.

72.    The use of available trace information by manufacturers to assess and mitigate diversion risks would not interfere with or endanger law-enforcement operations.

73.    Upon information and belief, Defendants each participate in ATF's NTC Connect Program, which allows industry members to automate the process of responding to ATF's firearms trace requests.

74.    NTC Connect provides a cloud-based platform through which companies can make their acquisition and disposition records available to the ATF for investigative purposes. Participants in the NTC Connect Program can generate reports "to show when trace actions have been conducted on their data."[60]

75.    Upon information and belief, through such reports or other means, Defendants could obtain and/or learn from NTC Connect information about which of its guns have been recovered by law enforcement, and as a result, identify to which distributor or retailer it sold each of those guns.

76.    Additionally, under New York law, licensed New York gun dealers are required to "maintain records of criminal firearm, rifle and shotgun traces initiated by the [ATF]." N.Y. Gen. Bus. L. § 875-f(4).

77.    New York State law also requires New York dealers to maintain and make accessible to manufacturers "firearm, rifle and shotgun disposition information, including the

---

[60] ATF, *Privacy Impact Assessment for NTC Connect* at 2 (Apr. 4, 2023), https://www.justice.gov/d9/2023-04/ntc_connect_pia_final.pdf.

serial numbers of firearms, rifles and shotguns sold, dates of sale, and identity of purchasers." N.Y. Gen. Bus. L. § 875f(3).

78.    New York dealers are thus required to maintain information that would show whether they are selling a large and/or disproportionate number of guns (including Defendants' guns) that are later recovered by law enforcement.

79.    Defendants could request that the dealers selling their firearms in New York State report this information to them. Indeed, Defendants have the market power, by virtue of their positions as four of the largest manufacturers of firearms in the country, to *require*—as either a matter of formal contract or simply a condition of supplying their products to them—that dealers selling their guns in New York State inform Defendants of each ATF trace request they receive, including traces related to Defendants' firearms.

80.    However, Defendants fail to leverage the trace data available to them to identify the dealers in New York State that frequently sell guns that are diverted to the criminal market.

**V.    Defendants Have Failed to Adopt Reasonable Controls and Procedures to Prevent the Diversion of Their Firearms, Despite Knowing or Being Willfully Blind to Problem Dealers in New York State.**

   **A.    Smith & Wesson Refuses to Monitor the Downstream Distribution of Its Firearms for Purposes of Identifying Problem Dealers, Despite Tracking Other Metrics Related to Its Profits.**

81.    Smith & Wesson, like most major manufacturers, has visibility into its downstream distribution chain. However, it knows or willfully chooses to remain ignorant of the High-Risk New York Dealers in its distribution chain.

82.    Smith & Wesson can and does track certain information regarding the distribution of its guns, for purposes of maximizing profit from its marketing, distribution, and sales strategies.

83.     For example, Smith & Wesson tracks which retail dealers sell its guns. It has a searchable "Dealer Locator" tool on its website, which enables retail buyers to find dealers near them that sell Smith & Wesson guns.[61] According to the "Dealer Locator," 21 dealers located within 50 miles of Rochester stock Smith & Wesson guns.[62]

84.     One of Smith & Wesson's authorized dealers (AmChar New York) is associated with AmChar Wholesale. Located in Rochester, AmChar Wholesale is a major firearms distributor that describes itself as "one of the top distributors in the industry for. . . independent dealers in the United States."[63]

85.     According to the investigative files of the Rochester Police Department, certain of the Rochester-area dealers that appear in Smith & Wesson's "Dealer Locator" are the sources of crime guns recently recovered in Rochester. And, upon information and belief, certain local dealers included in the Smith & Wesson "Dealer Locator" are among the top sources of crime guns into Rochester.

86.     Smith & Wesson also recognizes "Ambassador Dealers" on an annual basis. To be selected as a Smith & Wesson Ambassador Dealer, retailers are required to meet specific criteria pertaining to sales.[64]

87.     Additionally, upon information and belief, Smith & Wesson engages with analytics platforms that track aggregated data and provide insight into the downstream demand for, and sales of, Smith & Wesson's firearms.

---

[61] *Dealer Locator*, SMITH & WESSON, https://www.smith-wesson.com/dealer-locator (last visited Jan. 20, 2026).
[62] *Id.*
[63] *About Us*, AMCHAR WHOLESALE INC., https://www.amchar.com/about-us (last visited Jan. 20, 2026).
[64] *Smith & Wesson Recognizes Leading Retailers as 2024 Ambassador Dealers*, THE DEALER WIRE (Feb. 6, 2025), https://www.thedealerwire.com/releases/c9525002-8b9b-4314-86e0-e29e311946d8.

88.     For instance, Smith & Wesson is a member of the National Association of Sporting Goods Wholesalers (NASGW).[65] NASGW owns and administers SCOPE, a data analytics platform that provides its members with visibility into the firearms distribution channel by integrating distributor shipment data with aggregated point-of-sale data.[66] NASGW has boasted that SCOPE enables users to "analyze your sales," "provides you insight on distributor sales to dealers, allowing you to see product movement as well as inventory analysis and market share comparison," and "integrates point of sale data from retailers around the country, providing sales insight at the retail level. This data can be segmented by region, category, caliber, and much more."[67]

89.     Similarly, Gearfire, an ecommerce, point-of-sale, and merchant services software provider for the firearms industry, offers the RetailBI platform, which provides insight into retail-level sales trends.[68]

90.     Upon information and belief, Smith & Wesson invests in data tracking via SCOPE, RetailBI, and/or similar platforms in order to optimize its downstream sales for purposes of increasing its profits.

91.     Smith & Wesson could similarly leverage data available to it about regulatory inspections of its retailers and law enforcement recovery of guns sold by them in order to identify

---

[65] *Member Directory*, NASGW, https://members.nasgw.org/membership/directory?cat=manufacturers-and-importers (last visited Jan. 20, 2026).

[66] NASGW SCOPE, Solutions: SCOPE DLX, https://nasgwscope.org/solutions/dlx (last visited Jan. 20, 2026); NASGW SCOPE, Solutions: SCOPE CLX, https://nasgwscope.org/solutions/clx (last visited Jan. 20, 2026).

[67] *5 Ways Scope Can Help Your Business,* NASGW: SCOPE BLOG (Jan. 19, 2021), https://web.archive.org/web/20231205061000/https://news.nasgw.org/scope-blog/5-ways-scope-can-help-your-business.

[68] Gearfire, *RetailBI: Firearms Sales & Inventory Data for the Shooting Sports Industry*, https://gogearfire.com/solutions/retailbi/ (last visited Jan. 20, 2026).

the subset of High-Risk New York Dealers from which its guns are most frequently diverted, for purposes of reducing harm to public health and safety in Rochester. However, it chooses not to.

92.     As alleged above, data about ATF traces of recovered firearms are available to Smith & Wesson and would enable it to identify the downstream dealers in New York State that frequently sell crime guns recovered in Rochester.

