**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| THE CITY OF ROCHESTER, | Case No. 6:23-cv-06061-FPG |
| Plaintiff, | Honorable Frank P. Geraci, Jr. |
| -against- | |
| SMITH & WESSON BRANDS, INC.; GLOCK, INC.; STURM, RUGER & CO., INC.; AND TAURUS INTERNATIONAL MANUFACTURING, INC. | |
| Defendants. | |

|  |  |
|---|---|
| THE CITY OF BUFFALO, | Case No. 1:23-cv-00066-FPG |
| Plaintiff, | Honorable Frank P. Geraci, Jr. |
| -against- | |
| SMITH & WESSON BRANDS, INC.; GLOCK, INC.; STURM, RUGER & CO., INC.; AND TAURUS INTERNATIONAL MANUFACTURING, INC. | |
| Defendants. | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS'**
**JOINT MOTION TO DISMISS FIRST AMENDED COMPLAINTS**
**FOR FAILURE TO STATE A CLAIM UNDER RULE 12(b)(6)**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................... 1

BACKGROUND ................................................................................................... 4

STANDARD OF REVIEW ..................................................................................... 5

ARGUMENT ......................................................................................................... 6

    I.      PLAINTIFFS' CLAIMS ARE BARRED BY PLCAA ......................................... 6

        A.     This Case Falls Within the Heartland of PLCAA Immunity. ..................... 6

        B.     This Suit Does Not Fall Within PLCAA's Predicate Exception. ............... 8

    II.     PLAINTIFFS FAIL TO STATE A VALID CLAIM UNDER STATE LAW. ..... 17

        A.     There Is No Valid Claim for Public Nuisance. ......................................... 17

        B.     There Is No Valid Claim Under GBL 898. ............................................... 18

    III.    CONSTRUING NEW YORK LAW TO IMPOSE LIABILITY ON DEFENDANTS HERE WOULD BE UNCONSTITUTIONAL. ......................... 24

CONCLUSION ..................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Anza v. Ideal Steel Supply Corp.*,
    547 U.S. 451 (2006)..................................................................................................12, 15

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)......................................................................................................5, 9

*Bank of America Corp. v. City of Miami*,
    581 U.S. 189 (2017)........................................................................................................12

*Camden Cnty. Bd. of Chosen Freeholders v. Beretta USA Corp.*,
    273 F.3d 536 (3d Cir. 2001) (per curiam).....................................................................17

*Chicago v. Beretta, U.S.A. Corp.*,
    821 N.E.2d 1099 (Ill. 2004).....................................................................................13, 17

*City of New York v. Beretta U.S.A. Corp.*,
    524 F.3d 384 (2d Cir. 2008).........................................................................................8, 9

*City of Philadelphia v. Beretta U.S.A.*,
    277 F.3d 415 (3d Cir. 2002)................................................................................ *passim*

*Consol. Rail Corp. v. Gottshall*,
    512 U.S. 532 (1994)........................................................................................................12

*District of Columbia v. Beretta, U.S.A. Corp.*,
    872 A.2d 633 (D.C. 2005) (en banc) .............................................................................14

*District of Columbia v. Beretta U.S.A. Corp.*,
    940 A.2d 163 (D.C. 2008) ...............................................................................................8

*District of Columbia v. Heller*,
    554 U.S. 570 (2008).......................................................................................................24

*Ganim v. Smith & Wesson Corp.*,
    780 A.2d 98 (Conn. 2001) .............................................................................................13

*Hamilton v. Beretta U.S.A. Corp.*,
    750 N.E.2d 1055 (N.Y. 2001)......................................................................3, 13, 15, 22

*Hemi Grp., LLC v. City of New York*,
    559 U.S. 1 (2010)..................................................................................................12, 16

*Holmes v. Sec. Inv. Prot. Corp.*,
    503 U.S. 258 (1992)..........................................................................................11, 15, 16

*Illinois Ass'n of Firearms Retailers v. City of Chicago*,
    961 F. Supp. 2d 928 (N.D. Ill. 2014) ......................................................................24

*In re Academy, Ltd.*,
    625 S.W.3d 19 (Tex. 2021)........................................................................................8

*In re Jamie J.*,
    89 N.E.3d 468 (N.Y. 2017)......................................................................................25

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014)..........................................................................................11, 16

*Liparota v. United States*,
    471 U.S. 419 (1985)................................................................................................10

*Nat'l Shooting Sports Found., Inc. v. James*,
    144 F.4th 98 (2d Cir. 2025) ..................................................................................9, 21

*Nat'l Shooting Sports Found., Inc. v. James*,
    No. 25-1026 (U.S.)....................................................................................................9

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    597 U.S. 1 (2022)..............................................................................................24, 25

*Penelas v. Arms Tech., Inc.*,
    778 So. 2d 1042 (Fla. Dist. Ct. App. 2001) ............................................................17

*People ex rel. Spitzer v. Sturm, Ruger & Co.*,
    309 A.D.2d 91 (N.Y. App. Div. 1st Dep't 2003)......................................3, 13, 17, 18

*Radich v. Guerrero*,
    No. 1:14-CV-00020, 2016 WL 1212437 (D. N. Mar. I. Mar. 28, 2016)................24

*Rehaif v. United States*,
    588 U.S. 225 (2019)..........................................................................................10, 11

*Rothstein v. UBS AG*,
   708 F.3d 82 (2d Cir. 2013)........................................................................................5

*Ruan v. United States*,
   597 U.S. 450 (2022)................................................................................................10

*Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*,
   605 U.S. 280 (2025)........................................................................................ *passim*

*Teixeira v. Cnty. of Alameda*,
   873 F.3d 670 (9th Cir. 2017) (en banc) ..................................................................24

*Trimarco v. Klein*,
   56 N.Y.2d 98 (1982).................................................................................................22

*Williams v. Crane*,
   No. 2:14-CV-241 TS, 2015 WL 7176370 (D. Utah Nov. 13, 2015) .......................22

**STATUTES**

Protection of Lawful Commerce in Arms Act
   15 U.S.C. § 7901.......................................................................................... *passim*
   15 U.S.C. § 7902.....................................................................................1, 6, 7
   15 U.S.C. § 7903.......................................................................................... *passim*

18 U.S.C. § 922.........................................................................................................19

18 U.S.C. § 923.........................................................................................................19

N.Y. General Business Law 898........................................................................ *passim*

N.Y. General Business Law § 898-a.........................................................................3

N.Y. General Business Law § 898-b ..............................................................3, 10, 18

N.Y. General Business Law § 898-c.........................................................................3

N.Y. General Business Law § 898-d ........................................................................3

N.Y. General Business Law § 898-e.........................................................................3

N.Y. Penal Law § 240.45.........................................................................................9

N.Y. Penal Law § 265.07.........................................................................................19

N.Y. Penal Law § 400.00 ...............................................................................................19

**OTHER AUTHORITIES**

27 C.F.R. § 478.123 .....................................................................................................19

9 N.Y. C.R.R. § 472.5....................................................................................................19

Vivan S. Chu, CONG. RSCH. SERV. R42871, *The Protection of Lawful Commerce in Arms Act: An Overview of Limiting Tort Liability of Gun Manufacturers* (2012) ........................................................................................................................7

Fed. R. Civ. P. 12 ......................................................................................................1, 5

H.R. REP. NO. 109-124 (2005)...................................................................................7, 14

Timothy D. Lytton, *Tort Claims Against Gun Manufacturers for Crime-Related Injuries*, 65 Mo. L. Rev. 1 (2000) ...............................................................................7

RESTATEMENT (THIRD) OF TORTS: LIAB. FOR ECON. HARM (2020)................................17

Defendants Smith & Wesson Brands, Inc. ("Smith & Wesson"); Glock, Inc. ("Glock"); Sturm, Ruger & Co., Inc. ("Ruger"); and Taurus International Manufacturing, Inc. ("Taurus") (collectively "Defendants") submit this Memorandum of Law in Support of their Motion to Dismiss the First Amended Complaints pursuant to Federal Rule of Civil Procedure 12(b)(6).

