IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

<table>
<tr><td>

THE CITY OF ROCHESTER,

    *Plaintiff,*

v.

SMITH & WESSON BRANDS, INC; et al.,

    *Defendants.*
</td><td>

Case No. 6:23-cv-06061-FPG

LEAD CASE

Honorable Frank P. Geraci, Jr.
</td></tr>
<tr><td>

THE CITY OF BUFFALO,

    *Plaintiff,*

v.

SMITH & WESSON BRANDS, INC; et al.,

    *Defendants.*
</td><td>

Case No. 6:23-cv-00066-FPG

Honorable Frank P. Geraci, Jr.
</td></tr>
</table>

**BRIEF OF *AMICI CURIAE* STATE OF MONTANA AND 22 ADDITIONAL STATES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

**INTRODUCTION AND INTERESTS OF *AMICI***

*Amici* are sovereign states of the Union. They seek to protect the Constitutional rights of their citizens to obtain firearms without undue burden and expense. They also seek to protect their sovereign interest in a national industrial base that supplies firearms to State militia and police forces at minimal cost. Defendant Glock, Inc., for example, manufacturers firearms that equip many of *Amici*'s law enforcement officers. And former Defendant Colt's Manufacturing produces the M4 carbines that also equip *amici*'s law enforcement officers, as well as *amici*'s militia units.

In furtherance of those interests, *Amici* seek to provide additional background on the history and policies underlying the Protection of Lawful Commerce in Arms Act ("PLCAA"), Pub. L. No. 109-92, 119 Stat. 2095 (2005) (codified at 15 U.S.C. §§ 7901-03). *Amici* also seek to highlight Plaintiffs'

1

crime-increasing policies. Those policies have released thousands of violent offenders on to New York streets, are inconsistent with Plaintiffs' claims, and undermine Plaintiffs' requests for relief.

## BACKGROUND

These essentially identical actions were originally filed by two New York Cities in New York state court. The nub of both actions is that the firearms industry—despite complying with laws governing its distribution chain and individual sales—did not do enough to prevent unlawful post-sale use of firearms in crime. Tellingly, the cities sought only damages, not injunctive relief. Also tellingly, the cities are represented by well-known antigun activists like Everytown, the Brady Center (f/k/a Handgun Control, Inc.), and a repeat-player activist firm from Puerto Rico, rather than their own law departments or local attorneys.

Both actions were removed, and this Court consolidated them for pretrial purposes. The Court then stayed the actions pending the Second Circuit's opinion *National Shooting Sports Foundation, Inc. v. James*, which was a challenge to General Business Law ("GBL") § 898-a through -e as unconstitutional and preempted by the PLCAA. That opinion issued last year, with the Second Circuit rejecting the facial challenge in view of circuit precedent, while leaving open the possibility of as-applied challenges. *Nat'l Shooting Sports Found., Inc. v. James*, 144 F.4th 98 (2d Cir. 2025) (applying *City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384 (2d Cir. 2008)). Circuit Judge Jacobs concurred, but he emphasized that GBL § 898 was vulnerable to an as-applied challenge under PLCAA, and he suggested the earlier *Beretta* case was wrongly decided. 144 F.4th at 118-22 (Jacobs, J., concurring).

The consolidated action was unstayed, and the Plaintiff cities filed amended complaints. ECF 157, 158. They narrowed the Defendants to gun manufacturers. And they narrowed their claims to assert violations of GBL § 898-b(2), under which requires industry members who "manufacture, market, import or offer for wholesale or retail sale any [firearm] in New York state shall establish and utilize reasonable controls and procedures to prevent its [firearms] from being possessed, used,

marketed or sold unlawfully in New York state," as well as common-law public nuisance claims. But taking the hint from the Court's stay order, the cities added prayers for forward-looking relief and judicial supervision.

Defendants now move to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). ECF 176. They argue that the cities' claims are barred by PLCAA; they fail to state a claim in any event; and that imposing liability on the facts alleged would be unconstitutional. ECF 176-1.