93.     Smith & Wesson maintains contracts with the distributors, buying groups, and large retailers to which it directly sells its firearms.[69]

94.     Among other terms, Smith & Wesson's contracts with its distributors and buying groups require them to "support [Smith & Wesson's] full compliance with all applicable laws."[70] Additionally, Smith & Wesson's contracts with its distributors, through which it distributes most of its firearms, prohibit the distributors from "knowingly selling [Smith & Wesson]'s firearms to anyone who is not complying with the laws and regulations relating to the sale or distribution of firearms," "[p]rohibit them from knowingly selling [Smith & Wesson's] firearms to anyone that has made false or misleading statements with respect to the information required to purchase a firearm[;]" and "[p]rohibit them from knowingly selling or delivering [Smith & Wesson's] firearms where the purchase or possession would be in violation of any law applicable at the place of sale of delivery."[71]

95.     Upon information and belief, Smith & Wesson does not act to meaningfully enforce even these meager contractual terms with its middlemen. And the critical point is that these contracts, as described publicly by Smith & Wesson, do not require any monitoring of retailers or

---

[69] Am. Outdoor Brands Corp., *Shareholder Requested Report* ("Smith & Wesson 2019 Report") at 16-17 (Feb. 8, 2019), https://www.sec.gov/Archives/edgar/data/1092796/000119312519032245/d704097dex991.htm.
[70] *Id.* at 16. No information was provided in the Smith & Wesson 2019 Report about the contracts with the four large retailers with which Smith & Wesson has a direct contractual relationship.
[71] *Id.* at 16-17.

the reporting up by retailers to distributors of critical tracing and inspection information that could be used to prevent the diversion of firearms to criminals.

96.    Smith & Wesson easily could—under the terms of these contracts—require its distributors and other buyers to report to it information about the ATF trace requests they receive regarding Smith & Wesson firearms distributed to dealers in New York State. It could likewise mandate, as a matter of contract, that its distributors and other buyers require their downstream dealers of Smith & Wesson firearms in New York to report up regarding all ATF trace requests received by the dealers, as well as the results of their state or federal inspections. But instead, it chooses to remain willfully blind to this downstream information and relies on its two-tier distribution system to insulate it from responsibility.

97.    Smith & Wesson could, in parallel, also require each dealer featured on its "Dealer Locator" tool and located in New York to submit directly to Smith & Wesson (a) all ATF trace requests that dealer receives regarding Smith & Wesson firearms; (b) the aggregate number of all trace requests received for all firearms sold, regardless of the manufacturer; (c) the total number of firearms sold (including the number of Smith & Wesson firearms sold); and (d) the results of its ATF and New York State Police inspections, in order to be featured on its website. However, it chooses not to do this.

98.    Smith & Wesson could thus acquire information identifying, with respect to gun dealers in New York and in and around Rochester, (a) the specific Smith & Wesson firearms that have been recovered and traced by law enforcement; (b) the specific distributors, large retailers, or buying groups to which Smith & Wesson sold those firearms; (c) the downstream New York-based dealers that sold those guns to retail purchasers; and (d) the identities of downstream High-Risk New York Dealers.

99.    However, despite its previous agreement to monitor its distribution channels, as discussed in paragraph 63 above, Smith & Wesson refuses to meaningfully leverage the information available to it to monitor the downstream distribution of its firearms for purposes of decreasing the diversion of its firearms into the illegal market in New York.

100.    Smith & Wesson's recent corporate filings and other public statements indicate that the Company sees itself as having no obligation to meaningfully monitor its distribution channels in order to reduce the gun violence perpetrated with its firearms.

101.    For example, in 2022 and in the wake of numerous mass shootings—including one perpetrated with a Smith & Wesson assault weapon—Smith & Wesson Chief Executive Officer Mark Smith disclaimed any responsibility for gun violence committed with the Company's firearms: "To be clear, a Smith & Wesson firearm has never broken into a home; a Smith & Wesson firearm has never assaulted a woman out for a late-night run in the city; a Smith & Wesson firearm has never carjacked an unsuspecting driver stopped at a traffic light."[72]

102.    Similarly, in reaction to New York's passage of Section 898, Smith & Wesson's Vice President of Sales Susan Cupero declared that "liability [under the statute] is predicated on the behavior of third-party criminals outside Smith & Wesson's control," and that "[e]ven if Smith & Wesson could theoretically undertake drastic measures in an attempt to lessen potential liability. . . the economic impact to Smith & Wesson would be irreparable."[73]

103.    In another declaration, in response to the passage of a similar law in Illinois, Ms. Cupero stated that Smith & Wesson does not "provide training [about straw sales] to retailers that sell its products" because to do so "would cost Smith & Wesson time and money" and "there is no

---

[72] Smith & Wesson, *Smith & Wesson CEO Issues Strong Statement in the Face of 2nd Amendment Attacks*, https://www.smith-wesson.com/smith-wesson-ceo-issues-strong-statement.
[73] Decl. of Susan Cupero on Behalf of Smith & Wesson at ¶¶ 23-24, *NSSF v. James*, No. 1:21-cv-01348 (N.D.N.Y. Dec. 16, 2021), Dkt. No. 2-14.

legal requirement for any manufacturer to micromanage how retailers run their businesses or sell the products they are lawfully entitled (and licensed) to sell."[74]

104.    Furthermore, Smith & Wesson has stated clearly that it privileges protecting its reputation as a proponent of Second Amendment rights over proposals to improve its public safety footprint.

105.    For instance, in its 2023 Proxy Statement, the Company's Board of Directors "unanimously recommend[ed]" voting against a stockholder proposal that would have required the Company to conduct a third-party "Human Rights Impact Assessment," including an assessment of the gun violence implications of the Company's "policies, practices, and products."[75] The Board rejected the proposal, characterizing it as incompatible with its conception of "gun rights," because conducting and complying with a third party human rights assessment "would require us to reduce our lawful product offerings and accept a framework for assessing broad societal harms created by human rights groups."[76]

106.    Likewise, Smith & Wesson's Board of Directors issued a 2019 report in response to a similar shareholder proposal requesting that the Board issue a report "on the Company's activities related to gun safety measures and mitigation of harm associated with gun products, including. . . [e]vidence of monitoring of violent events associated with products produced by the Company."[77]

---

[74] Decl. of Susan Cupero on Behalf of Smith & Wesson at ¶ 13, *NSSF v. Raoul*, No. 3:23-cv-02791 (S.D. Ill. Sept. 15, 2023), Dkt. No. 27-2.
[75] Smith & Wesson, *U.S. Securities and Exchange Commission Schedule 14(A) Proxy Statement* 52-54 (Aug. 10, 2023), https://www.sec.gov/Archives/edgar/data/1092796/000095017023041366/swbi-20230810.htm.
[76] *Id*. at 53-54.
[77] Smith & Wesson 2019 Report, *supra* note 69, at 3.