## INTRODUCTION

Plaintiffs, the municipal governments of Buffalo and Rochester, seek to hold the firearms industry liable for attenuated harms they claim to have suffered from third-party criminals independently misusing firearms. Two decades ago, a bipartisan Congress enacted a statute, the Protection of Lawful Commerce in Arms Act, 15 U.S.C. §§ 7901–03 ("PLCAA"), to prohibit exactly this type of claim. In that statute, Congress declared that firearm companies "are not, and should not, be liable for the harm caused by those who criminally or unlawfully misuse firearm products . . . that function as designed and intended." 15 U.S.C. § 7901(a)(5). Even if such claims against the industry ultimately fail, they inflict enormous damage by imposing millions of dollars in legal costs through discovery and other proceedings. Thus, to protect the industry against lawfare—where the process itself becomes the punishment—Congress decreed that such claims may not even be "brought" in any court, and that any existing claims had to be "immediately dismissed" at the threshold. *Id*. § 7902(a), (b).

As the unanimous Supreme Court recently held, PLCAA provides a robust "immunity" that must be vigorously enforced at the motion-to-dismiss stage. *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280, 299 (2025). After all, the "core purpose" of the statute was to "halt a flurry of lawsuits attempting to make gun manufacturers pay for the downstream harms resulting from misuse of their products." *Id*. at 298. While the statute contains some narrow "exception[s]," courts must be careful not to construe them in "such a capacious way" that they

1

would "swallow most of the rule." *Id*. at 299. That is exactly what Buffalo and Rochester are trying to do here, attempting to bring claims under one of PLCAA's exceptions in a way that would effectively destroy the immunity that Congress created.

As relevant here, the so-called "predicate exception" allows firearm companies to be sued only if they "knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought." 15 U.S.C. § 7903(5)(A)(iii). Two features of that exception ensure that it does not "swallow the rule" as the Supreme Court warned. First, it allows suit only if a firearm company "knowingly" violated an applicable statute. *Id*. Thus, if a company engaged in conduct that it did not *know* was unlawful, it cannot be sued. Second, even if a company did commit a "knowing" violation, it still cannot be sued unless that violation was a "proximate cause" of the plaintiff's harm. *Id*. This limitation is especially critical because, at the time PLCAA was enacted, multiple courts had already held that injuries to state and local governments stemming from the criminal misuse of firearms were *not* proximately caused by firearm *companies*. When an independent third-party criminal misuses a firearm, the criminal is the proximate cause of the resulting harm. Any injury to the government is too remote, indirect, and derivative to hold firearm companies liable. By enacting PLCAA's proximate-cause requirement, Congress sought to uphold that traditional understanding, and to guard against any "maverick judicial officer" who might "expand civil liability" by laying blame on the firearms industry for independent criminal acts. *Id*. § 7901(a)(7).

Against that backdrop, Plaintiffs' complaints are barred by PLCAA and must be dismissed for several reasons. *First*, Plaintiffs do not allege facts showing any Defendant *knowingly* violated any statute. They instead rely on the vague and undefined concept of "reasonable controls," which is a *negligence* standard that PLCAA's knowledge requirement flatly prohibits.

2

*Second*, even if Plaintiffs could establish that Defendants committed some "knowing" statutory violation, PLCAA would still bar their claims because the harms they allege were not "proximately caused" by any such violation. If this Court were to hold otherwise, it would contradict a wall of precedent holding that firearm companies are *not* the proximate cause of governmental harms stemming from third-party criminal violence—including a seminal New York decision issued right before PLCAA's enactment. *People ex rel. Spitzer v. Sturm, Ruger & Co.*, 309 A.D.2d 91, 103 (N.Y. App. Div. 1st Dep't 2003) (dismissing nuisance claim for lack of proximate cause because government's harms were "far too remote" from companies' violations); *see also Hamilton v. Beretta U.S.A. Corp.*, 750 N.E.2d 1055 (N.Y. 2001) (rejecting liability for firearms manufacturers because they were not "a direct link in the causal chain that resulted in plaintiffs' injuries").

*Third*, Plaintiffs also have failed to state a valid nuisance claim under the common law or N.Y. General Business Law §§ 898-a-e ("GBL 898"). Courts have overwhelmingly held that selling and manufacturing lawful products (including firearms) cannot give rise to common-law nuisance liability. And as to GBL 898, Plaintiffs have alleged only that Defendants engaged in industry-standard, lawful conduct, including manufacturing common firearms that were sold in New York through federally licensed distributors and retailers. Such benign firearm commerce does not violate GBL 898. And if it did, then GBL 898 would be unconstitutional; if that law were construed in such an extreme manner, it would violate the Second Amendment and could not be a valid predicate statute for PLCAA purposes.

## BACKGROUND

Buffalo and Rochester filed these lawsuits seeking to place the blame for violence in their cities on the firearms industry. Plaintiffs' theory is that Defendants could do more to prevent the firearms they sell from ultimately ending up in the wrong hands, where they are criminally misused by third parties—and that Defendants' supposed failure to do more to prevent third-party violence should make them liable for the indirect harms that Plaintiffs allegedly sustain as a result.

In particular, the First Amended Complaints allege that "Defendants knowingly and intentionally refused . . . to adopt reasonable controls and procedures to prevent their guns from being sold, possessed, and used unlawfully" by independent third-party criminals in New York. Rochester Compl. ¶ 8; Buffalo Compl. ¶ 8.[1] More specifically, Plaintiffs claim that Defendants could "[l]everag[e] data readily available to gun manufacturers to identify the small minority of dealers that sell large and/or disproportionate numbers of crime guns and/or have been repeatedly cited for violations of firearms regulations by ATF or other law enforcement officials," "[r]equir[e], as a matter of contractual agreement, that wholesalers and retail dealers that sell Defendants' guns report such data upstream to Defendants," "[e]ngag[e] in corrective action against dealers that sell large and/or disproportionate numbers of crime guns and/or repeatedly violate firearms regulations, up to and including ceasing distribution to such dealers," and "[e]nsur[e] that all dealers selling Defendants' guns have established reasonable controls and procedures to prevent theft, as well as sales to straw purchasers, traffickers, prohibited individuals or persons at risk of injuring themselves or others." Rochester Compl. ¶ 65; Buffalo Compl. ¶ 71.