## ARGUMENT

I.    **Plaintiffs' claims are barred by PLCAA.**

    A.    **PLCAA is part of a carefully-calibrated regulatory scheme by which Congress has categorically precluded public nuisance liability for the firearms industry.**

**1.** For decades, Congress has carefully balanced the people's Second Amendment rights with the need to keep firearms away from criminals. That careful balancing started with Congress's first foray into firearms regulation in response to the gangland violence of the 1930s. Even in responding to that pressing problem, Congress used a calibrated touch: it concluded heavy taxation of transfers of machineguns, short-barreled shotguns, short-barreled rifles, and silencers—together with the manufacturers, importers, and dealers of those weapons—was enough to achieve its aim. National Firearms Act of 1934, Pub. L. 73-474, 48 Stat. 1236. But Congress concluded regulation of pistols, revolvers, and sporting arms was unnecessary. H.R. Rep. 73-1780 at 1. Four years later, Congress adjusted its calibrated view, requiring manufacturers and dealers of any firearms to obtain a license, but imposing little regulation other than record-keeping. Federal Firearms Act of 1938, Pub. L. 75-785, 52 Stat. 1250.

Congress pervasively regulated the firearms industry with the Gun Control Act of 1968, Pub. L. 90-168, 82 Stat. 1213, "the most comprehensive gun control law ever signed in this Nation's history." President Lyndon B. Johnson, Remarks Upon Signing the Gun Control Act of 1968, 2 Pub.

Papers 1059, 1059 (Oct. 22, 1968). Still, Congress's touch was measured. It expressly sought to prevent "crime and violence" without "plac[ing] any undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms appropriate to the purpose of hunting, trapshooting, target shooting, personal protection, or any other lawful activity." Anyone "engaged in the business" of manufacturing or dealing in firearms fell within the statute's ambit. 82 Stat. at 1232. But Congress made clear the Act was "not intended to discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes." *Id.* at 1213-14.

By the 1980s, Congress concluded the Executive was overreaching in its zeal to regulate transfers of firearms. *See* Senate Subcommittee on the Constitution, *The Right to Keep and Bear Arms* 20-21 (Comm. Print Feb. 1982). Congress responded with the Firearm Owners Protection Act, Pub. L. 99-308, 100 Stat. 449 (1986). As part of that Act, Congress found that "the rights of citizens … to keep and bear arms under the Second Amendment" required "correct[ion] of existing firearms statutes and enforcement policies," and that additional legislation was needed to reaffirm the limited purpose of the Gun Control Act. 100 Stat. at 449 (codified at 18 U.S.C. § 921 Note).

Congress continued to adjust its calibrated scheme to provide greater or lesser regulation as it believed necessary. In 1993, for example, Congress required background checks for those purchasing firearms. Brady Handgun Violence Prevention Act, Pub. L. 103-159, 107 Stat. 1536. But that, too, was tailored: the statute included a waiting period provision that was in effect only until the National Instant Criminal Background Check System could be implemented. *Id.* at 1536-37. Similarly, Congress enacted a ban on so-called assault weapons, Public Safety and Recreational Firearms Use Protection Act, Pub. L. 103-322 Title XI, 108 Stat. 1796, 1996 (1994), but allowed the ban to sunset when there was no evidence of a statistically significant impact on violent crime, *see, e.g.*, Robert A. Hahn et al, First Reports Evaluating the Effectiveness of Strategies for Preventing Violence: Firearms Laws, 52 RR-14 MMWR 11 (Oct. 3, 2003) ("insufficient evidence"); Lois K. Lee et al, Firearm Laws and Firearm

Homicides – A Systematic Review, 177 JAMA Int. Med. 106, 117 (Jan. 2017) ("4 studies … do not provide evidence that the ban was associated with a significant decrease in firearm homicides").

**2.** Although anti-gun activists had some success with the Brady Bill and the Assault Weapons Ban, they were unhappy with Congress's measured approach. So the activists—often in concert with big city politicians—started filing suits against firearm manufacturers. They made no secret that their strategy was to bankrupt firearms manufacturers through a large volume of litigation asserting novel legal claims.

The first suit was by New Orleans, in 1998. It sought to hold gun manufacturers responsible for police and healthcare expenditures the city alleged were attributable to gun violence. Paul Dugan & Saundra Torry, *New Orleans Initiates Suit Against Gunmakers*, WASHINGTON POST, Oct. 30, 1998. Among other things, New Orleans argued the firearms industry had not invested in technology to make weapons safer. *Id.* "Guns must now become the next tobacco," said Dennis Henigan, a lawyer in the case who worked for the Washington-based Center to Prevent Handgun Violence. *Id.*