107.    In its 2019 report, the Board expressed strong disapproval of the proposal, pejoratively dismissing the proposal as coming from "special interest groups with an anti-Second Amendment agenda": "The Company's reputation as a strong defender of the Second Amendment is not worth risking for a vague goal of improving the Company's reputation among non-customers or special interest groups with an anti-Second Amendment agenda."[78]

108.    And, despite the detailed data available to Smith & Wesson about the dangerous diversion and law enforcement recovery of its guns, the 2019 report disclosed only *de minimis* and temporary monitoring of news and social media mentions of the extensive criminal misuse of Smith & Wesson guns.[79] Instead, the report claimed that proponents of the shareholder proposal "misunderstand[ ] how [Smith & Wesson] conducts its firearms business," falling back on its two-tier distribution system to excuse its willful blindness to information pertaining to the diversion of its firearms.[80]

109.    In its most recent 10-K Form, Smith & Wesson stated: "[O]ur reputation could be damaged if our core consumers believe that we have adopted the gun control agenda of certain activists."[81]

110.    Consistent with these public statements, a 2022 investigation by the U.S. House Committee on Oversight and Reform concluded that Smith & Wesson failed to track or monitor deaths, injuries, or crimes that occur using the company's AR-15-style rifles.[82] Upon information

---

[78] *Id.* at 4.
[79] *Id*. at 6-7.
[80] *Id.* at 16.
[81] Smith & Wesson, *U.S. Securities and Exchange Commission Form 10-K* at 31, https://ir.smith-wesson.com/static-files/c5d76602-cb34-4d33-ad7e-925049021b9c.
[82] Memorandum from Chairwoman Carolyn B. Maloney to Members of the Committee on Oversight and Reform at 20-21 (July 27, 2022), https://oversightdemocrats.house.gov/imo/media/doc/2022.07.27%20Supplemental%20MEMO%20for%20the%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%20FC%20Gun%20Manufacturer%20Hearing.pdf [https://perma.cc/A8AZ-Y329].

and belief, Smith & Wesson does not track this information with regard to any of its products in New York (or elsewhere). However, as the Committee noted, "a small number of retailers are often responsible for supplying an inordinate number of guns used in crimes, suggesting that industry attention to where and how their products are misused by criminals could help curb violent crime or rising homicide rates."[83]

111.    As a natural and foreseeable consequence of Smith & Wesson's refusal to meaningfully monitor the downstream distribution of its products in New York, Smith & Wesson firearms are recovered by the Rochester Police Department in connection with a variety of crimes at a higher rate than they would be if Smith & Wesson took reasonable steps to monitor and control its distribution channels.

112.    According to information compiled by the City of Rochester, the Rochester Police Department recovered 241 Smith & Wesson firearms between January 1, 2021, and August 31, 2025. This includes Smith & Wesson firearms recovered in connection with homicides, aggravated assaults, sexual assaults, burglaries, and drug-related crimes.

113.    Smith & Wesson's failure to meaningfully monitor and exercise reasonable controls over the downstream distribution of its guns in New York results in harm to the public in Rochester.

### B. Glock Refuses to Monitor the Downstream Distribution of Its Firearms for Purposes of Identifying Problem Dealers, Despite Tracking Other Metrics Related to its Profits.

114.    Glock, like Smith & Wesson, has extensive visibility into its downstream distribution chain in New York. However, the company willfully chooses to remain ignorant of the High-Risk New York dealers in its distribution chain.

---

[83] *Id.* at 21 (quotation marks omitted).

115.    Like Smith & Wesson, Glock can—and does—track certain information regarding the distribution of its guns for purposes of maximizing profits from its marketing, distribution, and sales strategies.

116.    For instance, Glock distributes its guns to retail purchasers through a network of authorized Glock dealers. Glock develops and maintains relationships with its authorized dealers and incentivizes them to join and remain in Glock's preferred network of dealers. Glock advertises these authorized dealers on its website through its "Dealer Locator" feature, which directs online customers to specific Glock dealers where they can purchase firearms. And these dealers are permitted to market themselves as authorized Glock dealers for sales to civilians.

117.    Glock currently lists 21 authorized New York dealers within 50 miles of Rochester on its "Dealer Locator." In addition, one of Glock's authorized dealers, AmChar New York, is a dealer associated with AmChar Wholesale, Inc. As described above in ¶ 84, AmChar Wholesale is a major firearms distributor located in Rochester. Glock distributes firearms through AmChar Wholesale,[84] and, upon information and belief, many or all of the firearms that it distributes to dealers in Rochester and Monroe County go through AmChar Wholesale.

118.    In addition, like Smith & Wesson, Glock has tools and vendors that it uses to gain insight into sales of its products downstream. Upon information and belief, Glock utilizes aggregated data available to it via SCOPE, Gearfire's RetailBI, and/or other analytics platforms for purposes of increasing the retail sales of its firearms.

119.    Glock could similarly leverage data available to it about regulatory inspections and law enforcement recovery of guns sold by its authorized wholesalers and dealers in order to

---

[84] Decl. of Carlos Guevara on Behalf of Glock, Inc. at ¶ 9, *NSSF v. James*, No. 1:21-CV-1348 (N.D.N.Y. Dec. 16, 2021), Dkt. No. 2-10.

identify the subset of High-Risk New York Dealers from which its guns are most frequently diverted and reduce harm to public health and safety in Rochester. However, it chooses not to.

120.    As alleged above, data about ATF traces of recovered firearms are available to Glock and would enable it to identify the downstream dealers in New York State that frequently sell crime guns recovered in Rochester.

121.    Glock is empowered to exercise a significant level of contractual control over its authorized dealers and distributors.[85] Glock requires its authorized dealers to sign a Glock Dealer Agreement, which governs their business relationship and allows Glock to set requirements with which dealers must comply in exchange for the right to purchase Glock products and sell them to civilian customers.

122.    For instance, a Glock Dealer Agreement from 2017 includes multiple pages of dealer responsibilities, ranging from how the dealer shall appear while selling Glock products ("shall at all times maintain a professional appearance"), to the dealer's internet presence (a dealer's proposed website content related to Glock must be provided to Glock so that it may address "any trademark or infringement issues"), to the dealer's sales efforts ("Dealer shall use best efforts to market GLOCK products").[86] The Agreement also has a number of dealer responsibilities related to safety, including agreement to comply with federal, state, and local laws and regulations, and to file with Glock an annual certification verifying such compliance. Dealers must also train all employees involved with the sale of Glock products in compliance with the law as it relates to the sale of Glock firearms. In addition, the Glock Dealer Agreement requires that

---

[85] *See id.* (referencing Glock's contractual relationship with its authorized distributors).
[86] A pro forma version of this agreement was made publicly available on the Internet. *Glock, Inc. Stocking Dealer Program Agreement 2017* §§ 16(C), 10(D), 7(A), https://web.archive.org/web/20230615180323/https://www.ezgun.net/media/rebates/incentives/GLOCKStockingDealerAgreement10162017.pdf.

dealers maintain sales information for all Glock products, including the serial numbers of handguns sold, dates of sale, and identity of purchasers, and that they make this information available for review by Glock and law enforcement.  Under the agreement, Glock promises to "[a]udit and otherwise test or investigate Dealer's Glock-established policies and the standards and practices established pursuant to such policies."

123.   While Glock's contract *says* some of the right things about the distribution of firearms, its *actions* demonstrate that Glock neither meaningfully enforces the portions of its contract related to statutory compliance and responsible sales nor makes any efforts to learn or otherwise monitor which of its authorized dealers are High-Risk New York Dealers.