---

[1] Although the City of Buffalo and the City of Rochester each filed separate First Amended Complaints, they contain largely identical allegations, with no differences material to this motion. The arguments for dismissal apply equally to both Complaints.

The purported efficacy of these measures is premised, in part, on Plaintiffs' claim that "[l]arge or disproportionate trace activity attributable to a wholesaler or a retailer to which the manufacturer sells directly . . . serves as a reliable indicator warranting further scrutiny by the manufacturer." Rochester Compl. ¶ 69; Buffalo Compl. ¶ 75. Plaintiffs do not identify any specific retailers that are allegedly "high-risk," much less identify anything unlawful or otherwise problematic about their practices.

Although Plaintiffs assert in vague and conclusory terms that each Defendant's conduct "results in harm to the public" and ultimately leads Plaintiffs "to expend significant additional resources on policing, first-responders, the criminal justice system, funding intervention groups, and providing services to victims" (Rochester Compl. ¶¶ 113, 199; Buffalo Compl. ¶¶ 118, 204), they allege no facts showing a direct connection between any allegedly unlawful action of Defendants and any injury suffered by the municipal governments of Buffalo or Rochester.

## STANDARD OF REVIEW

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* To meet this standard, a pleading must be comprised of more than "'labels and conclusions'" or "'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 555, 557). Although the Court must accept all factual allegations in a complaint as true, it is "not required to credit conclusory allegations or legal conclusions couched as factual allegations." *Rothstein v. UBS AG*, 708 F.3d 82, 94 (2d Cir. 2013).

**ARGUMENT**

Plaintiffs' claims fail at every level. Under federal law, they are barred at the threshold by PLCAA. And under state law, they fail on their own terms because they fail to plead any facts that would satisfy the essential elements of their New York causes of action. Plaintiffs' claims thus should be dismissed with prejudice.

## I.    PLAINTIFFS' CLAIMS ARE BARRED BY PLCAA

Congress enacted PLCAA to prohibit precisely the type of claims asserted in this case. PLCAA bars certain claims from being "brought" in "any Federal or State court," including any claim "against a manufacturer or seller of a [firearm]" based on harms "resulting from the criminal or unlawful misuse of a [firearm] by . . . a third party." 15 U.S.C. §§ 7902(a), 7903(5)(A). Any such claim must "be immediately dismissed," unless it falls within one of PLCAA's narrow exceptions. *Id*. § 7902(b). Because Plaintiffs' claims fall easily within the definition of a "qualified civil liability action," and because none of them qualifies for any PLCAA exception, Plaintiffs' case fails at the threshold.

### A.    This Case Falls Within the Heartland of PLCAA Immunity

PLCAA generally bars any "qualified civil liability action," broadly defined to include claims "brought by any person against a manufacturer or seller of a qualified product" seeking relief for any harms "resulting from the criminal or unlawful misuse of a qualified product by the person or a third party. . . . ." *Id*. § 7903(5)(A). Plaintiffs' claims clearly fit that definition.

To start, covered "person[s]" include "any governmental entity" acting as a plaintiff, which covers both of the municipal governments that are Plaintiffs here. *Id*. § 7903(3). "Firearm[s]" are "qualified product[s]," and the Complaints allege that all Defendants are "manufacturers" of firearms.  Rochester Compl. ¶ 2; Buffalo Compl. ¶ 2. And all of Plaintiffs' alleged injuries "result[]

6

from" the "criminal or unlawful misuse of" firearms by "third part[ies]." 15 U.S.C. § 7903(5)(A). As the Complaints acknowledge, Plaintiffs' alleged injuries flow from "unlawful possession, transportation, disposition, and use of firearms" by third parties. Rochester Compl. ¶ 201; Buffalo Compl. ¶ 206. In other words, Plaintiffs' asserted damages are all caused by deliberate acts of third-party criminals. Thus, PLCAA applies by its plain terms.

History confirms that this case falls within the very core of suits that PLCAA was designed to prohibit. "PLCAA was considered and passed at a time when victims of shooting incidents," and many government entities, "brought civil suits seeking damages and injunctive relief against out-of-state manufacturers and sellers of firearms." Vivan S. Chu, CONG. RSCH. SERV. R42871, *The Protection of Lawful Commerce in Arms Act: An Overview of Limiting Tort Liability of Gun Manufacturers* 1 (2012). Plaintiffs invoked a broad range of legal theories, including "strict liability," "public nuisance," "negligent marketing," and "deceptive trade practices." Timothy D. Lytton, *Tort Claims Against Gun Manufacturers for Crime-Related Injuries*, 65 Mo. L. Rev. 1, 6–50 (2000). Congress recognized that even if these claims did not ultimately prevail, they still posed an existential threat to the firearms industry, which was "in danger of being overwhelmed by the cost of defending itself against these suits." H.R. REP. NO. 109-124, at 12 (2005) ("House Report").

Congress enacted PLCAA in direct response to these concerns. To avoid ruinous litigation costs, the statute did not just confer a defense against liability, but provided that covered claims could not even be "brought," and that any pending claims had to be "immediately dismissed." 15 U.S.C. § 7902(a), (b). The express statutory purpose was to "*prohibit causes of action*" against the firearms industry based on claims stemming from "the criminal or unlawful misuse of firearm products or ammunition products by others when the product functioned as designed and intended." *Id.* § 7901(b)(1) (emphasis added). Thus, as the Supreme Court has recognized, the

7

statute confers a threshold statutory "immunity" that is appropriately resolved at the motion-to-dismiss stage. *Smith & Wesson*, 605 U.S. at 299. Indeed, if covered claims are *not* immediately dismissed on the pleadings, then the "core purpose" of PLCAA's statutory immunity would be defeated, because the industry would still have to face a "flurry of lawsuits" that could subject them to the costs and burdens of litigation regardless of the ultimate outcome. *Id*. at 298.

Unsurprisingly, courts routinely apply PLCAA to dismiss cases like this one on the pleadings, brought by governmental plaintiffs against many of the same defendants here. *See, e.g.*, *Smith & Wesson*, 605 U.S. at 285 (dismissing aiding-and-abetting claim brought by Mexico); *City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384, 398 (2d Cir. 2008) (dismissing public-nuisance claim brought by New York City); *District of Columbia v. Beretta U.S.A. Corp.*, 940 A.2d 163, 169 (D.C. 2008) (dismissing statutory claim brought by D.C. government); *cf. In re Academy, Ltd.*, 625 S.W.3d 19, 35–36 (Tex. 2021) (granting mandamus, recognizing that allowing case to proceed would effectively destroy PLCAA immunity). This Court should do the same, as Plaintiffs' allegations show they cannot satisfy any of PLCAA's narrow exceptions. As the Supreme Court has admonished, the exceptions should not be read to be so "capacious" that they would "swallow most of the rule" barring suits based on "a third-party's criminal use of [a] company's product." *Smith & Wesson*, 605 U.S. at 298–99.