Chicago quickly followed with a suit against 38 retailers, distributors and manufacturers, seeking $433 million in damages. Raad Cawthon, *Chicago Sues Gun-makers*, PHILADELPHIA INQUIRER, Nov. 13, 1998. Mayor Richard Daly explained it was "not a product-liability suit," adding that the "problem is the guns work all too well." *Id.* Chicago instead alleged otherwise lawful sales of firearms created a public nuisance, including by supplying too many firearms to retailers *outside* of Chicago. *Id.* Daly opined that firearms "should not be on the streets, not only in Chicago, but in America." *Id.* The strategy, as Daly put it, was "to hit [the firearms industry] where it hurts, in the wallet." *Id.*

Dozens more cities and politicians piled on. For example, the small city of Bridgeport, Connecticut filed suit in early 1999. Fred Musante, *After Tobacco, Handgun Lawsuits*, NEW YORK TIMES, Jan. 31, 1999, at 1. That suit went so far as to target trade associations for promoting the idea that handgun ownership is an effective means of personal protection. *Id.* Bridgeport's mayor proudly

proclaimed he was "creating law with litigation" because other views prevailed in the legislature and "kept [his preferred] laws from being passed." *Id.*

The New Orleans, Chicago, and Bridgeport suits were ultimately rejected by the courts, albeit after years of litigation. *Morial v. Smith & Wesson Corp.*, 785 So. 2d 1 (La. 2001); *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E. 2d. 1099 (Ill. 2004); *Ganim v. Smith & Wesson Corp.*, 780 A.2d 98 (Conn. 2001). But the tidal wave of lawsuits had the desired effect. Manufacturers were being dropped by their insurers, some closed, and many were drowning in legal bills. Sharon Walsh, *Gun Industry Views Pact as Threat to Its Unity*, WASHINGTON POST, Mar. 17, 2000. A Washington lawyer involved in the city suits stated the obvious: "The legal fees alone are enough to bankrupt the industry." *Id.* HUD Secretary Andrew Cuomo famously told the firearms industry that those who did not fall into line would suffer "death by a thousand cuts." PLCAA: Hr'g Before the Subcomm. on Comm. & Admin. Law of the Comm. on the Judiciary, Ser. No. 109-21 (Mar. 15, 2005) at 30 (statement of Lawrence Keane).

The defense costs were staggering. In early 2005, Congress heard testimony that the firearms industry had spent over $200 million defending against those lawsuits, many of which were carefully drafted to take them "outside liability insurance coverage in order to apply maximum pressure." Ser. No. 109-21 at 30. That was in addition, of course, to the ever-present risk that "[o]ne abusive lawsuit … could destroy a national industry and [effectively] deny citizens nationwide the right to keep and bear arms guaranteed by the Constitution." 151 Cong. Rec. H8993 (Oct. 20, 2005).

**3.** Congress responded with the Protection of Lawful Commerce in Arms Act, Pub. L. 109-92, 119 Stat. 2095 (2005). The PLCAA's sponsor explained that "[b]ecause the anti-gun community didn't get it their way, they … determined that they could use the legal system, the court system, to bypass and suggest that the third party, or the manufacturer, even though he or she was a law-abiding company and produced under the auspices of the Federal laws in responsible ways in that those products were sold through federally licensed firearms dealers, that wasn't good enough." 151 Cong.

6

Rec. S9218 (July 28, 2005). "As a result, these legal, law-abiding manufacturers and citizens have increasingly had to pay higher and higher legal costs to defend themselves in lawsuit after lawsuit … largely by municipalities who, obviously frustrated by gun violence in their communities, chose this route." *Id.* "Instead of insisting that their communities and prosecutors and law enforcement go after the criminal element, they … looked for an easy way out." *Id.*

In findings enacted as part of the PLCAA, Congress made specific reference to "[l]awsuits [that] have been commenced against manufacturers, distributors, dealers, and importers of firearms that operate as designed and intended, which seek … relief for the harm caused by the misuse of firearms by third parties, including criminals." 119 Stat. at 2095 (codified at 15 U.S.C. § 7901). Congress made clear that it sought to eliminate those lawsuits. It found that the firearms industry is "heavily regulated," firearms businesses "are not, and should not, be liable for the harm caused by those who criminally or unlawfully misuse firearm products … that function as designed and intended," the liability theories underlying those lawsuits were not "a bona fide expansion of the common law," and acceptance of them "by a maverick judicial officer" "would constitute a deprivation of the rights, privileges, and immunities guaranteed to a citizen of the United States under the Fourteenth Amendment." *Id.* at 2095-96. Lest there be any doubt, Congress found that "us[ing] the judicial branch to circumvent the Legislative branch of government to regulate interstate and foreign commerce" raised grave "separation of powers," "federalism," and "State sovereignty" concerns. *Id.*

Congress accordingly prohibited lawsuits "against a manufacturer or seller of a [firearm], or a trade association, for damages … or other relief, resulting from the criminal or unlawful misuse of a [firearm] by the person or a third party." 119 Stat. at 2096-97 (codified at 15 U.S.C. §§ 7902, 7903). Opponents made clear the breadth of the PLCAA's prohibition:

> Essentially, this bill prohibits any civil liability lawsuit from being filed against the gun industry for damages resulting from the criminal or unlawful misuse of a gun by a third party, with a number of narrow exceptions.