124.   For example, despite the terms of the Glock contract, the country's most notorious gun stores—Westforth Sports in Gary, Indiana and Arrowhead Pawn in Jonesboro, Georgia—remained authorized Glock dealers until they both shut down in 2023 following legal and regulatory scrutiny. Another problematic dealer—Adventure Outdoors, located in Glock's hometown of Smyrna, Georgia—remains listed on Glock's website as an authorized dealer despite repeatedly selling guns that have been implicated in trafficking prosecutions in recent years. As another data point, every single one of the top 10 source dealers of crime guns recovered in Chicago between 2013 and 2016 were Glock authorized dealers.[87] And, many of the gun stores that were subject to ATF's Demand Letter 2 program for one or more years before the program's termination—meaning they sell the most crime guns in the country—are Glock authorized dealers.

---

[87] *See*  City of Chicago – Office of the Mayor & Chicago Police Department, GUN TRACE REPORT at 5 (2017), https://www.chicago.gov/content/dam/city/depts/mayor/Press%20Room/Press%20Releases/2017/October /GTR2017.pdf [https://perma.cc/PJ8P-4GED] (last visited Jan. 20, 2026) (identifying Chuck's Gun Shop, Midwest Sporting Goods, Westforth Sports, Shore Galleries, GAT Guns, Suburban Sporting Goods, Pelchers Shooter Supply, Blythe's Sport Shop, and Sporting Arms & Supply as the top 10 sources of crime guns in Chicago).

Moreover, numerous authorized Glock dealers—including several in New York State—have been found by ATF to be in violation of firearms laws and regulations, as documented in publicly-available inspection reports. And, upon information and belief, Glock authorized dealers are among the top sources of crime guns into Rochester.

125.    Notably, Glock either does not require its distributors like AmChar Wholesale to report up to it with information about the ATF trace requests they receive regarding Glock firearms distributed to dealers in New York State as a matter of contract or, if it does require such reporting, fails to act upon that information. Likewise, Glock either does not mandate as a matter of contract that its distributors require their downstream dealers of Glock pistols in New York to report up regarding all ATF trace requests received by the dealers, as well as the results of their state or federal inspections, or, if Glock does require such reporting, fails to act upon that information.

126.    Glock also does not require its authorized dealers in New York to submit directly to Glock (a) all ATF trace requests they receive regarding Glock firearms; (b) the aggregate number of all trace request received for all firearms sold, regardless of the manufacturer; (c) the total number of firearms sold (including the number of Glock firearms sold); and (d) the results of their ATF and New York State Police inspections, in order to be authorized dealers. Instead, it chooses to remain willfully blind to this information, despite the fact that, according to the investigative files of the Rochester Police Department, certain of Glock's Rochester-area authorized dealers are the sources of crime guns recently recovered in Rochester.

127.    Glock could acquire information identifying, with respect to gun dealers in New York and in and around Rochester, (a) the specific Glock pistols that have been recovered and traced by law enforcement; (b) the specific distributors to which Glock sold those firearms; (c) the downstream New York-based dealers that sold those guns to retail purchasers; and (d) the identities

of downstream High-Risk New York Dealers. However, upon information and belief, Glock either refuses to require such upstream reporting or fails to act upon such reporting.

128.    Glock fails to take meaningful steps to monitor the downstream distribution of its guns in New York even though it knows that monitoring and other reasonable controls exercised by manufacturers over their distribution to High-Risk New York Dealers would meaningfully affect the supply of guns to the criminal market in and around Rochester and, by extension, levels of gun violence and gun-related crime in Rochester.

129.    As a natural and foreseeable consequence of Glock's refusal to monitor the downstream distribution of its products in New York, Glock pistols are recovered by the Rochester Police Department in connection with a variety of crimes at a higher rate than they would be if Glock took reasonable steps to monitor its distribution channels.

130.    Between January 1, 2021, and August 31, 2025, Rochester police recovered 298 Glock firearms. Over that nearly five-year period, Glock ranked second among the manufacturers of guns recovered in Rochester. This includes Glocks recovered in connection with homicides, aggravated assaults, robberies, burglaries, and drug-related crimes.

131.    Glock's failure to meaningfully monitor and exercise reasonable controls over the downstream distribution of its guns in New York results in harm to the public in Rochester.

### C. Taurus Refuses to Monitor the Downstream Distribution of Its Firearms for Purposes of Identifying Problem Dealers, Despite Tracking Other Metrics Related to Its Profits.

132.    Taurus, like the other Defendants, has visibility into its downstream distribution chain in New York. However, it chooses to not take meaningful steps to monitor the downstream distribution of its firearms for purposes of identifying the High-Risk New York Dealers in its distribution chain.

133.    Taurus can and does track metrics that promote its own profits. For instance, Taurus's website provides consumers with a "Dealer Locator" tool, to facilitate their purchase of Taurus firearms.[88] Taurus's dealer located includes one dealer within 50 miles of Rochester, but, upon information and belief, several other retailers in Monroe County sell Taurus pistols. According to the investigative files of the Rochester Police Department, certain of these dealers are the sources of crime guns recently recovered in Rochester, and, upon information and belief, certain of these dealers selling Taurus firearms are among the top sources of crime guns into Rochester.

134.    Like the other Defendants, Taurus is also a member of NASGW.[89] Upon information and belief, Taurus utilizes aggregated data available to it via NASGW's SCOPE, Gearfire's RetailBI, and/or other analytics platforms to gain insight into the demand for and sales of its guns, for purposes of optimizing its profits.

135.    Taurus could similarly leverage data available to it about regulatory inspections and law enforcement recovery of guns sold by downstream retailers in order to identify the subset of High-Risk New York Dealers from which firearms are most frequently diverted and reduce harm to public health and safety in Rochester. However, it does not take meaningful steps to do so.

136.    As alleged above, data about ATF traces of recovered firearms are available to Taurus and would enable it to identify the downstream dealers in New York State that frequently sell crime guns recovered in Rochester.

137.    Taurus is empowered by its position as one of the largest firearms manufacturers in the U.S. market to require, as a matter of contract, that its distributors and other direct buyers report

---

[88] *Dealer Locator*, TAURUS USA, https://www.taurususa.com/dealer-locator/ (last visited Jan. 20, 2026).
[89] *Member Directory*, NASGW, https://members.nasgw.org/membership/directory?cat=manufacturers-and-importers (last visited Jan. 20, 2026).

up to it with information about the ATF trace requests they receive regarding Taurus firearms distributed to dealers in New York State. Taurus could likewise mandate as a matter of contract that its distributors and other buyers require their downstream dealers of Taurus firearms in New York State to report up regarding all ATF trace requests received by the dealers, as well as the results of their state or federal inspections.

138.    Taurus could likewise require that each retail dealer in New York that it lists on its "Dealer Locator" submit directly to Taurus (a) all ATF trace requests it receives regarding Taurus firearms; (b) the aggregate number of all trace requests it receives for all firearms sold, regardless of the manufacturer; (c) the total number of firearms sold (including the number of Taurus firearms sold); and (d) the results of its ATF audits and New York State Police inspections, as a condition of being featured on Taurus's website and/or being permitted to sell Taurus products.

139.    Taurus could thus acquire information identifying, with respect to gun dealers in New York and in and around Rochester, (a) the specific Taurus firearms that have been recovered and traced by law enforcement; (b) the specific distributors, large retailers, or buying groups to which Taurus sold those firearms; (c) the downstream New York-based dealers that sold those guns to retail purchasers; and (d) the identities of downstream High-Risk New York Dealers. However, it chooses to remain willfully blind to this information.