### B.     This Suit Does Not Fall Within PLCAA's Predicate Exception

PLCAA generally requires immediate dismissal, subject only to narrow exceptions defined in 15 U.S.C. § 7903(5). Most of these exceptions are plainly inapplicable here—for example, Plaintiffs do not assert claims "for negligent entrustment or negligence per se" or seek to bring "an action for breach of contract or warranty." *Id*. § 7903(5)(A)(ii), (iv). Based on the Complaints, however, it appears Plaintiffs intend to rely on the so-called "predicate exception," which provides

an exception to PLCAA immunity if "a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought." *Id*. § 7903(5)(A)(iii). But despite their efforts to suggest otherwise, Plaintiffs' claims do not fit within PLCAA's narrow predicate exception and must be dismissed.

### 1. Plaintiffs' common-law public nuisance claims are not based on a valid predicate statute

PLCAA's predicate exception applies only to violations of "statute[s] applicable to the sale or marketing" of firearms. *Id*. § 7903(5)(A)(iii). Thus, Count Two of the Amended Complaints, which alleges common-law public-nuisance, plainly does not qualify. Nor could Plaintiffs rescue their public-nuisance claim by reframing it as one based on New York's criminal nuisance statute, NYPL § 240.45: The Second Circuit has already held NYPL § 240.45 "does not fall within the predicate exception to the claim restricting provisions of the PLCAA." *Beretta*, 524 F.3d at 400. For this reason alone, the common-law public nuisance claims must be dismissed.

### 2. Plaintiffs fail to allege facts showing any "knowing" violation of law

As to Count One, alleging violation of GBL 898, Plaintiffs fail to satisfy PLCAA's predicate exception because they do not allege facts showing that any Defendant "*knowingly violated*" that statute. *See Iqbal*, 556 U.S. at 678 (conclusory assertions not enough).[2]

---

[2] Defendants acknowledge that the Second Circuit recently held that GBL 898 may qualify as an "applicable" statute for purposes of the predicate exception. *Nat'l Shooting Sports Found., Inc. v. James*, 144 F.4th 98, 111 (2d Cir. 2025) ("*NSSF*"). Defendants respectfully disagree, however, and note that a petition for certiorari to the Supreme Court is currently pending on that issue. *See Nat'l Shooting Sports Found., Inc. v. James*, No. 25-1026 (U.S.) (docketed Feb. 20, 2026). Defendants therefore preserve the argument that GBL 898 is not an "applicable" statute under PLCAA, either for appeal or following a decision from the Supreme Court in *NSSF*. In any event, as Judge Jacob's concurrence in *NSSF* explains, GBL 898 has only a "narrow aperture" of "legitimate reach" even under the Second Circuit's reasoning. *See NSSF*, 144 F.4th at 118.

The Supreme Court has repeatedly held that "knowingly," when used in this manner, requires "showing that the defendant knew his conduct to be unauthorized by statute or regulations." *Liparota v. United States*, 471 U.S. 419, 420, 425 (1985) (interpreting statute imposing penalties on "whoever knowingly uses . . . authorization cards in any manner not authorized by [the statute] or the regulations"); *Ruan v. United States,* 597 U.S. 450, 454 (2022) (interpreting statute making it a federal crime "for any person knowingly or intentionally" to "manufacture, distribute, or dispense . . . a controlled substance" "[e]xcept as authorized"); *Rehaif v. United States*, 588 U.S. 225, 229 (2019) (interpreting statute imposing heightened penalties on anyone who "knowingly violates" certain provisions). That is, where the law requires a "knowing violation," knowledge of the *unlawfulness* of the action is critical. *Liparota*, 471 U.S. at 426.

Instead of alleging facts showing Defendants knew they were violating any statute, Plaintiffs allege only that "Defendants have known for decades that exercising greater control over their distribution channels would decrease crime in New York." Rochester Compl. ¶ 53; Buffalo Compl. ¶ 59. But GBL 898 was passed only in 2021, so Plaintiffs' extensive allegations about conduct *prior to* 2021 obviously cannot constitute a "knowing" violation of GBL 898. *See, e.g.*, Rochester Compl. ¶¶ 12, 41-45; Buffalo Compl. ¶ 13 (same). And even after GBL 898's effective date, the mere allegation that Defendants know they could take additional steps to reduce the number of firearms misused by criminals does not show that Defendants themselves have *knowingly violated* any law. *See Smith & Wesson*, 605 U.S. at 292 (ordinary merchant not legally culpable "even if he knows that in some fraction of cases [criminal] misuse will occur").

The knowledge problem is particularly acute because Plaintiffs' GBL 898 claims allege only that Defendants have failed to take "reasonable" steps to "prevent" firearms from being unlawfully "used" or "sold." GBL § 898-b(2). Plaintiffs do not point to any concrete statutory

10

obligation or prohibition that could be "knowingly" violated. *See infra* pp. 18-20. And to the extent they try to substitute a *negligence* standard of "reasonableness" in place of PLCAA's "knowledge" standard, PLCAA forecloses any such claim. After all, the entire point of a knowledge requirement is to limit liability to those who acted with "a culpable mental state," *Rehaif*, 588 U.S. at 229—by doing something they *knew* was illegal—rather than imposing liability for *unknowing* violations based on an objective "reasonableness" standard.

### 3.    Plaintiffs' alleged injuries were not proximately caused by any alleged predicate violation

Even if Plaintiffs could show that Defendants knowingly violated some predicate statute, the facts alleged make clear that no such violation was a "proximate cause of the harm" allegedly suffered by the municipal governments of Buffalo or Rochester. 15 U.S.C. § 7903(5)(A)(iii). The statute requires that a firearm company's "violation" of an applicable statute  must be a "proximate cause" of the plaintiff's harm, not merely that a company engaged in some *non-violative* conduct that proximately caused injury to the plaintiff. 15 U.S.C. § 7903(5)(A)(iii) (emphasis added).  In adopting this proximate-cause requirement in PLCAA, Congress established a fixed federal standard to combat a trend in some modern courts of watering down proximate cause in a way that deviates from "hundreds of years of the common law." *Id*. § 7901(a)(7).

As the Supreme Court has explained, the traditional requirement of proximate cause under federal law requires a "direct relation between the injury asserted and the injurious conduct alleged." *Holmes v. Sec. Inv. Prot. Corp*., 503 U.S. 258, 268 (1992). The "general" rule has long been that proximate cause does not permit recovery for an injury that is "beyond the first step" of a causal chain. *Id*. at 271 (quoting *S. Pacific Co. v. Darnell-Taenzer Co*., 245 U.S. 531, 533 (1918)). Under this standard, the law does not permit a "judicial remedy" for "every conceivable harm that can be traced to alleged wrongdoing." *Lexmark Int'l, Inc. v. Static Control Components,*

11

*Inc.*, 572 U.S. 118, 132 (2014) (quotation omitted). After all, illegal acts always "cause ripples of harm [that] flow far beyond" their immediate object. *Bank of America Corp. v. City of Miami*, 581 U.S. 189, 202 (2017). But liability has never followed "wherever those ripples travel." *Id*. Instead, liability is limited by direct—or proximate—cause.