* * * * *

> Countless experts have now said that this bill would stop virtually all of the suits against gun dealers and manufacturers filed to date which are based on distribution practice, many of which are vital to changing industry practice ….

109 Cong. Rec. S9070 (July 27, 2005). That understanding should guide the Court here.

### B.    Reading the "predicate exception" to permit Plaintiffs' claims is inconsistent with the Supreme Court's instructions.

You'd think the broad prohibition of the PLCAA would have ended politically-motivated suits against the firearms industry. It did result in many of the lawsuits pending in 2005 being dismissed. *See, e.g., Ileto v. Glock, Inc.*, 565 F.3d 1126 (9th Cir. 2009). But anti-gun activists have continued to seek leverage through litigation, filing complaints that attempt to squeeze the same theories Congress targeted with the PLCAA into the Act's narrow exceptions.

These consolidated actions exemplify that tactic. Plaintiffs appear to rely on the so-called "predicate exception" to PLCAA. That provision allows firearm companies to be sued, but only if they "knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought." 15 U.S.C. § 7903(5)(A)(iii). Pointing to *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280 (2025), Defendants ably argue that PLCAA's exceptions must not be construed in "such a capricious way" that they would "swallow most of the rule." ECF 176-1 at 1-2 (quoting 605 U.S. at 299). There's nothing novel or gun-specific about that. "In construing provisions … in which a general statement of policy is qualified by an exception," the Supreme Court "usually read[s] the exception narrowly in order to preserve the primary operation of the provision." *Comm'r v. Clark*, 489 U.S. 726, 739 (1989). This Court should construe PLCAA in accordance with the Supreme Court's guidance, and dismiss Plaintiffs' claims as barred.

II.    **New York and its political subdivisions cannot burden Second Amendment rights while repudiating and restricting the use of well-established tools that prevent crime.**

Even if Plaintiffs' claims were not barred by PLCAA, they run into the Second Amendment. In deciding whether Plaintiff cities can burden Second Amendment rights with damages or an injunction against the firearms industry, the Court should consider the role of New York and Plaintiff cities in facilitating the crime that purportedly underlay their claims. Instead of cracking down on such crime, New York and Plaintiffs have eviscerated the detention provisions society historically used to protect itself from offenders.  By way of illustration:

- In 2019, the New York Legislature enacted so-called bail reform, which broadly restricted the arrest of those accused of crimes and required that many accused of violent crimes be released on their own recognizance. "New York is one of the few states to abolish bail for many crimes without also giving state judges the discretion to consider whether a person poses a threat to public safety in deciding whether to hold them." J. McKinley, A. Feuer, & Luis Ferre-Sadurni, *Why Abolishing Bail for Some Crimes Has Law Enforcement on Edge*, N.Y. TIMES (Dec. 31, 2019, updated Feb. 23, 2021); *see also, e.g., Police: Long Island Burglary Spree Suspect Released Under Bail Reform, Then Robs Another Store Hours Later*, CBS N.Y. (Jan. 4, 2020) ("Under New York's new criminal justice reform law, a 22-year-old man accused of a burglary spree at a Long Island shopping center was released without having to post bail on New Year's Eve. On Friday, that same man was back behind bars after police say he committed yet another burglary just hours after being set free."). Indeed, the Rochester City Council has tied gun violence in the city to the lack of a "dangerousness" consideration under New York's bail reform law.[1] The impact

---

[1] Letter from Rochester City Council to Hon. Kathy Hochul, Governor of the State of N.Y. (Oct. 25, 2022), https://www.scribd.com/document/603155721/Letter-to-Gov-Hochul.

is significant, with activists tying bail reform to a greater than 30% reduction in the number of offenders incarcerated in New York.