140.    Taurus's head-in-the-sand approach to monitoring or exercising control over the distribution of its own guns is not new. In a 2001 deposition, the former president of Taurus testified that Taurus did not investigate whether dealers selling its guns are involved in gun trafficking, stating: "I don't even know what a gun trafficker is." He further testified that "we believe that the guns don't pose any risk at all. It's the people that are using them that pose the

risk," and that it is the responsibility of law enforcement, and not Taurus, to enforce responsible conduct on the part of dealers that sell Taurus guns.[90]

141.    Fast forward to 2025, Bret Vorhees—who now serves as the Chief Executive Officer of Taurus International Manufacturing and the President and Chief Executive Officer of its parent company, Taurus Holdings—affirmed in a recent court filing that "[a]fter it sells firearms to a distributor or dealer, [Taurus] is not involved with, does not determine, and does not control where the firearms are then sold to retail consumers."[91]

142.    Similarly, Taurus's website expressly denies that it has any control over the downstream entities that distribute and sell its firearms: "Any reference to an independent licensed wholesaler or retailer on this Site does not constitute an endorsement or recommendation of any such independent entity by us. They are not within our control, and we are not responsible in any manner for any of their policies or practices."[92]

143.    Taurus takes no meaningful steps to monitor the downstream distribution of its guns in New York or to reduce the diversion of its guns from retail dealers in New York into the illicit market.

144.    It fails to do so even though it knows that monitoring and other reasonable controls exercised by manufacturers over their distribution to High-Risk New York Dealers would meaningfully affect the supply of guns to the criminal market in and around Rochester and, by extension, levels of gun violence and gun-related crime in Rochester.

---

[90] Mike McIntire & Michael Luo, *Gun Makers Saw No Role in Curbing Improper Sales*, N.Y. TIMES (May 27, 2013), https://www.nytimes.com/2013/05/28/us/gun-makers-shun-responsibility-for-sales-suits-show.html.
[91] Decl. of Bret Vorhees at ¶ 10, *Luna v. Taurus Int'l Mfg. Inc.*, No. 2:24-CV-02971, (D. Ariz. Feb. 5, 2025), Dkt. No. 19-1.
[92] Taurus, *Terms & Conditions*, https://www.taurususa.com/terms-conditions/ (last visited Jan. 20, 2026).

145.    This failure is particularly notable in light of Taurus's strategic decision a decade ago to sell many of its handguns at a cheap price point,[93] which it knows is likely to make them particularly attractive to criminal users.

146.    While Taurus turns a blind eye to the downstream practices of its dealers, its firearms are consistently among the most frequently recovered by the Rochester Police Department.

147.    Between January 1, 2021, and August 31, 2025, Rochester police recovered 316 Taurus crime guns. Taurus ranked first among manufacturers with the most frequently recovered firearms for that period. This includes Taurus pistols recovered in connection with homicides, aggravated assaults, robberies, and drug-related crimes.

148.    Taurus's failure to meaningfully monitor and exercise reasonable controls over the downstream distribution of its guns in New York results in harm to the public in Rochester.

**D.    Ruger Refuses to Monitor the Downstream Distribution of Its Firearms for Purposes of Identifying Problem Dealers, Despite Tracking Other Metrics Related to Its Profits.**

149.    Ruger, like the other Defendants, has visibility into its downstream distribution chain and could equally implement monitoring and controls in order to reduce the rate at which its guns become crime guns in Rochester. However, it knows or willfully chooses to remain ignorant of the High-Risk New York Dealers in its distribution chain.

150.    Like Smith & Wesson, Ruger utilizes a two-tier distribution system and distributes most of its guns via a network of 13 federally licensed wholesalers.[94] Ruger reviews and appoints

---

[93] Frank Miniter, *How A Brazilian Gun Company Became An Overnight Market Leader In The U.S.*, FORBES (Nov. 19, 2015), https://www.forbes.com/sites/frankminiter/2015/11/19/how-a-gun-maker-got-off-the-canvas-to-become-an-overnight-market-leader/.
[94] *See* Ruger, *Independent Distributors of Ruger Branded Products,* https://ruger.com/resources/distributors.html (last visited Jan. 20, 2026) (listing those 13 wholesalers).

these wholesale distributors annually, subject to contractual agreement. In turn, these wholesale distributors sell to retail dealers.

151.    Upon information and belief, several of these wholesale distributors sell Ruger products to retailers in and around Rochester and Monroe County. For example, the website for one of Ruger's distributors, Iron Valley Supply Co., identifies six dealers of its products within a 25-mile radius of Rochester.[95] The Lipsey's website also lists nearby dealers.[96] RSR Group, which was founded in Rochester, maintained a regional sales center there until recently.

152.    Ruger cites its "two-tier distribution model" as an excuse to explain what it claims is a lack of visibility into the retail activity of the dealers that sell its guns.[97] But Ruger could— under the terms of its contracts with these distributors—require them to report information about the trace requests they receive regarding Ruger firearms distributed to dealers in New York State. It could likewise mandate that its distributors and other buyers require each of their downstream dealers of Ruger firearms in New York to report up to Ruger regarding all trace requests received by the dealer, as well as the results of its state or federal inspections.

153.    Thus, Ruger could acquire information identifying: (a) the specific Ruger firearms that have been recovered and traced by law enforcement; (b) the specific distributors to which Ruger sold those firearms; (c) the downstream New York-based dealers that sold those guns to retail purchasers; and (d) the identities of downstream High-Risk New York Dealers. However, it chooses to remain willfully blind to this information.

---

[95] *Find a Dealer*, IRON VALLEY SUPPLY CO., https://www.ironvalleysupply.com/LocationFinder (last visited Jan. 20, 2026).

[96] *New York Firearms Dealers by City,* LIPSEY'S, https://www.lipseys.com/dealerstate?st=NY (last visited Jan. 20, 2026).

[97] Ruger, *2019 Shareholder Report (Form 8-K)* ("Ruger 2019 Report") at 16 (Feb. 8, 2019), https://ruger.com/corporate/PDF/8K-2019-02-08.pdf.

154.    Indeed, when it wants to, the company tracks certain information regarding the downstream distribution of its guns, for purposes of informing its marketing, distribution, and sales strategies.

155.    Although Ruger does not sell directly to retail dealers, it tracks which retail dealers sell its guns. It maintains a searchable "Retailer Locator" tool on its website, which enables retail buyers to find dealers near them that sell Ruger firearms.[98] According to this tool, seven dealers within a 50-mile radius of Rochester sell Ruger products. According to the investigative files of the Rochester Police Department, certain of these dealers are the sources of crime guns recently recovered in Rochester, and, upon information and belief, certain of these local dealers are among the top sources of crime guns into Rochester.

156.    Ruger could require each dealer in New York featured on its "Retailer Locator" tool to submit (a) all ATF trace requests it receives regarding Ruger firearms; (b) the aggregate number of all trace requests received for all firearms sold, regardless of the manufacturer; (c) the total number of firearms sold (including the number of Ruger firearms sold); and (d) the results of its ATF audits and New York State Police inspections, as a condition of being featured on Ruger's website. However, upon information and belief, Ruger chooses not to.