In identifying sufficiently direct harm, the Supreme Court has emphasized that "foreseeability alone does not ensure the close connection that proximate cause requires." *Bank of America*, 581 U.S. at 202. "If one takes a broad enough view, *all* consequences of a negligent act, no matter how far removed in time or space, may be foreseen. Conditioning liability on foreseeability, therefore, is hardly a condition at all." *Consol. Rail Corp. v. Gottshall*, 512 U.S. 532, 552–53 (1994). The "central question" is thus "whether the alleged violation led directly to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006). And where the "theory of liability rests . . . [on] separate actions carried out by separate parties" with no cooperation or coordination from the defendant, there is no proximate causal link to the defendant. *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 11 (2010) (plurality op.) (emphasis omitted).

In particular, when a state or city government claims harm resulting from third-party criminals misusing firearms, companies that manufacture or sell firearms are not a proximate cause because they do not directly cause such harm. Indeed, shortly before PLCAA's enactment in 2005, several court decisions held that proximate cause was lacking and rejected virtually identical claims brought by other state and city governments against the firearms industry.

In *City of Philadelphia v. Beretta U.S.A.*, 277 F.3d 415 (3d Cir. 2002), the Third Circuit dismissed a suit brought by Philadelphia and non-profit groups, holding that their claims "failed for lack of proximate cause because their injuries are too remote from the gun manufacturers' alleged conduct." *Id*. at 422–23. The court emphasized that "[t]he causal connection between the

12

gun manufacturers' conduct and the plaintiffs' injuries is attenuated and weak," and that, "if we allowed this action, it would be difficult to apportion damages to avoid multiple recoveries and the district court would be faced with apportioning liability among, at minimum, the various gun manufacturers, the distributors, the dealers, the re-sellers, and the shooter." *Id*. at 426.

Likewise, in *Spitzer*, a New York appellate court dismissed New York State's statutory nuisance claim as "far too remote" from the conduct of the firearms industry. 309 A.D.2d at 103. The State alleged that firearm companies—including some named here—created a "public nuisance, because they manufacture, distribute and market handguns allegedly in a manner that knowingly places a disproportionate number of handguns in the possession of people who use them unlawfully." *Id*. at 93. But the court held that proximate cause was lacking because the companies' conduct was "far removed from the downstream, unlawful use of handguns" by third parties who Defendants did not "control." *Id*.  Similarly, in *Hamilton*, the New York Court of Appeals made clear that "broad liability . . . should not be imposed" on the firearms industry "without a . . . tangible showing that defendants were a direct link in the causal chain that resulted in plaintiffs' injuries." 750 N.E.2d at 1062. No such showing can be made where, as here, "the connection between defendants, the criminal wrongdoers and plaintiffs is remote, running through several links in a chain consisting of at least the manufacturer, the federally licensed distributor or wholesaler, and the first retailer," and also "most often includes numerous subsequent legal purchasers or even a thief." *Id*.

The high courts of Connecticut, Illinois, and the District of Columbia all reached the same conclusion. *See Ganim v. Smith & Wesson Corp.*, 780 A.2d 98, 123 (Conn. 2001) (city's claim against firearm companies was too "indirect, remote, and derivative" to be viable); *Chicago v. Beretta, U.S.A. Corp.*, 821 N.E.2d 1099, 1136 (Ill. 2004) (firearm companies' conduct was "so

13

remote from the [City's] resulting injury that legal cause was not established"); *District of Columbia v. Beretta, U.S.A. Corp.*, 872 A.2d 633, 638 (D.C. 2005) (en banc) (dismissing nuisance claim against firearm companies due to "the sheer number of causal links, and resulting attenuation, that underlie the District's claim of injury"). The allegations in this case are indistinguishable from those asserted in these pre-PLCAA cases.

When Congress enacted PLCAA, it embraced these cases rejecting claims against firearms companies for lack of proximate cause. *See* House Report, H.R. REP. NO. 109-124, at 6-13 (collecting and analyzing these and similar cases). Indeed, Congress viewed such claims as invalid because they are based on "tenuous claim[s] of causality," punctuated by "many" steps that separate the companies' conduct from any harm to the government. *Id*. at 13. The House Report described the typical chain of causation that Congress viewed as too attenuated: (1) Manufacturers lawfully "produce the firearms"; (2) then "sell them to federally licensed distributors"; (3) who "sell them to federally licensed dealers"; (4) after which, "some of the firearms are diverted by third parties into an illegal gun market"; (5) where "these firearms are obtained by people who are not licensed to have them"; (6) then are used "in criminal acts that do harm"; (7) which then "the city or county must spend resources combatting." *Id*. The core purpose of PLCAA's proximate-cause requirement is to *prevent* claims based on such indirect and attenuated chains of causation.

Here, however, Plaintiffs allege facts exactly like those quoted in the House Report above, making clear that their chain of causation is impermissibly *indirect*. The core of their theory is that Defendants manufactured firearms and sold them to federally licensed distributors, who sold them to federally licensed retailers, which resold the firearms, which were unlawfully obtained by criminals, who unlawfully used them, which caused the cities' resources to be spent. At the start of this chain, Plaintiffs allege that Defendants violated GBL 898 by failing to "identify the High-

14

Risk New York dealers that supply large or disproportionate shares of . . . crime guns," and failing to "engage in corrective action against those dealers, up to and including ceasing distribution to them." Rochester Compl. ¶ 53; Buffalo Compl. ¶ 59. According to Plaintiffs, such "corrective action" would "reduce the supply of illicit crime guns" (Rochester Compl. ¶ 13; Buffalo Compl. ¶ 14) and thus "decrease crime in New York" (Rochester Compl. ¶ 53; Buffalo Compl. ¶ 59). That, in turn, would reduce the resources Plaintiffs would need to spend "on policing, first responders, the criminal justice system, funding intervention groups, and providing services to victims." Rochester Compl. ¶ 19, Buffalo Compl. ¶ 20. That is the very definition of *indirect*, non-proximate causation, as squarely recognized by all of the cases cited above and the House Report.

Moreover, a classic sign that a causal chain is too attenuated is that ascertaining damages and liability would be unworkable. *Anza*, 547 U.S. at 458–60. After all, "the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent factors." *Holmes*, 503 U.S. at 269. Just so here. While Plaintiffs' Amended Complaints have narrowed the defendants they are pursuing claims against, Plaintiffs initially gathered a broad collection of defendants in these cases, and even that list barely scratches the surface of the long list of alleged bad actors—including unscrupulous dealers, straw purchasers, weapons smugglers, thieves, and violent criminals—who have contributed to Plaintiffs' alleged injuries. There is no way to apportion fault among all these actors, or to isolate the supposed causal role Defendants play in those alleged injuries, much less the causal role Defendants' alleged *statutory violations* play. *See City of Philadelphia*, 277 F.3d at 426; *Hamilton*, 750 N.E.2d at 1062. And that is especially true since the violations here must have occurred after GBL 898 (the only statute which they could conceivably have "violated") was enacted in 2021, and Plaintiffs complain about criminal firearm use dating back "decades."