- The State of New York is a so-called "sanctuary state" that restricts cooperation with federal immigration enforcement.[2] Plaintiff cities are, too. Since 1986, Rochester has forbidden city employees—including its police—from cooperating with federal immigration enforcement. More recently, the Mayor of Buffalo barred city employees from cooperating with federal immigration enforcement.[3] Alien offenders—including those who have committed violent crimes—are thus released back on to New York streets rather than handed over to federal authorities for detention and removal from the country, as provided by federal law. 8 U.S.C. §§ 1226, 1231. Indeed, the Department of Homeland Security reports that New York's refusal to honor ICE detainers resulted in the release of at least 6,947 criminal illegal aliens in 2025 alone.[4] "The crimes of these aliens include 29 homicides, 2,509 assaults, 199 burglaries, 305 robberies, 392 dangerous drugs offenses, 300 weapons offenses, and 207 sexual predatory offenses."[5] Given high rates of recidivism, there can be little doubt that many of these aliens went on to commit other violent offenses.

Basic fairness restricts the Plaintiff cities from obtaining damages or an injunction—particularly where constitutional rights would be burdened—after repudiating long-established tools

---

[2] Letitia James, N.Y. State Att'y Gen., Immigration Enforcement: Guidance Concerning Local Authorities' Participation in Immigration Enforcement & Model Provisions (updated Jan. 2025), https://ag.ny.gov/police-departments-law-enforcement/immigration-enforcement.

[3] J. Dale Shoemaker, *Ryan Bars City Cooperation with Federal Immigration*, INVESTIGATIVE POST (Jan. 26, 2026), https://investigativepost.org/2026/01/26/ryan-bars-city-cooperation-with-federal-immigration/.

[4] Press Releiase, U.S. Dep't of Homeland Sec., Sanctuary New York Released Nearly 7,000 Criminal Illegal Aliens Including Murderers, Terrorists, and Sexual Predators (Dec. 1, 2025), https://www.dhs.gov/news/2025/12/01/sanctuary-new-york-released-nearly-7000-criminal-illegal-aliens-including-murderers.

[5] *Id.*

for fighting the same crime that purportedly forms the basis for their claims. One might point Plaintiffs to the biblical maxim about "look[ing] at the speck of sawdust in your brother's eye and pay[ing] no attention to the plank in your own eye." *Matthew* 7:3.

## **CONCLUSION**

For the foregoing reasons, the Court should GRANT Defendants' motion to dismiss.

Dated: March 30, 2026

Respectfully submitted,

AUSTIN KNUDSEN
Attorney General of Montana

By: ___*Joseph T. Burns*
Joseph T. Burns (N.Y. Bar No. 4411666)
Holtzman Vogel Baran Torchinsky & Josefiak PLLC
5360 Genesee St., Suite 203
Buffalo, NY 14026
Phone: (716) 647-6103
Email: jburns@holtzmanvogel.com

*Counsel for Amicus State of Montana, by and through Attorney General Austin Knudsen*

### ADDITIONAL AUTHORIZED LAW OFFICERS OF AMICI

STEVE MARSHALL
*Attorney General of*
*Alabama*

STEPHEN J. COX
*Attorney General of*
*Alaska*

TIM GRIFFIN
*Attorney General of*
*Arkansas*

JAMES UTHMEIER
*Attorney General of*
*Florida*

CHRISTOPHER M. CARR
*Attorney General of*
*Georgia*

RAÚL R. LABRADOR
*Attorney General of*
*Idaho*

THEODORE E. ROKITA
*Attorney General of*
*Indiana*

BRENNA BIRD
*Attorney General of*
*Iowa*

KRIS W. KOBACH
*Attorney General of*
*Kansas*

LIZ MURRILL
*Attorney General of*
*Louisiana*

LYNN FITCH
*Attorney General of*
*Mississippi*

MICHAEL T. HILGERS
*Attorney General of*
*Nebraska*

JOHN M. FORMELLA
*Attorney General of*
*New Hampshire*

DREW H. WRIGLEY
*Attorney General of*
*North Dakota*

GENTNER F. DRUMMOND
*Attorney General of*
*Oklahoma*

ALAN WILSON
*Attorney General of*
*South Carolina*

MARTY JACKLEY
*Attorney General of*
*South Dakota*

JONATHAN SKRMETTI
*Attorney General of*
*Tennessee*

KEN PAXTON
*Attorney General of*
*Texas*

DEREK BROWN
*Attorney General of*
*Utah*

JOHN B. MCCUSKEY
*Attorney General of*
*West Virginia*

KEITH G. KAUTZ
*Attorney General of*
*Wyoming*

12