157.    Ruger also maintains a "Retailer Portal" on its website: "your one-stop-shop for all of your retailer needs, from high-resolution product images to current program info."[99] As recently as 2019, retailers of Ruger products could use this portal to track their sales in order to earn incentives via the Ruger Rapid Retail Rewards ("4R") Program and seek reimbursement for

---

[98] *Retailer Locator,* RUGER, https://ruger.com/dataProcess/retailerLocator/ (last visited Jan. 20, 2026).
[99] *Retailer Portal,* RUGER, https://retailer.ruger.com/app/login/?rp=app%2Fdashboard (last visited Jan. 20, 2026).

approved advertising expenditures via the Ruger Retail Co-Op Advertising Program.[100] The portal also offers, or at least as of 2019 offered, learning modules on the Ruger brand, key Ruger products, and how to sell Ruger firearms to customers, which are or were intended to improve marketing and drive sales.[101] Ruger offered incentives to retailers to encourage them to complete these modules.[102]

158.    As with dealers featured on its "Retailer Locator" tool, Ruger could easily use the "Retailer Portal" to require each participating retailer to submit information related to trace requests and inspections, as a condition of access to the Retailer Portal. However, on information and belief, it does neither of these things.

159.    In addition, upon information and belief, Ruger, like most major manufacturers, has access to retail-level data through data analytics platforms that are marketed to the gun industry.

160.    Ruger and all 13 of its wholesale distributors are members of NASGW, the industry group that owns and operates SCOPE.[103] As advertised, SCOPE enables manufacturers like Ruger to access "all of your distributors' and retailers' data" and track "where distributors are shipping your products (down to the zip code) and how much is on the shelf."[104]

161.    Upon information and belief, Ruger, a featured brand on the Gearfire website, also utilizes data available to it via Gearfire's RetailBI platform.

---

[100] *Providing You the Tools for Success*, RUGER (2019), https://ruger-docs.s3.amazonaws.com/ToolsForSuccess.pdf.

[101] *Id.*

[102] *Id.*

[103] *Member Directory*, NASGW, https://members.nasgw.org/membership/directory?cat=manufacturers-and-importers (last visited Jan. 20, 2026).

[104] *5 People in Your Company Who Will Benefit from SCOPE*, NASGW: SCOPE BLOG (May 18, 2021), https://web.archive.org/web/20220814103433/https://news.nasgw.org/scope-blog/5-people-in-your-company-benefit-scope.

162.    In sum, Ruger uses monitoring tools in order to have visibility into its downstream supply chain past the point of its transactions with its wholesale distributors for purposes of sales, distribution, and marketing. Similarly, the company could monitor and/or require reporting by High-Risk New York Dealers. It just refuses to do so.

163.    Ruger's recent corporate filings and other public statements indicate that the company sees itself as having no obligation to take any steps to reduce the gun violence perpetrated with its firearms.

164.    A 2022 investigation by the U.S. House Committee on Oversight and Reform concluded that Ruger failed to track or monitor deaths, injuries, or crimes that occur using its AR-15-style rifles.[105]

165.    As part of the investigation, Ruger submitted a letter to Chairwoman Carolyn B. Maloney stating that it only learns of these incidents through its "customer service department," the media, or "occasionally" from lawsuits.[106] Ruger maintained that it deals with each customer claim of injuries or deaths associated with its products individually, and "does not create or maintain records based upon the nature of the injury claimed."[107]

166.    Testifying before the Committee on July 27, 2022, Ruger's President and Chief Executive Officer Christopher Killoy refused to commit to tracking crimes committed by his

---

[105] Memorandum from Chairwoman Carolyn B. Maloney to Members of the Committee on Oversight and Reform at 20-21 (July 27, 2022), https://oversightdemocrats.house.gov/sites/evo-subsites/democrats-oversight.house.gov/files/2022.07.27%20Supplemental%20MEMO%20for%20the%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%20FC%20Gun%20Manufacturer%20Hearing.pdf [https://perma.cc/WMB2-4WB2].

[106] *Id.* at 2-3, 20 (quoting internal letter from Ruger to Chairwoman Carolyn B. Maloney, Committee on Oversight and Reform (June 3, 2022)).

[107] *Id.* at 20 (quoting same).

company's products, saying "[T]hat is not our job. We are not law enforcement. We do not have the resources, training or capabilities."[108]

167.    Asked whether Ruger takes any steps to identify problematic patterns of dealers or to stop shipments of firearms to dealers who sell a disproportionate amount of crime guns, Mr. Killoy replied that "we do not have visibility into those individual dealers" because Ruger only directly transacts with their "much smaller network" of independent wholesalers.[109]

168.    In reaction to New York's passage of Section 898, Ruger's Vice President, General Counsel, and Corporate Secretary, Kevin B. Reid, Sr., declared that "liability [under the statute] is predicated on the behavior of third-party criminals outside Ruger's control."[110]

169.    Mr. Reid made a similar declaration in response to the passage of a similar law in Delaware, once again distancing the company from the "misdeeds of others that it does not know, has never dealt with, and cannot control."[111]

170.    Ruger refuses to take reasonable steps to reduce the gun violence and gun-related crime perpetrated with its firearms even though its shareholders are eager for accountability. Twice, a majority of Ruger shareholders have voted to approve shareholder proposals promoting gun safety.

---

[108] *Examining the Practices and Profits of Gun Manufacturers: Hearing Before the H. Comm. on Oversight and Reform*, 117th Cong. (2022), at 38 (oral testimony of Christopher Killoy, President & CEO, Ruger), https://www.congress.gov/117/chrg/CHRG-117hhrg48386/CHRG-117hhrg48386.pdf.
[109] *Id.* at 66.
[110] Decl. of Kevin B. Reid, Sr. on Behalf of Ruger at ¶ 23, *NSSF. v. James*, No. 1:21-CV-1348 (N.D.N.Y. Dec. 16, 2021), Dkt. No. 2-2.
[111] Decl. of Kevin B. Reid, Sr. on Behalf of Ruger at ¶ 14, *NSSF v. Jennings*, No. 1:22-CV-01499-RGA (D. Del. Nov. 16, 2022), Dkt. No. 5-1.

171.     In 2019, the company published a report in response to the first of these proposals. The Ruger 2019 Report incorrectly claimed that monitoring the criminal misuse of Ruger products was "not feasible" for several reasons.[112]

172.     First, similar to the 2022 testimony cited above, the Ruger 2019 Report claimed that Ruger does not have visibility into its downstream supply chain because the company only directly transacts with select independent wholesalers, and Ruger does not monitor or control how those distributors market, sell, or distribute Ruger products beyond the terms of the Ruger Sales Policy, which merely requires the distributors to comply with all applicable laws. "Thus, we do not have access to the data necessary to track individual firearms through the distribution channel and 'monitoring' is not possible," the report concludes, without exploring whether the company could gain access to such data.[113]

173.     Second, the Ruger 2019 Report claimed that Ruger's access to trace information was "extremely limited" because most of the ATF trace requests it receives are conducted via an automated process.[114] Again, the report does not explore whether Ruger could gain access to more trace request data. For example, as described *supra* ¶¶ 73-75, the NTC Connect platform provides manufacturers with the option to create reports showing when trace actions have been conducted on their data. Ruger's claim of limited access to trace request data is thus *by its own choosing*.