15

The problem is compounded by the nature of Plaintiffs' alleged injuries, which are derivative rather than direct: Buffalo and Rochester are not direct victims of violence committed by criminals wielding firearms, but rather allege they must expend "law enforcement resources" to combat violence committed against *others* by criminals wielding firearms. Rochester Compl. ¶ 202; Buffalo Compl. ¶ 207. Where a plaintiff asserts such derivative injuries, the direct victims are "better situated plaintiffs." *Hemi*, 559 U.S. at 11–12; *Holmes*, 503 U.S. at 269–70. Thus, an "alleged harm" is "ordinarily" too attenuated "if the harm is purely derivative of the misfortunes visited upon a third person by the defendant's acts." *Lexmark*, 572 U.S. at 133. And that is clearly the case here. Victims in Buffalo or Rochester can sue the criminals who actually injure or threaten them. That is not only the traditional common-law rule, *City of Philadelphia*, 277 F.3d at 424–25 (discussing the City's "derivative injuries"); it is also the basic policy judgment Congress made in PLCAA. *See* 15 U.S.C. § 7901(a)(5).

Finally, since the lack of proximate cause here is readily apparent from the facts Plaintiffs have alleged, dismissal on the pleadings is appropriate. "[L]ike any other element of a cause of action, [proximate cause] must be adequately alleged at the pleading stage in order for the case to proceed." *Lexmark*, 572 U.S. at 134 n.6. Thus, "[i]f a plaintiff's allegations, taken as true, are insufficient to establish proximate causation, then the complaint must be dismissed." *Id*. After all, if the facts alleged in the complaint cannot establish proximate cause as a matter of law, even if true, then the plaintiff is not "entitled to an opportunity to prove them." *Id*. Indeed, applying the proximate-cause requirement here on a motion to dismiss is essential to enforcing the threshold statutory "immunity" that PLCAA provides, since allowing the case to proceed to discovery would impose exactly the type of litigation burdens that the statute was designed to prevent. *Smith & Wesson*, 605 U.S. at 299.

16

## II.    PLAINTIFFS FAIL TO STATE A VALID CLAIM UNDER STATE LAW

Although the reasons above are fully dispositive, Plaintiffs also fail to state a valid claim for any violation of New York state law—which means they fail even on their own terms, and they also fail to fit within PLCAA's predicate exception for this reason too. *See Smith & Wesson*, 605 U.S. at 286-87 (PLCAA requires dismissal for failure to state a predicate violation).

### A.    There Is No Valid Claim for Public Nuisance

At the outset, selling and manufacturing lawful products (including firearms) does not violate New York's ordinary public-nuisance law. As the Restatement explains, public-nuisance claims "against the makers of products that have caused harm, such as tobacco, firearms, and lead paint" have been "rejected by most courts . . . because the common law of public nuisance is an inapt vehicle." RESTATEMENT (THIRD) OF TORTS: LIAB. FOR ECON. HARM § 8 cmt. G (2020). Indeed, "courts have refrained from applying public nuisance doctrine in cases where the instrument of the nuisance is a lawfully sold product which has left the manufacturer's control" as it is "nothing more than a clever, but transparent attempt at an end run around the legislature's statutory prerogatives." *City of Philadelphia*, 277 F.3d at 420–22; *see also, e.g.*, *Chicago*, 821 N.E.2d at 1116; *Camden Cnty. Bd. of Chosen Freeholders v. Beretta USA Corp.*, 273 F.3d 536, 541 (3d Cir. 2001) (per curiam) (same); *Penelas v. Arms Tech., Inc.*, 778 So. 2d 1042, 1044–45 (Fla. Dist. Ct. App. 2001) (same).

*Spitzer* is on point. There, the State of New York brought New York common-law public nuisance claims against handgun manufacturers, wholesalers and retailers, alleging that "after being placed on actual and constructive notice that guns defendants sell, distribute and market are being used in crimes, they have, by their conduct and omissions, created, maintained, and contributed to this public nuisance, because they manufacture, distribute and market handguns

17

allegedly in a manner that knowingly places a disproportionate number of handguns in the possession of people who use them unlawfully." *Spitzer*, 309 A.D.2d at 93. New York's Appellate Division affirmed the dismissal of the public-nuisance claims, noting that the "New York Court of Appeals has never recognized a common-law public nuisance cause of action based on allegations like those in this complaint." *Id*. at 94. As the court explained, "the legislative and executive branches are better suited to address the societal problems concerning the already heavily regulated commercial activity at issue." *Id*. at 93–94. Thus, no common-law public nuisance claim was viable. Because the claims at issue here are indistinguishable, Plaintiffs' common-law public nuisance claims must be dismissed for the same reasons.

### B.    There Is No Valid Claim Under GBL 898

Plaintiffs' claims under GBL 898 likewise fail. They rely exclusively on GBL § 898-(b)(2), which provides that "[a]ll gun industry members . . . shall establish and utilize reasonable controls and procedures to prevent its [firearms] from being possessed, used, marketed or sold unlawfully in New York state." GBL 898-b-(1)–(2). The statute defines "reasonable controls and procedures" to mean "policies that include, but are not limited to," the following:

(a) instituting screening, security, inventory and other business practices to prevent thefts of qualified products as well as sales of qualified products to straw purchasers, traffickers, persons prohibited from possessing firearms under state or, federal law, or persons at risk of injuring themselves or others;

(b) preventing deceptive acts and practices and false advertising and otherwise ensuring compliance with all provisions of article twenty-two-A of this chapter; and

(c) taking reasonable steps to prevent the installation and use of a pistol converter, as defined in section 265.00 of the penal law, on qualified products.

Plaintiffs do not allege that Defendants engaged in any "deceptive acts or practices" or failed to prevent the installation of a "pistol converter." And although state and federal law impose a host of detailed rules that Defendants are required to follow to guard against "theft" and unlawful

18

"sales," Plaintiffs do not allege that Defendants have violated any of those rules.[3] Instead, Plaintiffs claim that despite *complying* with these rules, Defendants violated GBL 898-b(2) because they "either (a) refuse to monitor the downstream distribution of their firearms for purposes of identifying High-Risk New York Dealers or (b) if they do engage in such monitoring, refuse to act upon that information." Rochester Compl. ¶ 187, Buffalo Compl. ¶ 192. In particular, Plaintiffs allege that "each of the Defendants has failed to" take the following specific actions:

(i)      leverage data readily available to them to identify the small minority of federally licensed gun dealers in Monroe [or Erie] County and elsewhere in New York State that sell large and/or disproportionate numbers of crime guns . . . , as well as local dealers that have a history of repeatedly violating firearm regulations (together, "High-Risk New York Dealers");

(ii)     require, as a matter of contractual agreement, that wholesalers and retail dealers selling . . . their [guns] in or into New York report such information upstream to Defendants;

(iii)    engage in corrective action against High-Risk New York Dealers, up to and including ceasing distribution to such dealers;

(iv)     ensure that the retail dealers that sell their products have established reasonable controls and procedures to prevent theft, as well as sales to straw purchasers, gun traffickers, prohibited individuals or persons at risk of injuring themselves or others; and/or

(v)      implement alternative measures that would be reasonably effective at preventing theft, straw purchases, and other sales to traffickers or prohibited persons.