174.     Third, the Ruger 2019 Report suggested that monitoring was futile because the mere fact that a trace request occurred, or even that multiple trace requests associated with the same retailer occurred, does not mean that a firearm was involved in a crime or establish any wrongdoing by the FFL or retailer.[115] To support this contention, the Ruger 2019 Report cherry-

---

[112] Ruger 2019 Report, *supra* note 97, at 16.
[113] *Id.*
[114] *Id.* at 17.
[115] *Id.* at 18.

picked facts and statements by the ATF without acknowledging that trace data can indeed reveal sales patterns that warrant further investigation—or that the ATF itself utilizes trace data for this exact purpose. For example, indicia like short time-to-crime and multiple trace requests that are disproportionate to the overall sales volume of the retailer could help identify retailers that are facilitating trafficking or straw purchasing.

175.    Fourth, the Ruger 2019 Report claimed that monitoring would not be effective because *on average* many years elapse between Ruger's initial disposition of a firearm and a subsequent trace.[116] This framing belies the precise reason why collecting and calculating time-to-crime data would be a useful monitoring tool: a below-average time-to-crime is an indicator of potential illegal activity. In particular, the ATF considers a period of less than three years between a firearm's last retail sale and its recovery in a crime to be a strong indicator of potential illegal activity.[117]

176.    In 2022, Ruger's shareholders voted to approve a proposal for the company to undertake a third party-led Human Rights Impact Assessment. In his testimony before Congress, Mr. Killoy refused to commit to the proposal,[118] and in 2023, the Ruger Board of Directors declined to adopt it.[119] The proxy statement that accompanied the Board's decision stated: "While Ruger assumes responsibility for its own actions, Ruger lacks the ability, resources, or authority

---

[116] *Id.*

[117] ATF, *National Firearms Commerce and Trafficking Assessment (NFTCA)*, Volume IV: "Protecting America from Trafficked Firearms—Part III: Crime Gun Tracing Updates and New Analysis" at 9 (Jan. 8, 2025), https://www.atf.gov/firearms/docs/report/nfcta-volume-iv-part-iii-%E2%80%93-crime-gun-tracing-updates-and-new-analysis/download.

[118] *Examining the Practices and Profits of Gun Manufacturers: Hearing Before the H. Comm. on Oversight and Reform*, 117th Cong. (2022), at 38 (oral testimony of Christopher Killoy, President & CEO, Ruger), https://www.congress.gov/117/chrg/CHRG-117hhrg48386/CHRG-117hhrg48386.pdf.

[119] Ruger, *2023 Proxy Statement (DEF 14A)* at 34-35, (June 1, 2023), https://www.sec.gov/Archives/edgar/data/95029/000117494723000592/def14a0323_sturmruger.htm.

to control the use of its products after they have been sold to an independent, federally licensed distributor."[120]

177.    Thus, upon information and belief, Ruger categorically refuses to leverage the information available to it to monitor the downstream distribution of its firearms for purposes of identifying High-Risk New York Dealers. Nor has it taken any other meaningful steps to implement reasonable controls and procedures to reduce the diversion of its guns from retail dealers in New York State into the illicit market.

178.    As a natural consequence of Ruger's refusal to monitor the downstream distribution of its products, Ruger firearms are more frequently recovered by the Rochester Police Department than they would otherwise be, and in connection with a variety of crimes, including, in recent years, homicides, aggravate assaults, robberies and drug-related crimes.

179.    According to information compiled by the City of Rochester, the Rochester Police Department recovered 203 Ruger firearms between January 1, 2021, and August 31, 2025. Ruger ranked fourth among manufacturers of the most-frequently recovered crime guns in Rochester.

180.    Ruger's failure to meaningfully monitor and exercise reasonable controls over the downstream distribution of its guns in New York results in harm to the public in Rochester.

## COUNT ONE
### Violation of N.Y. Gen. Bus. Law § 898-b(2)

181.    Plaintiff incorporates and re-alleges the above paragraphs as if stated fully here.

182.    New York General Business Law section 898-b(2) mandates that "[a]ll gun industry members who manufacture, market, import or offer for wholesale or retail sale any qualified product in New York state shall establish and utilize reasonable controls and procedures to prevent

---

[120] *Id.* at 33.

its qualified products from being possessed, used, marketed or sold unlawfully in New York state." "Qualified products" include firearms. N.Y. Gen. Bus. Law § 898-a(6).

183.    The statute further defines "reasonable controls and procedures" to mean, in relevant part, "policies that include, but are not limited to . . . instituting screening, security, inventory and other business practices to prevent thefts of qualified products as well as sales of qualified products to straw purchasers, traffickers, persons prohibited from possessing firearms under state or federal law, or persons at risk of injuring themselves or others." *Id.* § 898-a(2).

184.    "A violation of [section 898-b(2)] that results in harm to the public" is a public nuisance. *Id.* § 898-c(1). "The existence of a public nuisance shall not depend on whether the gun industry member acted for the purpose of causing harm to the public." *Id.* § 898-c(2).

185.    Defendants manufacture, import, and/or distribute firearms and market and offer them for wholesale or retail sale in New York State.

186.    However, in violation of section 898-b(2), each of the Defendants has knowingly failed to establish and utilize reasonable controls and procedures to prevent its firearms from being possessed, used, marketed, or sold unlawfully in New York.

187.    Despite the actionable information available to them, Defendants either (a) refuse to monitor the downstream distribution of their firearms for purposes of identifying High-Risk New York Dealers or (b) if they do engage in such monitoring, refuse to act upon that information.

188.    Specifically, upon information and belief, Defendants have failed to:

    a.    Leverage the data readily available to them to identify the small minority of high-risk dealers in Monroe County and elsewhere in New York State that sell large and/or disproportionate numbers of guns that are later recovered by law

enforcement and/or have been repeatedly cited by ATF or other law-enforcement officials for violations of firearms regulations;

b.   Require, as a matter of contractual agreement, that wholesalers and retail dealers that sell Defendants' guns in or into New York State report such information to Defendants;

c.   Engage in corrective action against High-Risk New York Dealers, up to and including ceasing distribution to such dealers;

d.   Ensure that all dealers in New York State that sell their guns have established reasonable controls and procedures to prevent theft as well as to prevent sales to straw purchasers, traffickers, prohibited individuals, or persons at risk of injuring themselves or others; and/or

e.   Implement alternative measures that would be reasonably effective at preventing theft, straw purchases, and other sales to traffickers or prohibited persons.

189.    Defendants' failure to establish and utilize reasonable controls over the distribution of their firearms is a proximate cause of the harm to the public in the City of Rochester and is a public nuisance as defined in New York General Business Law section 898-c.

190.    If Defendants established and utilized reasonable controls over the downstream distribution of their guns into New York State, the foreseeable diversion of Glock, Smith & Wesson, Ruger, and Taurus guns into the criminal market in the City of Rochester would be significantly reduced.

## COUNT TWO
### Common Law Public Nuisance

191.    Plaintiff incorporates and re-alleges the above paragraphs as if stated fully here.

192.    Defendants, through their past and present business practices, create, contribute to, and maintain a public nuisance under the common law.