Rochester Compl. ¶ 9; Buffalo Compl. ¶ 9.

---

[3] *See, e.g.*, 18 U.S.C. § 923(i) (manufacturers required to "identify [each firearm manufactured] by a serial number engraved or cast on the receiver or frame of the weapon"); *id.* § 923(g)(1) (record-keeping requirements); *id*. § 922(b)-(e) (limitations on firearm sales); 27 C.F.R. § 478.123 (record-keeping requirements for manufacturers); N.Y. Penal Law § 400.00 (New York licensing for "gunsmith or dealer in firearms"); N.Y. Penal Law § 265.07 (state registration and serialization requirements); 9 N.Y. C.R.R. § 472.5 (ballistic sample requirements).

To start, Plaintiffs do not claim that any of these specific "reasonable controls" that they demand are expressly required under any state or federal law, including GBL 898 itself. Instead, they insist Defendants are acting "unreasonably" by failing to follow these *unwritten* rules, which have never been enacted into any law or regulation. As discussed above, since Defendants have never had any notice that these specific actions are required by any law, it would be impossible to "knowingly" violate them as required by PLCAA. *See supra* pp.10-11.

But even putting aside the required element of knowledge, Plaintiffs' Complaints confirm that Defendants have complied with GBL 898-b(2) by taking a multitude of "reasonable" steps to prevent theft and unlawful sales. As noted, Plaintiffs do not allege Defendants fail to comply with the many specific state and federal rules designed for this purpose, nor do they explain why taking those required steps does not count as maintaining "reasonable controls." *Supra* p. 19 & n.3.

Plaintiffs' own allegations also show Defendants have acted reasonably by taking various other actions—which no law even requires—to proactively prevent downstream misuse. For example, they allege that "Smith & Wesson's contracts with its distributors and buying groups require them to 'support [its] full compliance with all applicable laws,'" and prohibit distributors from "knowingly selling [Smith & Wesson's] firearms to anyone who is not complying with the laws and regulations relating to the sale or distribution of firearms," "knowingly selling [Smith & Wesson's] firearms to anyone that has made false or misleading statements with respect to the information required to purchase a firearm," or "knowingly selling or delivering [Smith & Wesson's] firearms where the purchase or possession would be in violation of any law applicable at the place of sale of delivery." Rochester Compl. ¶ 94; Buffalo Compl. ¶ 99. Although Plaintiffs conclusorily assert, on information and belief, that "Smith & Wesson does not act to meaningfully enforce" these contractual requirements (Rochester Compl. ¶ 95, Buffalo Compl. ¶ 100), they do

20

not offer any factual allegations showing that any of Smith & Wesson's distributors or buying groups have violated these provisions in a way that should have triggered enforcement.

Similarly, Plaintiffs allege that Glock imposes on its dealers "a number of dealer responsibilities related to safety, including agreement to comply with federal, state, and local laws and regulations, and to file with Glock an annual certification verifying such compliance." Rochester Compl. ¶ 122; Buffalo Compl. ¶ 127. Glock also requires dealers to "train all employees involved with the sale of Glock products in compliance with the law as it relates to the sale of Glock firearms" and to "maintain sales information for all Glock products, including the serial numbers of handguns sold, dates of sale, and identity of purchasers," and "make this information available for review by Glock and law enforcement." Rochester Compl. ¶ 122; Buffalo Compl. ¶ 127. Again, Plaintiffs claim that Glock does not "meaningfully enforce[]" these requirements, but in support, it primarily offers allegations about stores *outside* New York, which are irrelevant to any GBL 898 claims. Rochester Compl. ¶¶ 123–24; Buffalo Compl. ¶¶ 128–29.[4] As to stores in New York, Plaintiffs allege some authorized Glock dealers "have been found by ATF to be in violation of firearms laws and regulations" (Rochester Compl. ¶ 124; Buffalo Compl. ¶ 129), but do not explain the nature of the alleged violations or how Glock allegedly responded.

---

[4] Under the federal Constitution, the Dormant Commerce Clause "precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State." *NSSF*, 144 F.4th at 105 (quoting *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989)). Thus, a state statute violates the Dormant Commerce Clause if it "has the practical effect of extraterritorial control of commerce occurring entirely outside the boundaries of the state in question." *Id*. (quoting *Grand River Enters. Six Nations, Ltd. v. Boughton*, 988 F.3d 114, 123 (2d Cir. 2021)). GBL 898 thus applies only to claims involving relevant conduct (i.e., the manufacture, import, sale, or marketing of firearms) occurring *within New York*. It cannot be used to regulate conduct that takes place wholly outside New York's boundaries, such as lawful firearm sales in other states.

Plaintiffs' failure to plausibly allege facts showing that there is anything "unreasonable" about Defendants' conduct does not end there. For one thing, they allege that essentially the entire firearms industry has long operated the same way as Defendants do. *See* Rochester Compl. ¶¶ 14-15, 56-64; Buffalo Compl. ¶¶ 15-16, 62-70. Such adherence to industry standards generally shows that conduct is both lawful and reasonable. *Trimarco v. Klein*, 56 N.Y.2d 98, 105–06 (1982) ("[W]hen proof of an accepted practice is accompanied by evidence that the defendant conformed to it, this may establish due care."); *Williams v. Crane*, No. 2:14-CV-241 TS, 2015 WL 7176370, at *1 (D. Utah Nov. 13, 2015) ("[I]ndustry standards may represent a consensus regarding what a reasonable person in a particular industry would do").

As another example, Plaintiffs assert that Defendants have not "leverage[d] data readily available to them to identify the small minority of federally licensed gun dealers . . . in New York State that sell large and/or disproportionate numbers of crime guns" and thus have not "engage[d] in corrective action against High-Risk New York Dealers." Rochester Compl. ¶ 9; Buffalo Compl. ¶ 9. But Plaintiffs have not offered any factual allegations to support the claim that any "corrective action" against these dealers would be warranted. That is, Plaintiffs do not identify any of the supposed "High-Risk New York Dealers," much less allege facts showing that those dealers engage in any improper sales practices.

Instead, Plaintiffs allege only certain statistics on retailers that have sold firearms that were later traced to crimes. As the New York Court of Appeals has explained, though, "the appearance of [a retailer] . . . in association with a crime gun or in association with multiple crime guns in no way suggests that either the [retailer] or the first purchaser has committed criminal acts." *Hamilton*, 750 N.E.2d at 1065 n.8; *see also City of Philadelphia*, 277 F.3d at 424 n.14 (that a "licensed distributor or dealer" sold firearms later used in crimes does not state a plausible claim that the

22

distributor or dealer "has committed an illegal act"). Rather, as even Plaintiffs are forced to acknowledge, it is "possible" that "top sellers of New York crime guns attain that distinction" due to "the volume of firearms they sell," rather than anything problematic about their sales practices. Rochester Compl. ¶ 52; Buffalo Compl. ¶ 58.