193.    A public nuisance "consists of conduct or omissions which offend, interfere with or cause damage to the public in the exercise of rights common to all, in a manner such as to offend public morals, interfere with use by the public of a public place or endanger or injure the property, health, safety or comfort of a considerable number of persons." *Copart Indus., Inc. v. Consol. Edison Co. of N.Y.*, 362 N.E.2d 968, 971 (N.Y. 1977) (citations omitted).

194.    Defendants, who are sued individually and jointly and severally, manufacture, import, and/or distribute firearms and market and offer them for sale in New York State.

195.    Defendants' products have been recovered and used in the commission of crimes within the City.

196.    In violation of New York law, each of the Defendants has knowingly failed to establish and utilize reasonable controls and procedures over its distribution chains to prevent its firearms from being possessed, used, marketed or sold unlawfully in New York. *See* N.Y Gen. Bus. Law § 898-b(2).

197.    As described above, despite the actionable information available to them, Defendants either (a) refuse to monitor the downstream distribution of their firearms for purposes of identifying High-Risk New York Dealers or (b) if they do engage in such monitoring, refuse to act upon that information.

198.    Specifically, upon information and belief, Defendants have failed to:

    a.    Leverage the data readily available to them to identify the small minority of high-risk dealers in Monroe County and elsewhere in New York State that sell large and/or disproportionate numbers of guns that are later recovered by law

enforcement and/or who have been repeatedly cited by ATF or other law enforcement officials for violations of firearms regulations;

b.  Require, as a matter of contractual agreement, that wholesalers and retail dealers that sell Defendants' guns in or into New York State report such information to Defendants;

c.  Engage in corrective action against High-Risk New York Dealers, up to and including ceasing distribution to such dealers;

d.  Ensure that all dealers in New York State that sell Defendants' guns have established reasonable controls and procedures to prevent theft as well as to prevent sales to straw purchasers, traffickers, prohibited individuals, or persons at risk of injuring themselves or others and/or

e.  Implement alternative measures that would be reasonably effective at preventing theft, straw purchases, and other sales to traffickers or prohibited persons.

199.    Defendants' failure to establish and utilize reasonable controls over the distribution of their firearms is a proximate cause of the harm to the public in the City of Rochester, including, but not limited to, Rochester being forced to expend significant additional resources on policing, first-responders, the criminal justice system, funding intervention groups, and providing services to victims. The City is also damaged by the diminution of public and private property value and lost wages of victims and offenders.

200.    If Defendants established and utilized reasonable controls over the downstream distribution of their guns into New York State, the diversion of Glock, Smith & Wesson, Ruger, and Taurus guns into the criminal market in the City of Rochester would be significantly reduced.

201.    Defendants, through their failure to establish and utilize reasonable controls over the distribution of their firearms, have created, contributed to, and maintained a public nuisance of unlawful possession, transportation, disposition, and use of firearms that unreasonably interferes with rights common to the general public; deprives City residents of the peaceful use of public streets, sidewalks and parks; interferes with commerce, travel and the quality of daily life; and endangers the property, health, and safety of large numbers of residents of the City.

202.    Defendants have endangered and harmed the public, undermined law-enforcement efforts to prevent gun violence and other gun-related crime, and caused the diversion of scarce law-enforcement resources.

203.    At all relevant times herein mentioned, it was foreseeable to Defendants that their failure to exercise reasonable controls over their distribution chains would result in increased diversion of and criminal access to firearms, including access by persons intent on murder, mayhem, and other violent crimes.

204.    Each Defendant has sold, and continues to sell, manufacture, import, distribute, and/or market firearms in the City and New York State.

205.    Defendants' conduct, as described herein, unreasonably exposes the City and the public to a foreseeable risk of harm by increasing the availability and unlawful use of firearms within the City and the State of New York.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests that this Court enter judgment against Defendants, jointly and severally, as to all counts, and

A.     Enter an order enjoining and restraining Defendants from continuing to maintain a public nuisance, as alleged in Count I and II above, and requiring them to abate such nuisance by:

1. Establishing and utilizing reasonable controls and procedures to prevent their qualified products from being possessed, used, marketed, or sold unlawfully in New York state, as required by section 898;

2. Submitting to supervision by a court-appointed special master(s) for a period of five years or longer if deemed necessary by the Court, the responsibilities of whom shall include verifying that each Defendant has established and is utilizing the aforementioned reasonable controls and procedures, with the costs of the special master(s) to be borne by such Defendant;

3. Posting bonds in amounts to be determined by the Court, which must be forfeited in the event of future violations by such Defendant; and

4. Paying into an abatement fund a sum that the Court deems just and proper for addressing the continuing harms caused by the nuisance that Defendants have created, contributed to, and/or maintained;

B.     Award the City costs it has incurred abating the public nuisance set forth in this Complaint;

C.      Award the City a reasonable sum of money that will fairly compensate it for the

damages it has suffered;

D.      Award the City pre- and post-judgment interest, to the extent allowable;

E.      Award the City punitive and exemplary damages;

F.      Award the City's costs incurred in this action; and

G.      Grant such other relief as the Court may deem just, equitable, or proper.

## JURY DEMAND

The City of Rochester requests a trial by jury.

Dated: January 22, 2026                               Respectfully submitted,

**EVERYTOWN LAW**                                     */s/ Paul J. Napoli*
Eric Tirschwell**                                     **NAPOLI SHKOLNIK**
Carolyn Shanahan**                                    Paul J. Napoli
Caroline Zweifach**                                   Hunter J. Shkolnik
450 Lexington Ave.                                    Rebeca Martínez Sicari**
P.O Box 4184                                          Nestor Galarza**
New York, NY 10017                                    1302 Avenida Ponce de León
(646) 324-8222                                        Santurce, PR 00907
etirschwell@everytown.org                             (787) 493-5088
cshanahan@everytown.org                               pnapoli@NSPRlaw.com
czweifach@everytown.org                               hunter@NSPRlaw.com
                                                      rmartinez@NSPRlaw.com
Alla Lefkowitz**                                      ngalarza@NSPRlaw.com
P.O. Box 14780
Washington, DC 20044
(203) 738-5121                                        **NAPOLI SHKOLNIK PLLC**
alefkowitz@everytown.org                              Salvatore C. Badala*
                                                      Shayna E. Sacks*
                                                      360 Lexington Ave., Eleventh Floor
                                                      New York, NY 10017
                                                      (212) 397-1000
                                                      sbadala@napolilaw.com
                                                      ssacks@napolilaw.com

**BRADY CENTER TO PREVENT GUN
VIOLENCE**
Douglas N. Letter**
Philip Bangle**
Jenna Klein**

840 1st St. N.E., Suite 400
Washington, DC 20002
(202) 370-8104
(202) 898-0059-Fax
dletter@bradyunited.org
pbangle@bradyunited.org
jklein@bradyunited.org

*Admitted pro hac vice*
***Pro hac vice application forthcoming*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on January 22, 2026, the foregoing document was served upon all counsel of record through this Court's electronic filing system as identified in the Notice of Electronic Filing.

<u>/s/ Paul J. Napoli</u>
Paul J. Napoli
*Attorney for the City of Rochester*