Similarly, geographic proximity may well explain why certain retailers' firearms are frequently recovered by law enforcement in Rochester or Buffalo. Yet Plaintiffs offer no allegations about the number of retailers selling firearms in the region, much less the volume of those various retailers' sales. They thus offer no allegations suggesting that *any* New York retailer's sales result in a higher-than-expected recovery by law enforcement, much less that such "disproportionate" recoveries are caused by problematic sales practices as opposed to other factors. Absent allegations that what Plaintiffs call "High-Risk New York Dealers" are actually engaged in problematic sales practices that would justify "corrective action"—much less that Defendants are well-positioned to distinguish such problematic retailers from retailers who frequently appear in traces through no fault of their own—Plaintiffs fall far short of plausibly pleading that Defendants have acted unreasonably by failing to identify such dealers and stop selling to them.

Plaintiffs offer even less factual support for the idea that Defendants have acted unreasonably by allegedly not "ensur[ing] that the retail dealers that sell their products have established reasonable controls and procedures to prevent theft, as well as sales to straw purchasers, gun traffickers, prohibited individuals or persons at risk of injuring themselves or others." Rochester Compl. ¶ 9; Buffalo Compl. ¶ 9. That is, Plaintiffs do not offer any allegations about any New York retailers' existing controls or procedures to prevent theft or unlawful sales. And again, absent allegations that retailers are falling short in these areas, Plaintiffs cannot plausibly allege that Defendants have acted unreasonably by not "ensuring" retailer compliance.

In sum, Plaintiffs allege nothing more than the distribution and sale of firearms to retailers within New York, without alleging anything problematic about those retailers' sales practices. Plaintiffs thus fail to allege anything that could fall within GBL 898's prohibitions.

## III.     CONSTRUING NEW YORK LAW TO IMPOSE LIABILITY ON DEFENDANTS HERE WOULD BE UNCONSTITUTIONAL

To the extent GBL 898, or any other New York law, could be interpreted to prohibit Defendants' routine commercial behavior as alleged here, it would violate the Second Amendment by infringing on the right to manufacture and sell lawful firearms free from novel restrictions that have no basis in our nation's constitutional tradition.

The Second Amendment protects the right to keep and bear arms, and it prohibits state law from burdening that right by imposing novel and historically unprecedented restrictions on manufacturers and sellers. As several courts have recognized, "the core Second Amendment right to keep and bear arms . . . 'wouldn't mean much' without the ability to acquire arms." *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (en banc). And "if the Second Amendment individual right to keep and bear a handgun for self-defense is to have any meaning, it must protect an eligible individual's right to purchase a handgun, as well as the complimentary right to sell handguns." *Radich v. Guerrero*, No. 1:14-CV-00020, 2016 WL 1212437, at *7 (D. N. Mar. I. Mar. 28, 2016); *see also e.g.*, *Illinois Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d 928, 947 (N.D. Ill. 2014) (holding Chicago ordinances "which ban gun sales and transfers other than inheritance . . . unconstitutional under the Second Amendment").

While New York may be able to "impos[e] conditions and qualifications on the commercial sale of arms," *District of Columbia v. Heller*, 554 U.S. 570, 626–27 (2008), it must do so in a manner that is "consistent with this Nation's historical tradition of firearm regulation." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 17 (2022). In particular, "when a challenged

24

regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id*. at 26.

Needless to say, the "societal problem" of criminals misusing firearms in the United States is nothing new. But until recently, no state or other governmental entity has ever tried to address that problem by requiring firearm companies to adopt unspecified "reasonable controls" enabling them to dictate how their products are later handled by others far down the distribution chain. Accordingly, since there is no historical basis for such regulation anywhere in our nation's long history and tradition, any attempt by New York to impose such regulation today would violate the Second Amendment. *Bruen*, 597 U.S. at 26. In order to survive constitutional scrutiny, GBL 898 must be narrowly construed to avoid such a novel and sweeping effect. *See In re Jamie J.*, 89 N.E.3d 468, 471 (N.Y. 2017) (under New York law, "canon of constitutional avoidance" requires courts to "construe the statute, if possible, to avoid" constitutional concerns). If GBL 898 were construed as broadly as Plaintiffs say, it would be unconstitutional and could not serve as a valid PLCAA predicate statute for that reason.

## CONCLUSION

The Court should dismiss the Amended Complaints with prejudice.

25

Dated: March 23, 2026

*/s/ James B. Vogts*
James B. Vogts (admitted PHV)
SWANSON, MARTIN & BELL, LLP
330 N. Wabash, Suite 3300
Chicago, IL 60611
Telephone: (312) 222-8517
Email: jvogts@smbtrials.com

Meghan M. Brown
GOLDBERG SEGALLA LLP
665 Main Street
Suite 400
Buffalo, NY 14203
Telephone: (716) 566-5400
Email: mbrown@goldbergsegalla.com

*Counsel for Sturm, Ruger & Co., Inc.*


*/s/ John F. Weeks IV*
John F. Weeks IV (admitted PHV)
SMITH, GAMBRELL & RUSSELL, LLP
1105 West Peachtree Street NE, Suite 1000
Atlanta, GA 30309
Telephone: (404) 815-3500
Email: jweeks@sgrlaw.com

John G. McCarthy
SMITH, GAMBRELL & RUSSELL, LLP
1301 Avenue of the Americas, 15th Floor
New York, NY 10019
Telephone: (212) 907-9700
Email: jmccarthy@sgrlaw.com


*Counsel for Taurus International
Manufacturing, Inc.*

*/s/ Noel J. Francisco*
Noel J. Francisco (admitted PHV)
Anthony J. Dick (admitted PHV)
JONES DAY
51 Louisiana Ave. NW
Washington, DC 20001
Telephone: (202) 879-3939
Email: njfrancisco@jonesday.com
        ajdick@jonesday.com

Andrew Lelling (admitted PHV)
JONES DAY
100 High Street
Boston, MA 02110
Telephone: (617) 449-6856
Email: alelling@jonesday.com

Kelly Holt Rodriguez (admitted PHV)
JONES DAY
90 S 7th St.
Minneapolis, MN 55402
Telephone: (612) 217-8855
Email: kholt@jonesday.com

Barry Nelson Covert
LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware Ave.
Suite 120
Buffalo, NY 14202
Telephone: (716) 849-1333
Email: bcovert@lglaw.com

*Counsel for Smith & Wesson Brands, Inc.*

*/s/ Scott C. Allan*
Christopher Renzulli
Scott C. Allan
RENZULLI LAW FIRM, LLP
One North Broadway, Suite 1005
White Plains, NY 10601
Telephone: (914) 285-0700
Email: crenzulli@renzullilaw.com
        sallan@renzullilaw.com

*Counsel for Glock, Inc.*

26