IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| THE CITY OF ROCHESTER | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 23-cv-06061-FPG |
| | ) | |
| SMITH & WESSON BRANDS, INC.; | ) | Honorable Frank P. Geraci, Jr. |
| GLOCK, INC.; STURM, RUGER & CO., | ) | |
| INC., AND TAURUS INTERNATIONAL | ) | |
| MANUFACTURING, INC., | ) | |
| | ) | |
| Defendants. | ) | |

<u>PLAINTIFF CITY OF ROCHESTER'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' JOINT MOTION TO DISMISS FIRST AMENDED COMPLAINT</u>

TABLE OF CONTENTS

INTRODUCTION ...............................................................................................................1

BACKGROUND ...............................................................................................................3

    A.  The New York Legislature Has Mandated that Gun Manufacturers Exercise Reasonable Controls and Procedures Over Their Downstream Distribution. .......................................3

    B.  Gun Manufacturers Have Been on Notice for Decades That Exercising Reasonable Distribution Controls Would Meaningfully Reduce Diversion.............................................4

    C.  Defendants Know or Have Access to Data That Would Tell Them the Identity of the Small Number of High-Risk New York Dealers....................................................................6

    D.  Defendants Refuse to Establish or Exercise Reasonable Anti-Diversion Controls Over Downstream Distribution of Their Guns by and to High-Risk New York Dealers...........6

    E.  Defendants Are the Top Source Manufacturers of Crime Guns Recovered in the City of Rochester. ............................................................................................................................8

STANDARD OF REVIEW..................................................................................................9

ARGUMENT .....................................................................................................................9

    I.  PLCAA'S PREDICATE EXCEPTION PERMITS ROCHESTER'S SECTION 898 CLAIM. ......................................................................................................................9

    A.  Rochester Has Adequately Pleaded That Each Defendant Violated Section 898-b(2).....11

    B.  The Amended Complaint Adequately Pleads That Defendants' Violations of Section 898-b(2) Are "Knowing" Within the Meaning of PLCAA's Predicate Exception............17

    C.  The Amended Complaint Adequately Pleads That Defendants' Violations of Section 898-b(2) Are a Proximate Cause of Rochester's Harms......................................................20

    II.  ROCHESTER'S COMMON-LAW PUBLIC NUISANCE CLAIM MAY GO FORWARD. ..............................................................................................................29

    A.  The Amended Complaint Adequately Pleads a Public Nuisance Under New York Common Law. ...................................................................................................................30

    B.  New York Has Not Adopted the Third Restatement's Narrower Formulation................32

    III.  THIS CASE IS NOT BARRED BY THE SECOND AMENDMENT.....................33

    A.  Section 898-b(2) Does Not Implicate the Second Amendment's Plain Text...................33

    B.  The Statute Is Consistent with the Nation's Historical Tradition of Firearm Regulation.... .............................................................................................................................................34

CONCLUSION..................................................................................................................35

## TABLE OF AUTHORITIES

Cases

*532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Center, Inc.,*
96 N.Y.2d 280 (2001)................................................................................................30, 31, 32

*Anza v. Ideal Steel Supply Corp.,*
547 U.S. 451 (2006)..................................................................................................................25

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)....................................................................................................................9

*Bailey v. United States,*
516 U.S. 137 (1995)...................................................................................................................11

*Baity v. Gen. Elec. Co.,*
86 A.D.3d 948 (4th Dep't 2011) ............................................................................................31

*Bank of Am. Corp. v. City of Miami,*
581 U.S. 189 (2017)..................................................................................................................25

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007).....................................................................................................................9

*Bell v. Bd. of Educ.,*
90 N.Y.2d 944 (1997)......................................................................................................... 16, 24

*Bryan v. United States,*
524 U.S. 184 (1998)............................................................................................................passim

*Chiapperini v. Gander Mountain Co.,*
13 N.Y.S.3d 777 (Sup. Ct. 2014) ..........................................................................................22

*City & Cnty. of San Francisco v. Purdue Pharma L.P.,*
No. 18-CV-07591, 620 F.Supp.3d 936 (N.D. Cal. Aug. 10, 2022)......................................20

*City of Cincinnati v. Beretta U.S.A., Corp.,*
768 N.E.2d 1136 (Ohio 2002)................................................................................................28

*City of Gary ex rel. King v. Smith & Wesson Corp.,*
801 N.E.2d 1222 (Ind. 2003).................................................................................................28

*City of New York v. Beretta U.S.A. Corp.,*
315 F. Supp. 2d 256 (E.D.N.Y. 2004)....................................................................................28

*City of New York v. Beretta U.S.A. Corp.,*
524 F.3d 384 (2d Cir. 2008) .......................................................................................10, 11, 28

*City of Philadelphia v. Beretta U.S.A. Corp.,*
  277 F.3d 415 (3d Cir. 2002) ...............................................................................................29

*Consol. Rail Corp. v. Gottshall,*
  512 U.S. 532 (1994) ................................................................................................... 25, 26

*Copart Industries v. Consolidated Edison Co. of N.Y.,*
  41 N.Y.2d 564 (1977) ..............................................................................................30, 31, 32

*District of Columbia v. Beretta, U.S.A. Corp.,*
  872 A.2d 633 (D.C. 2005) ....................................................................................................28

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) ..........................................................................................................33

*Estados Unidos Mexicanos v. Diamondback Shooting Sports Inc.,*
  No. CV-22-00472-TUC-TM, 2024 WL 1256038 (D. Ariz. Mar. 25, 2024) ......................................27

*Ganim v. Smith & Wesson Corp.,*
  780 A.2d 98 (Conn. 2001) ...................................................................................................28

*Gazzola v. Hochul,*
  88 F.4th 186 (2d Cir. 2023) .................................................................................................34

*Hain v. Jamison,*
  68 N.E.3d 1233 (N.Y. 2016) ........................................................................................... 23, 24

*Hamilton v. Beretta U.S.A. Corp.,*
  96 N.Y.2d 222 (2001) ..................................................................................................17, 29, 32

*Havens v. James,*
  76 F.4th 103 (2d Cir. 2023) ...................................................................................................9

*Hemi Grp., LLC v. City of New York,*
  559 U.S. 1 (2010) ..............................................................................................................25

*Holmes v. Sec. Inv'r Prot. Corp.,*
  503 U.S. 258 (1992) ................................................................................................... 25, 26

*Ileto v. Glock,*
  349 F.3d 1191 (9th Cir. 2003) ..............................................................................................28

*Ill. Ass'n of Firearms Retailers v. City of Chicago,*
  961 F. Supp. 2d 928 (N.D. Ill. 2014) .....................................................................................34

*In re Methyl Tertiary Butyl Ether Prod. Liab. Litig.,*
  725 F.3d 65 (2d Cir. 2013) ...................................................................................................23

iii

*In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*,
  591 F. Supp. 2d 259 (S.D.N.Y. 2008) ................................................................................................ 23

*Kingsley v. Hendrickson*,
  576 U.S. 389 (2015) ........................................................................................................................ 20

*Laborers Local 17 Health and Benefit Fund v. Philip Morris*,
  191 F.3d 229 (2d Cir. 1999) ...................................................................................................... 26, 27

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014) ............................................................................................................ 21, 25, 26

*Liparota v. United States*,
  471 U.S. 419 (1985) ........................................................................................................................ 18

*Mastroianni v. County of Suffolk*,
  91 N.Y.2d 198 (1997) ................................................................................................................. 12, 13

*McDonald v. City of Chicago*,
  561 U.S. 742 (2010) ........................................................................................................................ 33

*Minnesota v. Fleet Farm*,
  679 F. Supp. 3d 825 (D. Minn. 2023) ............................................................................................. 22

*Myun-Uk Choi v. Tower Rsch. Cap. LLC*,
  890 F.3d 60 (2d Cir. 2018) ............................................................................................................... 9

*N.Y. State Firearms Ass'n v. James*,
  157 F.4th 232 (2d Cir. 2025) .......................................................................................................... 34

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
  597 U.S. 1 (2022) ................................................................................................................ 33, 34, 35

*Nat'l Shooting Sports Foundation, Inc. v. James*,
  144 F.4th 98 (2d Cir. 2025) ...................................................................................................... passim

*New York v. Arm or Ally, LLC*,
  718 F. Supp. 3d 310 (S.D.N.Y. 2024) ........................................................................................ passim

*People ex rel. Spitzer v. Sturm, Ruger & Co.*,
  309 A.D.2d 91 (1st Dep't 2003) ......................................................................................... 29, 30, 32

*Radich v. Guerrero*,
  No. 14-CV-20, 2016 WL 1212437 (D. N. Mar. I. Mar. 28, 2016) ...................................................... 34

*Rehaif v. United States*,
  588 U.S. 225 (2019) ........................................................................................................................ 18

*Ruan v. United States,*
    597 U.S. 450 (2022).................................................................................................................18

*Saarinen v. Kerr,*
    84 N.Y.2d 494 (1994)..............................................................................................................20

*Salter v. Meta Platforms, Inc.,*
    240 A.D.3d 1378 (4th Dep't 2025) ...................................................................................passim

*Schneider v. Diallo,*
    14 A.D.3d 445 N.Y.S.2d 366 (1st Dep't 2005) .....................................................................23

*Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos,*
    605 U.S. 280 (2025)................................................................................... 10, 11, 24, 27

*Teixeira v. County of Alameda,*
    873 F.3d 670 (9th Cir. 2017)...................................................................................................35

*Trimarco v. Klein,*
    56 N.Y.2d 98 (1982)......................................................................................................... 13, 15

*Twitter, Inc. v. Taamneh,*
    598 U.S. 471 (2023)................................................................................................................10

*U.S. v. Sirois,*
    87 F.3d 34 (2d Cir. 1996) ......................................................................................................11

*United States v. Rahimi,*
    602 U.S. 680 (2024)................................................................................................................35

*United States v. Vereen,*
    152 F.4th 89 (2d Cir. 2025) .............................................................................................. 33, 35

*United States v. Weintraub,*
    273 F.3d 139 (2d Cir. 2001) ........................................................................................17, 18, 19

*Wiley v. Fleet Farm LLC,*
    799 F. Supp. 3d 860 (D. Minn. 2025)...................................................................................22

*Williams v. Beemiller, Inc.,*
    100 A.D.3d 143 (4th Dep't 2012) .....................................................................................passim

*Wyeth v. Levine,*
    555 U.S. 555 (2009)................................................................................................................23

Statutes

15 U.S.C. §§ 1051–1141n.............................................................................................................25

18 U.S.C. § 1964.................................................................................................................25

18 U.S.C. § 2.....................................................................................................................10

18 U.S.C. § 922.................................................................................................................18

18 U.S.C. § 924.................................................................................................................18

21 U.S.C. § 841.................................................................................................................18

42 U.S.C. § 1983...............................................................................................................20

42 U.S.C. §§ 3601–3619...................................................................................................25

45 U.S.C. §§ 51–60...........................................................................................................25

Act of July 6, 2021, ch. 237, § 1, 2021 N.Y. Laws.......................................................3, 21

Assault Weapon Manufacturing Strict Liability Act, D.C. Code § 7-2551.01......................28

Clean Air Act, 42 U.S.C. §§ 7401–7671q..........................................................................19

N.Y. Gen. Bus. Law § 875-f................................................................................................5

N.Y. Gen. Bus. Law § 898-a..........................................................................................3, 12

N.Y. Gen. Bus. Law § 898-b.......................................................................................passim

N.Y. Gen. Bus. Law § 898-c................................................................................................3

N.Y. Gen. Bus. Law § 898-d......................................................................................1, 3, 21

N.Y. Gen. Bus. Law § 898-e................................................................................................2

N.Y. Gen. Bus. Law §§ 349 & 350....................................................................................30

Protection of Lawful Commerce in Arms Act, 15 U.S.C. §§ 7901-03..........................passim

Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968...............25

Other Authorities

Heidi Li Feldman, *What It Takes to Write Statutes that Hold the Firearms Industry Accountable to Civil Justice*, 133 Yale L.J. F. 717 (2024).....................................................................................35

Restatement (Second) of Torts § 821B (Am. L. Inst. 1979)................................................32

Restatement (Third) of Torts: Liab. for Econ. Harm § 8 (Am. L. Inst. 2020)................30, 32

Wayne R. LaFave & Austin W. Scott, Jr., *Substantive Criminal Law* 575 (1986).................18

William Lloyd Prosser et al., *Prosser and Keeton on the Law of Torts* (5th ed. 1984).................20

INTRODUCTION

This case arises under a New York statute, enacted in 2021 and upheld by the Second Circuit last term, that requires gun manufacturers selling firearms in New York to "establish and utilize reasonable controls and procedures" to prevent their products from being unlawfully diverted, possessed, used, or sold in the State. N.Y. Gen. Bus. Law § 898-b(2). The City of Rochester brings this enforcement action under the cause of action the statute expressly confers on municipalities. *Id.* § 898-d. Defendants—the manufacturers of more than 40% of crime guns recovered by the Rochester Police Department—have refused to comply with that statute. They have not established the reasonable controls New York law requires; they have not utilized the controls they purport to maintain; and they have publicly disclaimed any obligation to do either. Am. Compl. ("FAC") ¶¶ 100-110, 140-144, 163-177. Defendants frame this case as one in which Rochester seeks to hold them liable for "third-party criminals independently misusing firearms." Mot. to Dismiss Am. Compl. ("MTD") at 1. That is not what Rochester is doing. Rochester asks the Court to hold Defendants liable for *their own* statutory violations.

As its name suggests, the federal Protection of Lawful Commerce in Arms Act, 15 U.S.C. §§ 7901-03 (PLCAA) does not protect *unlawful* commerce in firearms. PLCAA's predicate exception preserves civil actions in which "a manufacturer or seller of a [firearm] knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought." *Id.* § 7903(5)(A)(iii). PLCAA itself does not create a cause of action (*id.* § 7903(5)(C)), and Congress expressly preserved "important principles of federalism, State sovereignty and comity between sister States" as a purpose of the statute. *Id.* § 7901(b)(6).

1

GBL § 898-e ("Section 898") is one of eleven similar state firearm-industry-accountability statutes now in force across the country, [1] all enacted within the past five years in response to PLCAA's express preservation of state predicate statutes. The Second Circuit has already held that Section 898 is a valid predicate statute. *Nat'l Shooting Sports Foundation, Inc. v. James*, 144 F.4th 98, 108–11 (2d Cir. 2025) ("*NSSF*"), *cert. pending*, (U.S. Feb. 26, 2026) (No. 25-1026) (rejecting facial challenge brought by three of the four defendants here). And the Fourth Department recently rejected PLCAA proximate-cause arguments by a firearm-industry defendant materially similar to the ones Defendants make here, applying New York's substantial-factor analysis to a claim predicated on violations of New York statutes. *Salter v. Meta Platforms, Inc.*, 240 A.D.3d 1378, 1385-86 (4th Dep't 2025). Defendants' references to decades-old cases in which courts refused to expand common law duties in deference to legislative bodies simply have no relevance here where the New York Legislature *has* made the policy decision to recognize the kind of claims that the City has brought.

The Motion to Dismiss fails for the reasons explained below. Part I explains that Rochester's Section 898 claim falls within PLCAA's predicate exception and is not preempted. This section shows that Rochester has adequately pleaded a violation of Section 898-b(2); that the violations are knowing within the meaning of PLCAA's predicate exception under *Bryan v. United States*, 524 U.S. 184 (1998); and that Defendants' statutory violations are a proximate cause of Rochester's injuries under New York's substantial-factor test, as applied in *Salter* and *Williams v. Beemiller, Inc.*, 100 A.D.3d 143 (4th Dep't 2012). Part II addresses common-law public nuisance. Part III addresses Defendants' Second Amendment argument, which fails because Section 898-b(2) does not regulate the keeping or bearing of arms and is, in any event, consistent with this Nation's historical tradition of firearm regulation.

---

[1] *See* Cal. Civ. Code §§ 3273.50-55; Colo. Rev. Stat. § 6-27-101; Conn. Gen. Stat. §§ 52-571*o*-q; Del. Code. Ann. § 3930; Haw. Rev. Stat. § 134-101; 815 Ill. Comp. Stat. 505/2DDDD; Md. Code Ann., Cts. & Jud. Proc. § 3-2501; N.J. Stat. Ann. § 2C:58-33; Va. Acts ch. 530; Wash. Rev. Code § 7.48.330.

BACKGROUND

A.    The New York Legislature Has Mandated that Gun Manufacturers Exercise Reasonable Controls and Procedures Over Their Downstream Distribution.

In 2021, with the passage of Section 898, New York recognized that "those responsible for the illegal or unreasonable sale, manufacture, distribution, importing or marketing of firearms may be held liable for the public nuisance caused by such activities." 2021 Sess. Law News of N.Y. Ch. 237 § 1 (S. 7196). As relevant here, Section 898-b(2) provides:

> All gun industry members who manufacture, market, import or offer for wholesale or retail sale any [firearms] product in New York state shall establish and utilize reasonable controls and procedures to prevent its qualified products from being possessed, used, marketed or sold unlawfully in New York state.

(emphasis added). Section 898-a(2) provides an outcome-oriented definition of "reasonable controls and procedures":

> "Reasonable controls and procedures" shall mean policies that include, but are not limited to: (a) instituting screening, security, inventory and other business practices to prevent . . . sales of qualified products to straw purchasers, traffickers, persons prohibited from possessing firearms under state or federal law, or persons at risk of injuring themselves or others . . .

(emphasis added). As is commonplace in public nuisance statutes, the New York Legislature allowed regulated companies flexibility in how they would implement reasonable controls and procedures to achieve the obligations imposed on them. The statute declares that a violation of Section 898-b(2) that "results in harm to the public" is a public nuisance, regardless of "whether the gun industry member acted for the purpose of causing harm to the public." *Id.* § 898-c. The statute provides an enforcement cause of action to "a city corporation counsel on behalf of the locality . . . to enjoin and restrain such violation[] and to obtain restitution and damages." *Id.* § 898-d. The Second Circuit recently upheld the statute against a facial constitutional and preemption challenge brought by three of the four Defendants, among others. *NSSF*, 144 F.4th at 108-11.

3

B.    Gun Manufacturers Have Been on Notice for Decades That Exercising
Reasonable Distribution Controls Would Meaningfully Reduce Diversion.

The Legislature enacted Section 898 against the backdrop of substantial evidence establishing that gun manufacturers can meaningfully reduce the diversion of their guns into the illicit market through reasonable controls over downstream distributors and dealers. FAC ¶¶ 55-60, 63-66. The principal vectors of gun diversion occur at the point of retail sale through straw sales, multiple-gun transactions, and off-the-books sales by dealers. *Id.* ¶ 39. Research has shown that the practices of licensed dealers, and not just the volume of guns they sell, are the main determinant of whether and how frequently illegal diversion occurs. *Id.* ¶¶ 50–52.

While any one dealer can only reduce diversion of the guns it sells, Defendants are situated by their size, market share, and power within the gun industry to reduce diversion across dealers. *Id.* ¶ 4. As alleged in the Amended Complaint, Defendants could meaningfully reduce diversion in New York State and Rochester by, for example:

- Leveraging data available to them to identify retail dealers that sell large and/or disproportionate numbers of crime guns and/or have been repeatedly cited for regulatory violations by ATF or other law enforcement;

- Requiring, as a matter of contractual agreement, that wholesalers and retail dealers report such data upstream;

- Engaging in corrective action against dealers that sell large and/or disproportionate numbers of crime guns and/or have been repeatedly cited for regulatory violations by ATF or other law enforcement;

- Ensuring that all dealers selling their guns have established reasonable controls and procedures to prevent theft, and sales to straw purchasers, traffickers, prohibited individuals, or persons at risk of injuring themselves or others.

*Id.* ¶¶ 9, 65, 188.

The core data available to Defendants is generated through ATF's "trace" process, which traces firearms recovered by law enforcement from manufacturer down the distribution chain to the first retail purchaser. *Id.* ¶¶ 67-68. Through traces, Defendants learn which of their firearms were

4

recovered in connection with crimes and to which wholesalers (or, in some cases, retailers) they directly sold those guns. *Id.* ¶¶ 68-69, 73-75. Defendants could easily supplement this data by requiring that downstream wholesalers and retailers selling their guns in New York State report to them regarding ATF trace requests received by the wholesalers and dealers. *Id.* ¶¶ 11, 79, 96, 125, 137, 152.[2] They could similarly require reports of ATF and other law enforcement inspections. *See, e.g., id.* ¶¶ 91, 96, 125-27, 137-38, 152, 156.

The Amended Complaint recognizes that not all guns recovered by law enforcement are traced by ATF—for instance, ATF can use its own internal records to identify the retail purchaser of a recovered gun sold as part of a multi-gun sale (*id.* ¶ 69)—and that a trace request is not by itself conclusive evidence of diversion (*see id.* ¶¶ 69, 174). But, critically, large or disproportionate aggregate trace activity attributable to a wholesaler or retailer—particularly concerning guns recovered within three years after retail sale—is a reliable indicator of diversion risk. *Id.* ¶¶ 69-70. Together, trace and inspection data would identify the New York retail dealers selling disproportionate numbers of crime guns or those with patterns of regulatory violations, allowing Defendants to supervise those dealers more closely or cease distribution to them entirely. *See, e.g., id.* ¶¶ 8, 53, 98, 127, 139, 153.

The Amended Complaint alleges Defendants have known for decades that such controls could meaningfully reduce diversion into the illegal market and that their failures to exercise these controls have exacerbated gun crime in New York State and Rochester. *Id.* ¶ 55. For example, in 2000, a corporate predecessor of Smith & Wesson agreed to implement anti-diversion procedures and controls over its distribution chain consistent with those outlined in the Amended Complaint. *Id.* ¶ 63. A year later, the U.S. Department of Justice issued a report calling on gun manufacturers to police

---

[2] Such information would be readily available, because New York requires in-state dealers to "maintain records of criminal firearm . . . traces initiated by the [ATF]" and to maintain and make accessible to manufacturers "firearm . . . disposition information, including the serial numbers of firearms . . . sold, dates of sale, and identity of purchasers." N.Y. Gen. Bus. Law § 875-f(3) & (4); FAC ¶¶ 76-77.

their distribution chains and recommending steps including "identify[ing] and refus[ing] to supply dealers and distributors that have a pattern of selling guns to criminals and straw purchasers." *Id.* ¶ 64. And in 2003, each of Defendants (or their predecessor entities) faced a six-week federal trial on public nuisance claims arising from their contributions to gun violence in New York State. *Id.* ¶¶ 56-57. The court found, based on extensive evidence, that defendants could reduce diversion-related harm by, among other things, utilizing gun trace data to monitor downstream sellers and enforcing good-dealer practices. *Id.* ¶¶ 58-60. In short, Defendants "have known for decades that exercising greater control over their distribution channels would decrease crime in New York," and have long known the specific practices that would do so. *Id.* ¶¶ 15, 53, 55, 99, 128, 144.

C.      Defendants Know or Have Access to Data That Would Tell Them the Identity of the Small Number of High-Risk New York Dealers.

As the Amended Complaint alleges, a small number of retail gun dealers in Monroe County and New York State sell an outsized share of crime guns recovered in Rochester. *Id.* ¶¶ 40–46. For instance, only 20 dealers sold over 20 crime guns recovered by Rochester police between 2012 and 2022; 18 of those dealers were located in New York state. *Id.* ¶ 45. Rochester knows the identity of these dealers but, in accordance with prior guidance from the ATF relating to a previously published report, did not publish their names in the Amended Complaint. *Id.* ¶ 46 n.39. As described above, Defendants have access to the information necessary for them also to identify the in-state dealers that sell large and/or disproportionate numbers of Rochester crime guns, as well as dealers with a history of repeated violations of firearms regulations (together, "High-Risk New York Dealers"). *Id.* ¶¶ 9, 53.

D.      Defendants Refuse to Establish or Exercise Reasonable Anti-Diversion Controls Over Downstream Distribution of Their Guns by and to High-Risk New York Dealers.

Although Section 898 has been in force for nearly five years—and although Defendants have been aware for far longer of the types of monitoring and controls that would mitigate downstream

6

diversion—Defendants categorically refuse to establish and utilize reasonable controls to prevent the diversion of their guns through High-Risk New York Dealers. *Id.* ¶¶ 81-180.

Each Defendant can, and does, track information regarding the distribution of its guns for marketing and sales purposes. *Id.* ¶¶ 82-90, 115-18, 133-34, 154-62. This includes tracking retailers for purposes of maintaining consumer-facing retailer locator tools (*id.* ¶¶ 83, 116-17, 133, 155), engaging with data analytics platforms to track data pertaining to downstream demand for, and sale of, their guns (*id.* ¶¶ 87-90, 118, 134, 159-61), and granting special status or incentives to dealers that meet certain metrics or agree to certain contractual terms (*id.* ¶¶ 86, 116, 157). Defendants could similarly leverage available data to identify and take corrective action against High-Risk New York Dealers but, as alleged in the Amended Complaint, they refuse to do so.

The Amended Complaint alleges that Taurus and Ruger refuse to take any meaningful steps to monitor the downstream distribution of their firearms. *Id.* ¶¶ 132, 135-39, 143-44, 149-80. Taurus takes the position that the wholesalers and retailers that sell its guns "are not within our control, and we are not responsible in any manner for any of their policies or practices." *Id.* ¶ 142; *see also id.* ¶ 141. Likewise, Ruger either knows or willfully ignores the High-Risk New York Dealers in its distribution chain, hiding behind its two-tier distribution model. *Id.* ¶¶ 149-50, 152, 167, 172, 176. The company has more visibility than it publicly admits–through its relationships with wholesalers, its relationships with dealers, its internal and third-party data analytics tools, and readily available trace data and inspection reports; it simply chooses not to use them to monitor and prevent the unlawful diversion of its products. *Id.* ¶¶ 65, 71, 73–75, 79–80, 149-80, 188, 198.

Smith & Wesson and Glock purport to have established controls on paper, acknowledging in those contracts their capacity to control downstream distribution. Smith & Wesson maintains contracts with its distributors and buying groups that include only generalized provisions requiring them to "support [Smith & Wesson's] full compliance with all applicable laws" and prohibiting them

7

from knowingly selling Smith & Wesson firearms in unlawful transactions or to persons who do not comply with the law. *Id.* ¶¶ 93-94. Glock maintains contractual relationships with its authorized distributors and directly with its authorized dealers (*id.* ¶ 121), and its dealer contracts include certain more substantive provisions, such as those requiring dealers to file with Glock an annual certification verifying legal compliance, train their employees in compliance with the law, and submit to audits by Glock. *Id.* ¶ 122.

But critically, neither company requires upstream reporting of available gun-tracing data or regulatory inspection information that would enable them to monitor retailer misfeasance and diversion. *Id.* ¶¶ 95-99, 125-28. And, even if these contractual provisions were on their face sufficient, the Amended Complaint alleges that both companies fail to enforce them. *Id.* ¶¶ 95, 123-24. Smith & Wesson's corporate filings and public statements, including those post-dating enactment of Section 898, make clear that it rejects any obligation to prevent diversion. *Id.* ¶¶ 100-10.

E.    Defendants Are the Top Source Manufacturers of Crime Guns Recovered in the City of Rochester.

Defendants account for over 40 percent of crime guns recovered by RPD between 2021 and 2025. *Id.* ¶ 35. RPD recovered 316 Taurus crime guns, 298 Glock crime guns, 241 Smith & Wesson crime guns, and 203 Ruger crime guns during that period. *Id.* ¶¶ 112, 130, 147, 179. Many of these guns were linked to serious crimes, including homicides, aggravated assaults, sexual assaults, robberies, burglaries, and drugs crime. *Id.* ¶¶ 36-37, 112, 130, 147. This misuse would be reduced if Defendants implemented anti-diversion practices as required by New York law. *Id.* ¶¶ 65, 111, 129, 144, 178.

Gun violence is a persistent reality for the City. During the five years between 2021 and 2025, the City experienced 1,211 shooting incidents, involving 1,426 shooting victims, 218 of whom were killed. *Id.* ¶ 31. In response, the City expends significant resources on preventive and reactive policing, first-responders, the criminal justice system, and violence intervention groups. *Id.* ¶¶ 19, 199, 202. The mayor's office spent nearly $4 million in 2024 to fund the Office of Violence Prevention. *Id.* ¶ 19.

8

## STANDARD OF REVIEW

On this motion to dismiss, Defendants have the burden to demonstrate that Rochester's Amended Complaint lacks "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Myun-Uk Choi v. Tower Rsch. Cap. LLC*, 890 F.3d 60, 65 (2d Cir. 2018) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). This Court's role at this stage is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Havens v. James*, 76 F.4th 103, 116–17 (2d Cir. 2023) (citation modified). The Court must "accept as true" the facts alleged in the Amended Complaint and "draw all reasonable inferences in the plaintiff's favor." *NSSF*, 144 F.4th at 106 (citation modified). The plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). At the pleading stage, "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555. Where the plaintiff has pleaded specific factual allegations that, taken as true, would establish the elements of its claim, dismissal is improper even where the defendant disputes the inferences to be drawn from those facts.

## ARGUMENT

I.  **PLCAA'S PREDICATE EXCEPTION PERMITS ROCHESTER'S SECTION 898 CLAIM.**

PLCAA generally bars "qualified civil liability action[s]"—civil claims against firearm manufacturers or sellers for harm "resulting from the criminal or unlawful misuse" of a firearm by a third party. 15 U.S.C. §§ 7902(a), 7903(5)(A). The bar is subject to several enumerated exceptions. The "predicate exception" permits civil actions in which "a manufacturer or seller of a [firearm] knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought." *Id.* § 7903(5)(A)(iii). PLCAA means

9

what it says: Lawful commerce is generally protected from civil liability, but unlawful commerce is not. The predicate exception reflects Congress's concern for "important principles of federalism, State sovereignty and comity between the sister States." 15 U.S.C. § 7901(b)(6); *see also id.* § 7901(a)(7)–(8). As acknowledged by Defendants (MTD at 9 n.2), the Second Circuit recently confirmed that Section 898 qualifies as a "statute applicable to the sale or marketing" of firearms within the meaning of PLCAA's predicate exception. *NSSF*, 144 F.4th at 111. Applying *City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384, 404 (2d Cir. 2008), the court held that Section 898 "expressly regulates firearms" and "falls within" the predicate exception's bounds. *NSSF*, 144 F.4th at 109–10.

Defendants invoke the Supreme Court's caution in *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280 (2025) ("*Mexico*"), that the predicate exception should not be construed in "such a capacious way" that it would "swallow most of the rule." MTD at 1-2 (quoting *Mexico*, 605 U.S. at 299). The admonition is well-taken but inapplicable here. *Mexico* addressed an aiding-and-abetting theory under federal law, where the plaintiff sought to convert a generic failure to exercise "reasonable care" allegation into a PLCAA predicate violation through 18 U.S.C. § 2(a). 605 U.S. at 286-87, 294-96. The Supreme Court held that the plaintiff's complaint failed to plead the "conscious . . . and culpable participation" required for aiding and abetting. *Id.* at 291 (quoting *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 493 (2023)).

This case is structurally different and plainly distinguishable. Rochester does not invoke federal aiding-and-abetting law; it sues under a specific New York statute expressly directed at the firearm industry that the Second Circuit has recognized as a valid PLCAA predicate. *NSSF*, 144 F.4th at 109-11. After the *Mexico* decision was issued, the Second Circuit implicitly rejected the "swallow the rule" argument in precisely this context, holding that the predicate exception is not limited to statutes resembling the enumerated examples in 15 U.S.C. § 7903(5)(A)(iii)(I)–(II). *NSSF*, 144 F.4th at 110. The rule remains intact: PLCAA bars suits predicated on common-law tort theories and on statutes

10

of general applicability that have never been applied to the gun industry. *See Beretta*, 524 F.3d at 400–04 (holding that New York's general criminal nuisance statute is not a valid predicate). What it does not bar is what the predicate exception permits—civil actions predicated on the knowing violation of a state statute that specifically regulates the firearm industry.

To satisfy the predicate exception, a plaintiff must plead and prove three elements: (1) the defendant violated a state or federal statute applicable to the sale or marketing of firearms; (2) the violation was knowing; and (3) the violation was a proximate cause of the harm for which relief is sought. 15 U.S.C. § 7903(5)(A)(iii); *see Mexico*, 605 U.S. at 286; *NSSF*, 144 F.4th at 108. Part I(A) addresses the first: Each Defendant has failed to establish and to utilize the reasonable controls Section 898-b(2) requires. Part I(B) addresses the second: Each Defendant knows the facts constituting its violation, all "knowingly" requires. *See Bryan v. United States*, 524 U.S. 184, 193 (1998). Part I(C) addresses the third: Defendants' violations are a proximate cause in producing Rochester's harms under New York's substantial-factor test. *See Salter*, 240 A.D.3d at 1385-86.

A.    Rochester Has Adequately Pleaded That Each Defendant Violated Section 898-b(2).

1.    Section 898-b(2) Imposes a Two-Part Duty.

Section 898-b(2) requires every gun industry member that conducts business in New York to "establish and utilize reasonable controls and procedures to prevent its qualified products from being possessed, used, marketed or sold unlawfully in New York state." The duty has two parts. A gun industry member must "establish" reasonable controls (put policies in place) *and* "utilize" them (actively employ them). *See Utilize*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/utilize ("to make use of: turn to practical use or account"); *Cf. Bailey v. United States*, 516 U.S. 137, 143-145 (1995) ("use[]" in provision criminalizing "us[ing] and carr[ying] a firearm" during a violent or drug trafficking crime requires "active employment" not "mere possession"); *U.S. v. Sirois*, 87 F.3d 34, 41 (2d Cir. 1996) (citing *Bailey* and construing "use," in statute

11

criminalizing "employ[ing], us[ing], persuad[ing], induc[ing], entic[ing], or coerc[ing] any minor to engage in. . . sexually explicit conduct" as including an "active component"). In other words, a gun industry member that "establishes" controls but does not "utilize" them has not satisfied the statute. Here, Rochester alleges Defendants have neither established nor utilized reasonable controls. And even paper compliance unaccompanied by enforcement does not satisfy the statute.

Section 898-a(2) supplies the content. It defines "reasonable controls and procedures" to include "screening, security, inventory and other business practices to prevent thefts of qualified products as well as sales of qualified products to straw purchasers, traffickers, persons prohibited from possessing firearms under state or federal law, or persons at risk of injuring themselves or others." N.Y. Gen. Bus. Law § 898-a(2). The Legislature defined the objective and gave regulated entities flexibility in how to achieve it — the ordinary structure of performance-based regulation. The Second Circuit upheld it against a vagueness challenge last year. *NSSF*, 144 F.4th at 118 ("reasonableness is a well-established legal standard"). And what constitutes reasonable conduct in any given case is a question of fact for the jury. *Mastroianni v. County of Suffolk*, 91 N.Y.2d 198, 205–06 (1997). The question at the pleading stage is whether Rochester has plausibly alleged that each Defendant has failed either to establish or to utilize the controls the statute requires. It has.

2.      Ruger and Taurus Have Established No Anti-Diversion Controls and Have Publicly Disclaimed Any Obligation to Do So.

Two of the four Defendants—Ruger and Taurus—have effectively admitted, in their own court filings, corporate statements, congressional testimony, and public communications, that they have established no anti-diversion controls of consequence and disclaim any obligation to do so. Those admissions defeat the Motion to Dismiss as to these two Defendants. The MTD does not contend that Ruger or Taurus *has* established reasonable controls within the meaning of Section 898-b(2); it cannot, because neither company claims to have done so.

Taurus. Taurus's own website states, of the wholesalers and retailers that sell its products, that "[t]hey are not within our control, and we are not responsible in any manner for any of their policies or practices." FAC ¶ 142. The Taurus CEO affirmed in a 2025 court filing that "[a]fter it sells firearms to a distributor or dealer, [Taurus] is not involved with, does not determine, and does not control where the firearms are then sold to retail consumers." *Id.* ¶ 141. And Taurus's then-president testified at deposition in 2001 that he did not "even know what a gun trafficker is." *Id.* ¶ 140. The Amended Complaint alleges that Taurus's conduct conforms to its stated position. *Id.* ¶¶ 132, 143-144. That is more an admission of the claim than a defense to it.

Ruger. Ruger's general counsel has declared in court filings that liability under Section 898-b(2) "is predicated on the behavior of third-party criminals outside Ruger's control." *Id.* ¶ 168. Ruger's 2023 proxy statement asserted that Ruger "lacks the ability, resources, or authority to control the use of its products after they have been sold to an independent, federally licensed distributor." *Id.* ¶ 176. Ruger's CEO testified before Congress in 2022 that monitoring crimes committed with Ruger products "is not our job." *Id.* ¶ 166. And Ruger's 2019 corporate report claimed that monitoring downstream sales was "not feasible." *Id.* ¶ 171. Ruger's own corporate documents thus confirm the violation: It has not established the reasonable controls Section 898-b(2) requires, and disclaims any obligation to do so.

3.      Smith & Wesson's and Glock's Paper Contracts Do Not Satisfy Section 898-b(2).

Smith & Wesson and Glock contend that contractual provisions in their distribution agreements satisfy Section 898-b(2). MTD at 20–21. They do not. The provisions are neither reasonable nor utilized, and at minimum the question is one for the jury. *Trimarco v. Klein*, 56 N.Y.2d 98, 107 (1982); *Mastroianni*, 91 N.Y.2d at 205–06.

Smith & Wesson. The Amended Complaint pleads three independent reasons that Smith & Wesson's contractual provisions do not satisfy the statute. *First*, the provisions reach only distributors

13

and buying groups, not the retail dealers where the alleged diversion occurs. FAC ¶¶ 39, 94. *Second*, the provisions contain no monitoring, reporting, or audit mechanism, and Smith & Wesson therefore has no way to know whether its distributors or downstream retail dealers are complying with the contractual terms. *Id.* ¶ 95. *Third*, the Amended Complaint alleges that Smith & Wesson does not enforce even the limited provisions its contracts contain. *Id.* Smith & Wesson's own Vice President of Sales has declared that the company does not train retailers because doing so "would cost Smith & Wesson time and money." *Id.* ¶ 102-03. The Smith & Wesson Board has stated that the company will not adopt monitoring frameworks because "[t]he Company's reputation as a strong defender of the Second Amendment is not worth risking." *Id.* ¶ 107. Smith & Wesson's most recent 10-K explains that "our reputation could be damaged if our core consumers believe that we have adopted the gun control agenda of certain activists." *Id.* ¶ 109. These are not the statements of a company that has "utilized" reasonable controls.

Glock. Glock's contractual provisions are more detailed—requiring authorized dealers to comply with law, file annual certifications, train employees in firearms-sales law, and maintain auditable records. *Id.* ¶ 122; MTD at 20–21. Two independent reasons render those provisions insufficient at the pleading stage. *First*, the Amended Complaint alleges that Glock does not enforce them. FAC ¶ 123. The pleading is supported with concrete examples: Westforth Sports and Arrowhead Pawn — notorious sources of crime guns — remained authorized Glock dealers until they shut down in 2023 following independent regulatory scrutiny, not action by Glock; every one of the top ten source dealers of crime guns recovered in Chicago between 2013 and 2016 was a Glock authorized dealer; and Glock authorized dealers in New York have been "found by ATF to be in

14

violation of firearms laws and regulations" and remain authorized. *Id.* ¶ 124.[3] *Second*, the contractual provisions contain no upstream-reporting mechanism that would allow Glock to identify diversion-risk dealers in the ordinary course. *Id.* ¶¶ 125–127. A contractual right to audit, exercised only when Glock has been alerted to a problem from some other source, if at all, is not active utilization of a control to prevent diversion.

        4.        Defendants' Remaining Arguments Do Not Warrant Dismissal.

Defendants' remaining arguments—compliance with industry standards and other firearm regulations and lack of identified dealers—both fail at the pleading stage.

Compliance with industry standards and other firearm regulations. The MTD argues that "essentially the entire firearms industry has long operated the same way as Defendants do," citing *Trimarco*. MTD at 22. But *Trimarco* is controlling authority that industry custom is *not* a conclusive defense to a reasonableness inquiry: "[C]ustoms and usages run the gamut of merit like everything else. That is why the question in each instance is whether it meets the test of reasonableness." 56 N.Y.2d at 107 (reinstating plaintiff's verdict); *see id.* (quoting Justice Holmes: "What usually is done may be evidence of what ought to be done, but what ought to be done is fixed by a standard of reasonable prudence, whether it usually is complied with or not."). And there is a more fundamental problem: the Legislature enacted Section 898 in 2021 *to change* industry standards. A defendant cannot defeat a reform statute by pointing to the industry conduct the statute was designed to reform.

Additionally, Defendants argue that their (alleged) compliance with federal serialization rules and dealer-licensing requirements should be treated as compliance with Section 898-b(2). MTD at 19

---

[3] The Amended Complaint's references to out-of-state Glock dealers are direct evidence of Glock's failure to enforce its contracts against demonstrably problematic dealers, and circumstantial evidence that Glock's failure of enforcement is corporate-wide (i.e., including in New York). Rochester does not seek to apply Section § 898-b(2) extraterritorially. The Second Circuit has rejected a facial Dormant Commerce Clause challenge to Section § 898 itself. *NSSF*, 144 F.4th at 113-17.

& n.3. That would render Section 898-b(2) a nullity. The regulations the Motion to Dismiss lists govern different aspects of firearms commerce—marking, licensing, record-keeping—and impose no duty on manufacturers to establish controls preventing post-sale diversion. If compliance with them were enough to satisfy Section 898-b(2), every federally licensed gun industry member would be in automatic compliance from the moment of licensure, and Section 898-b(2) would do no work.

No identified High-Risk New York Dealers. Defendants argue that the Amended Complaint must identify the unlawful conduct of specific dealers to state a claim. MTD at 22. It does not. Section 898-b(2) imposes an affirmative duty on the gun industry member to maintain controls reasonably designed to *prevent* unlawful downstream conduct. Whether downstream dealers are knowingly, negligently, or unwittingly engaged in straw sales is immaterial to whether the manufacturer has discharged its statutory duty. *See Bell v. Bd. of Educ.*, 90 N.Y.2d 944, 947 (1997) ("When the intervening, intentional act of another is itself the foreseeable harm that shapes the duty imposed, the defendant who fails to guard against such conduct will not be relieved of liability when that act occurs.") (citation omitted). In any event, the Amended Complaint addresses the High-Risk New York Dealers with the specificity required at the pleading stage. FAC ¶¶ 12, n.3, 40-49. For instance, between 2012 and 2022, thirty dealers (1.4% of the total dealers that had a crime gun traced to them over that period) accounted for 32% of crime guns recovered in Rochester; twenty dealers each sold more than twenty crime guns and eighteen of those dealers were located in New York. *Id.* ¶¶ 40-45. Data from 2023 onwards demonstrate that local gun stores continue to be a significant source of crime guns recovered in Rochester and that Monroe County is currently the top source county in the United States for crime guns recovered in New York State. *Id.* ¶¶ 46-48. As noted previously, Rochester knows the High-Risk New York Dealers' identities and those identities will be revealed as discovery progresses. *Id.* ¶ 46, n. 39. That is precisely the kind of factual showing—i.e., that "specific groups of dealers play a disproportionate role in supplying the illegal gun market"—that the New York Court

16

of Appeals found was lacking in dismissing common law claims against manufacturers arising from their allegedly irresponsible distribution and marketing practices. *Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 237-38 (2001).

Moreover, the Court of Appeals' factual statement in *Hamilton* that the defendant manufacturers there "[were] not in a position to acquire" trace and inspection information, *id.* at 239, and did not "know[] or ha[ve] reason to know [which] distributors are engaging in substantial sales of guns into the gun-trafficking market on a consistent basis," *id.* at 237, is contradicted here by the detailed and well-pled allegations in the Amended Complaint.  The Amended Complaint alleges that Defendants do indeed have access to ATF's NTC Connect program, FAC ¶¶ 73–75; can require upstream reporting through their contracts, *id.* ¶¶ 79, 96, 125, 137, 152; have access to publicly-available ATF inspection reports (*id.* ¶ 124); and have access to the information necessary to identify the in-state dealers that sell large and/or disproportionate numbers of Rochester crime guns. *Id.* ¶¶ 11, 53.

      B.      The Amended Complaint Adequately Pleads That Defendants' Violations of Section 898-b(2) Are "Knowing" Within the Meaning of PLCAA's Predicate Exception.

The predicate exception applies only where a manufacturer "knowingly violated" a qualifying statute. 15 U.S.C. § 7903(5)(A)(iii). Defendants argue that this requires Rochester to plead that each Defendant knew its conduct was unlawful. MTD at 9-11. That is not what "knowingly violated" requires. Under settled Supreme Court and Second Circuit law, "knowingly violated" requires knowledge of the facts that constitute the violation, not knowledge that the violation is unlawful. *Bryan v. United States*, 524 U.S. 184, 193 (1998) ("unless the text of the statute dictates a different result, the term 'knowingly' merely requires proof of knowledge of the facts that constitute the offense"); *United States v. Weintraub*, 273 F.3d 139, 147 (2d Cir. 2001) ("the phrase 'knowingly violates' requires knowledge of facts and attendant circumstances that comprise a violation of the statute, not specific

17

knowledge that one's conduct is illegal"); *see New York v. Arm or Ally, LLC*, 718 F. Supp. 3d 310, 330–31 (S.D.N.Y. 2024) ("*Arm or Ally*") (applying *Weintraub* to PLCAA's predicate exception), *appeal dismissed and remanded on other grounds*, 2026 WL 537890 (2d Cir. Feb. 26, 2026).

Defendants invite this Court to be the first to hold that a "knowing" violation under the predicate exception requires a heightened mens rea of "knowledge of the *unlawfulness* of the action . . ." MTD at 10. In support of this argument, Defendants cite three Supreme Court cases — *Liparota v. United States*, 471 U.S. 419 (1985), *Rehaif v. United States*, 588 U.S. 225 (2019), and *Ruan v. United States*, 597 U.S. 450 (2022). Each is narrowly tied to a statutory feature absent from PLCAA's predicate exception. *Liparota* read "knowingly" to apply to a food-stamp statute's "not authorized" element to avoid criminalizing the conduct of, for instance, "a food stamp recipient who, for example, used stamps to purchase food from a store that, unknown to him, charged higher than normal prices." 471 U.S. at 426. *Bryan* identified the *Liparota* holding as the exception, not the rule. 524 U.S. at 193. *Rehaif* applied "knowingly" to the status element of an unlawful-alien-in-possession prosecution under §§ 922(g)(5) and 924(a)(2) because "the possession of a gun can be entirely innocent" without that element. 588 U.S. at 232. The Court there distinguished "ignorance of the law" (no excuse) from a defendant's "mistaken impression concerning the legal effect of some collateral matter" that negates an element of the offense. *Id.* at 234 (quoting 1 W. LaFave & A. Scott, *Substantive Criminal Law* § 5.1(a), p. 575 (1986)). And *Ruan* applied "knowingly" to a specific "except as authorized" clause in 21 U.S.C. § 841, based on the structural feature that prescribing controlled substances is otherwise "socially beneficial" conduct. 597 U.S. at 458–59. As Judge Furman held in rejecting an identical *Ruan*-based argument under a parallel "knowingly violates" provision of New York law, "*Ruan* is irrelevant . . . because its statutory language is entirely distinct . . ." *Arm or Ally*, 718 F. Supp. 3d at 330 n.11.

A further point distinguishes the entire *Liparota* line: Each was a criminal case. *Weintraub* held that "knowingly violates" requires only factual knowledge even where defendants faced imprisonment

18

under the Clean Air Act. 273 F.3d at 147-48. If only factual knowledge is required to support a criminal conviction under a "knowingly violates" provision, the same standard cannot demand more in the civil-liability context of § 7903(5)(A)(iii).

Applying the *Bryan/Weintraub/Arm or Ally* rule, the Amended Complaint asserts that each Defendant knows the facts and circumstances that comprise its failure to establish and utilize the reasonable controls and procedures required by Section 898-b(2). Defendants have known for decades that their exercise of monitoring and control over the distribution of their guns would reduce diversion into the illicit market. *See* FAC ¶¶ 55-66, 71-79. In fact, two Defendants (Smith & Wesson and Glock) acknowledge their role in monitoring and enforcing downstream legal compliance, through contractual provisions, but do not enforce these provisions. *Id.* ¶¶ 94-99, 122-127. Defendants know, or are willfully blind to the fact, that a small subset of identifiable High-Risk New York Dealers sell an outsized share of crime guns recovered in Rochester. *See id.* ¶¶ 40-53. And, Defendants of course know that, as of 2021, New York law requires them to establish and utilize reasonable controls and procedures, three of them having unsuccessfully sued to enjoin the law, filing declarations and corporate statements addressing the statute's application to their conduct. *NSSF*, 144 F.4th 98; FAC ¶¶ 8, 102, 168-69. Nevertheless, Defendants categorically refuse to establish and utilize reasonable controls and procedures to prevent downstream diversion. *See id.* ¶¶ 81-180.

Faced with these clear factual allegations, Defendants pivot to claiming that it is essentially impossible to knowingly violate a requirement to act reasonably. MTD at 9-11. This argument proves too much. If accepted, no reasonableness-based predicate statute could ever satisfy PLCAA's predicate exception. The Second Circuit has already rejected the premise, holding that "reasonableness is a well-established legal standard that is employed in a wide range of statutes consistent with the requirements of the Due Process Clause." *NSSF*, 144 F.4th at 118. A standard that provides

19

constitutionally adequate notice can be knowingly violated by a regulated entity that does not do what is required and knows the facts of its own conduct.

Put simply, knowledge is a mental state, while reasonableness is a standard of conduct, and entities like Defendants here can act unreasonably with a mental state greater than negligence. *See, e.g., Kingsley v. Hendrickson*, 576 U.S. 389, 396-97 (2015) (holding that a pre-trial detainee asserting an excessive force claim pursuant to 42 U.S.C. § 1983 "must show only that the force purposely or *knowingly* used against him was objectively *unreasonable*") (emphasis added)); *Saarinen v. Kerr*, 84 N.Y.2d 494, 500-01 (1994) (interpreting a statutory reckless disregard standard to require showing that "'the actor has intentionally done an act of an unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow' and has done with conscious indifference to the outcome") (quoting Prosser and Keeton, Torts § 34, at 213 (5th ed. 1984)); *City & Cnty. of San Francisco v. Purdue Pharma L.P.*, No. 18-CV-07591, 620 F.Supp.3d 936, 938 (N.D. Cal. Aug. 10, 2022) (holding that plaintiff city carried its burden at trial to prove that defendant pharmacy chain "*knowingly* engaged in *unreasonable* conduct that was a substantial factor in contributing to the opioid epidemic in San Francisco") (emphasis added)).

    C.    The Amended Complaint Adequately Pleads That Defendants' Violations of Section 898-b(2) Are a Proximate Cause of Rochester's Harms.

The third element of PLCAA's predicate exception requires that the defendant's knowing statutory violation be "a proximate cause of the harm for which relief is sought." 15 U.S.C. § 7903(5)(A)(iii). Contrary to Defendants' position (MTD at 11-12), New York law, not federal law, supplies the proximate-cause element of a New York cause of action. As detailed herein, Rochester has pleaded proximate cause under New York's substantial-cause framework. The line of Supreme Court decisions applying proximate cause principles in the context of *federal* statutory causes of action cited by Defendants do not control. Nor does the group of pre-PLCAA decisions cited by Defendants

that addressed proximate cause in the context of *common law claims* against industry defendants where there were no material allegations of those defendants' violation of their statutory duties.

      1.      New York Law Supplies the Substantive Proximate-Cause Standard for Rochester's New York-Law Cause of Action.

PLCAA does not itself create a cause of action; it merely interposes a *defense.* 15 U.S.C. § 7903(5)(C). Rochester's cause of action is created by Section 898-d, which authorizes municipalities to bring civil actions for violations of Section 898-b. Congress was deliberate in its choice not to create a cause of action with PLCAA: Its express purposes include preserving "important principles of federalism, State sovereignty and comity between the sister States." 15 U.S.C. § 7901(b)(6). Proximate cause for purposes of PLCAA is thus not a free-floating federal doctrine; it takes its content from the cause of action being asserted. Therefore, proximate cause, for purposes of both Rochester's cause of action and the application of the predicate exception to it, is supplied by New York law. Indeed, as the cases Defendants themselves cite acknowledge, "[p]roximate-cause analysis is controlled by the nature of the statutory cause of action. The question it presents is whether the harm alleged has a sufficiently close connection to the conduct the statute prohibits." *Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 572 U.S. 118, 133 (2014). In this regard, the New York Legislature spoke clearly in its legislative findings: "Those responsible for the illegal or unreasonable sale, manufacture, distribution, importing or marketing of firearms may be held liable for the public nuisance caused by such activities." Act of July 6, 2021, ch. 237, § 1, 2021 N.Y. Sess. Laws.

The New York appellate court that has most directly and recently considered this question agrees that New York law of proximate causation applies. In *Salter v. Meta Platforms, Inc.,* 240 A.D.3d 1378 (4th Dep't 2025), like here, plaintiffs brought state law claims and relied on violations of New York statutory law to satisfy PLCAA's predicate exception. *Id.* at 1382. In response, and paralleling the arguments Defendants make to this Court, the defendant gun lock manufacturer (MEAN LLC) contended that PLCAA imposed a federal proximate-cause standard governed by the same Supreme

21

Court federal-cause-of-action decisions Defendants cite here.[4] The unanimous decision of the Appellate Division, however, looked to New York's law of proximate causation and affirmed the denial of the motion to dismiss. *Salter*, 240 A.D.3d at 1385-86 (rejecting MEAN's argument as "[w]ith respect to the [proximate] causation element of 15 USC § 7903(5)(A)(iii)," citing exclusively New York State cases and New York principles of proximate cause). Other courts considering state-law claims asserted pursuant to PLCAA's predicate exception, including another New York decision from the Fourth Department, have similarly looked to state law concepts of proximate cause without applying a different or independent federal proximate cause standard. *See, e.g., Williams v Beemiller, Inc.*, 100 A.D.3d 143, 151-52, 154.1 (4th Dep't 2012) (reinstating complaint against gun industry defendants for downstream harm to a shooting victim, finding plaintiffs' case fit within PLCAA's predicate exception, and relying exclusively on New York state law of proximate causation); *Chiapperini v. Gander Mountain Co.*, 13 N.Y.S.3d 777, 786 (Sup. Ct. 2014) (following *Williams*); *Wiley ex rel. Wiley v. Fleet Farm LLC*, 799 F. Supp. 3d 860, 887, 897-98 (D. Minn. 2025) (applying state law of proximate cause to claims against gun retailer for downstream criminal misuse of weapon it sold); *Minnesota v. Fleet Farm LLC*, 679 F. Supp. 3d 825, 843-44 (D. Minn. 2023) (same in case brought by the state).

PLCAA's preemption clause is narrow by design: Congress preempted only those state actions that fall outside the reach of its exceptions. *See* 15 U.S.C. §§ 7902(a), 7903(5)(A)(iii). To read PLCAA's reference to "proximate cause" otherwise would create an unworkable framework that would require courts considering state law claims asserted pursuant to the predicate exception to apply one (federal) proximate cause standard for purposes of the predicate exception and a second, possibly inconsistent (state law) proximate cause standard for purposes of the underlying claim. This Court should instead

---

[4] *See* Reply Brief for Defendant-Appellant at 17-19, *Salter*, 240 A.D.3d 1378 (No. 24-01334), available at https://everytownlaw.org/wp-content/uploads/sites/5/2023/08/2025.03.31-Defendants-Reply-Brief.pdf.

follow the decisions above by assessing proximate cause under New York law. The Supreme Court has repeatedly cautioned that federal preemption of state law must rest on "clear and manifest" congressional intent. *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (citation omitted). No clear and manifest intent supports Defendants' reading. A New York cause of action whose New York-law proximate-cause element has been displaced by federal doctrine is not the New York cause of action the Legislature created. Congress did not enact PLCAA to bring about partial preemption by indirection. In enacting PLCAA, Congress preserved state-law causes of action for knowing violations of state statutes regulating firearm commerce—with their state-law elements intact.

> 2. Under New York's Substantial-Cause Framework, the Amended Complaint Plausibly Alleges That Defendants' Statutory Violations Are a Proximate Cause of Rochester's Harms.

A defendant's wrongful conduct is a proximate cause of an injury where it was a "substantial factor" in bringing about the injury. *In re Methyl Tertiary Butyl Ether Prod. Liab. Litig.*, 725 F.3d 65, 116 (2d Cir. 2013) (quoting *Schneider v. Diallo*, 788 N.Y.S.2d 366. 367 (1st Dep't 2005)). This test "recognizes that often many acts can be said to have caused a particular injury, and requires only that defendant's actions be *a* substantial factor in producing the injury." *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 591 F. Supp. 2d 259, 266 (S.D.N.Y. 2008) (emphasis added). Typically, whether a wrongful act "is a substantial cause of the plaintiff's injuries is one to be made by the factfinder, as such a determination turns upon questions of foreseeability." *Hain v. Jamison*, 68 N.E.3d 1233, 1237 (N.Y. 2016). Proximate cause may be decided as a matter of law only where "only one conclusion may be drawn from the established facts." *Id.* at 1238 (citation omitted). Where the harm-producing act is the intervening criminal conduct of a third party, "[a]n intervening act may not serve as a superseding cause, and relieve an actor of responsibility, where the risk of the intervening act occurring is the *very same risk* which renders the actor negligent." *Id.* at 1239 (citation omitted). And critically: "When the intervening, intentional act of another is itself the foreseeable harm that shapes the duty imposed, the

23

defendant who fails to guard against such conduct will not be relieved of liability when that act occurs." *Bell v. Bd. of Educ.*, 687 N.E.2d 1325, 1327 (N.Y. 1997) (citation omitted)).

The Fourth Department has twice applied this framework to gun-industry defendants and twice held that intervening criminal acts do not, as a matter of law, sever the causal chain. *Williams* concerned a high school student shot in Buffalo with firearms an Ohio dealer had repeatedly sold to a trafficker through straw purchasers. *See* 100 A.D.3d at 145. The court reinstated the complaint: The shooter's "intervening criminal act does not necessarily sever the causal connection between the alleged negligence of defendants and plaintiff's injury. Rather, liability turns upon whether the intervening act is a normal or foreseeable consequence of the situation created by the defendants' negligence." *Id.* at 152 (citation modified). And just months ago, in *Salter*, the Fourth Department rejected a gun-industry defendant's identical argument in a PLCAA predicate-exception case: "[T]he criminal act of a third party may be a reasonably foreseeable consequence of circumstances created by a defendant." 240 A.D.3d at 1386 (citation modified). These holdings are consistent with the Supreme Court's recognition in *Mexico* that the predicate exception "opens a path to making a gun manufacturer civilly liable for the way a third party has used the weapon it made." 605 U.S. at 286 (explaining that such an action may proceed "even though it arises from a third party's later misuse of a gun").

Rochester's allegations satisfy this standard. The Amended Complaint asserts that Defendants refuse to adopt or enforce the controls that New York law requires; that refusal foreseeably permits an identifiable group of High-Risk New York Dealers to continue diverting or allowing the diversion of Defendants' firearms into the criminal market; those firearms are foreseeably trafficked into Rochester; and Rochester foreseeably bears the resulting costs. FAC ¶¶ 9, 19, 39, 42-46, 53, 65, 81-180, 199, 202. This is the *Hain* "same risk" framework applied: The very risk Section 898-b(2) requires Defendants to guard against—diversion to straw purchasers, traffickers, and prohibited persons—is the risk Rochester alleges has come to fruition. Whether Defendants' conduct is a substantial factor

24

in producing Rochester's harms—and whether intervening conduct should be characterized as foreseeable or superseding—are quintessential questions for the factfinder, not for resolution at the pleading stage. *See Lexmark*, 572 U.S. at 134 n.6 ("If a plaintiff's allegations, taken as true, are insufficient to establish proximate causation, then the complaint must be dismissed; if they are sufficient, then the plaintiff is entitled to an opportunity to prove them").

       3.      Defendants' Cited Authorities Do Not Warrant a Different Result.

In arguing that Rochester has not adequately alleged proximate cause under PLCAA's predicate exception, Defendants cite two groups of distinguishable case law: (1) a line of Supreme Court cases dealing with federal statutory causes of action (under the Racketeer Influenced and Corrupt Organizations Act (RICO), the Lanham Act, the Fair Housing Act (FHA), and the Federal Employers Liability Act (FELA)); and (2) five pre-PLCAA decisions dismissing common law claims against gun manufacturers that were *not* predicated on violations of any state or federal law. None of these cases discusses, much less applies, the proximate-cause requirement in PLCAA's predicate exception.

      a)      *Holmes* and Its Progeny Do Not Undermine Rochester's Proximate Cause Allegations.

Defendants' Supreme Court proximate-cause authorities—*Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258 (1992); *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006); *Hemi Grp., LLC v. City of New York*, 559 U.S. 1 (2010); *Bank of Am. Corp. v. City of Miami*, 581 U.S. 189 (2017); *Lexmark*, 572 U.S. 118 (2014); and *Consol. Rail Corp. v. Gottshall*, 512 U.S. 532 (1994)—each interpreted the proximate-cause element of a federal cause of action. *Holmes* derived RICO's "direct relation" requirement from the Clayton Act language Congress imported into 18 U.S.C. § 1964(c). *See* 503 U.S. at 267-69. *Anza* and *Hemi* applied that RICO-specific standard to RICO claims. *See* 547 U.S. at 457; 559 U.S. at 10. *Bank of America* interpreted the proximate-cause element of the FHA, declining to "draw the precise boundaries" and remanding the case for further proceedings rather than dismissing; it held only that

25

"some direct relation" between the conduct and the injury was required. *Id.* at 202-03 (quoting *Holmes*, 503 U.S. at 268). The Amended Complaint pleads that direct relation here. Meanwhile, *Lexmark* and *Gottshall* do not apply the "direct harm" test at all. *Lexmark* concerned standing to bring a false advertising claim under the Lanham Act. 572 U.S. at 125. The Supreme Court found proximate cause even though the causal chain was "not direct" because there was no "discontinuity" between the harm and the injury. *Id.* at 139-40 (quoting *Anza*, 547 U.S. at 459). And *Gottshall* applied the "zone of danger" test to claims for negligent infliction of emotional distress under FELA. 512 U.S. at 554-57. None of these cases purported to displace state-law proximate-cause doctrine in a state-law cause of action. To the contrary, the Supreme Court has explicitly said that proximate-cause analysis "is controlled by the nature of the statutory cause of action." *Lexmark*, 572 U.S. at 133. Rochester's statutory cause of action is a New York cause of action. Its proximate-cause element is controlled by New York law.

*Holmes* and its progeny are further distinguishable because those cases were centrally concerned with whether the plaintiffs asserting federal statutory claims sought relief for direct harm incurred as a result of the actionable conduct or merely for indirect, derivative harm that was contingent upon harms to third parties. *See Laborers Local 17 Health and Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229, 236-39 (2d Cir. 1999) (explaining that the "critical question" as to direct injury is "whether the damages a plaintiff sustains are derivative of an injury to a third party. If so, then the injury is indirect; if not, it is direct."). Here, the harms that Rochester alleges are not wholly contingent upon harms to third parties. For example, funds that the City is forced to expend for preventive policing and violence intervention programs (FAC ¶¶ 19, 202)—both aimed at getting Defendants' illegally circulating guns off the streets *before* they are used in crimes directly harming city residents— are non-derivative harms and costs. *See Arm or Ally*, 718 F. Supp. 3d at 331-32 (State alleged "'foreseeable and direct consequence[s]'" of ghost gun manufacturers' alleged violations, including the State's "'invest[ing] in ghost gun-specific law enforcement[]' [and] 'expend[ing] increasing amounts of

26

resources on . . . investigative efforts to solve specific crimes involving assembled ghost guns'") (alteration in original, internal citation omitted); *Estados Unidos Mexicanos v. Diamondback Shooting Sports Inc.*, No. CV-22-00472-TUC-TM, 2024 WL 1256038, at \*13-\*14 (D. Ariz. Mar. 25, 2024) ("Plaintiff alleges injuries that it has suffered directly, including increased costs of law enforcement and other expenditures. These alleged injuries are not 'wholly derivative of harm to a third party.'") (citing *Laborers*, 191 F.3d at 236). In addition, concerns about double recoveries and apportioning damages are premature—as indicated by the decisions in cases like *Salter*, *Williams*, and the other PLCAA cases cited above that advanced past the motion to dismiss stage. Such concerns also do not apply to Rochester's request for injunctive relief—which alone is a sufficient basis to allow this case to proceed.

Finally, PLCAA's text is incompatible with Defendants' overly narrow construction of the predicate exception. As noted above, the Supreme Court recently confirmed that the predicate exception necessarily and expressly permits recovery against gun industry defendants beyond the first step of harm caused by the criminals who misuse their guns. *Mexico*, 605 U.S. at 286. Additionally, the predicate exception, unlike other sections of PLCAA, contemplates liability for multiple wrongdoers by using the phrasing "*a* proximate cause," not "*the sole* proximate cause," 15 U.S.C. § 7903(5)(A)(iii) (emphasis added); *id.* § 7903(5)(A)(v) (emphasis added); *see Arm or Ally*, 718 F. Supp. at 332. The exemplar statutory violations listed in the predicate exception further reinforce that Congress preserved actions for harms (i) resulting from downstream unlawful misuse and (ii) extending through multi-step causal chains connecting back to statutory violations by upstream manufacturers or sellers (like making false entries in ATF records). *See* 15 U.S.C. § 7903(5)(A)(iii)(I) and (II).

b)    Pre-PLCAA Cases Concerning Common Law Claims Against Industry Defendants Do Not Control.

Defendants also rely on a series of pre-PLCAA municipal-gun cases. MTD at 12–15. To be sure, prior to PLCAA's passage in 2005, there was a split of authority on whether, for purposes of *common law claims*, gun manufacturers' business practices were too far removed from downstream

27

harms experienced by states, cities, and individual victims of gun violence to satisfy the common law requirements of duty and (in some but not all of these decisions) proximate cause, including two New York state appellate court decisions. *Compare* MTD at 12-14 (citing six cases rejecting such claims) *with City of Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136, 1147-49 (Ohio 2002) (allowing case against firearms manufacturers to go forward despite multi-step causal chain); *City of New York v. Beretta U.S.A. Corp.*, 315 F. Supp. 2d 256, 283-84 (E.D.N.Y. 2004) (same); *Ileto v. Glock*, 349 F.3d 1191, 1196-1207 (9th Cir. 2003) (same); *City of Gary ex rel. King v. Smith & Wesson Corp.*, 801 N.E.2d 1222, 1244-45 (Ind. 2003) (same).[5]

Not only was there no judicial consensus on this issue; the critical point is that the pre-PLCAA decisions cited by Defendants are all clearly distinguishable. With two immaterial exceptions,[6] each one of them centered on claims against gun manufacturers where there was no allegation that the manufacturers had violated any obligation imposed by a firearms-specific statute, federal or state — i.e., they all involved *lawful* commerce in arms of the type PLCAA was intended to protect. Here, of course, a statutory violation is the center of Rochester's lawsuit, making this a case about *unlawful* commerce in arms. Thus, Rochester's action addresses the separation of powers concern expressed in all five of the decisions cited by Defendants: that *courts* should not be in the business of expanding liability against gun manufacturers under the common law and policy decisions about extending this

---

[5] After the passage of PLCAA, two of these cases were reversed on other grounds not applicable here, i.e., because they were predicated on laws of general applicability rather than laws applicable to the sale and marketing of firearms. *See City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384, 404 (2d Cir. 2008); *Ileto v. Glock*, 565 F.3d 1126, 1138 (9th Cir. 2009).

[6] One case concerned, in addition to common law claims, the Assault Weapon Manufacturing Strict Liability Act, a D.C. statute that did not expressly confer a right of action on the District of Columbia, as Section 898 does Rochester. That claim was dismissed for that reason, not proximate cause. *See District of Columbia v. Beretta U.S.A. Corp.*, 872 A.2d 633, 651-54 (D.C. 2005) (en banc). The other case involved dismissal of claims asserted under the common law and consumer protection statutes that are not specific to the firearms industry, all of which were dismissed for lack of standing. *Ganim v. Smith & Wesson Corp.*, 780 A.2d 98, 101-02 (Conn. 2001).

type of manufacturer liability should be left to *legislative bodies*—which is precisely what New York has done. *See, e.g., Hamilton*, 96 N.Y.2d at 233, 239-40 (invoking the "judicial resistance to the expansion of duty" because "[w]hile common-law principles can supplement a manufacturer's statutory duties, we should be cautious in imposing novel theories of tort liability while the difficult problem of illegal gun sales in the United States remains the focus of a national policy debate"); *People ex rel. Spitzer v. Sturm, Ruger & Co.*, 309 A.D.2d 91, 104-06 (1st Dep't 2003) ("*Spitzer*") (emphasizing that "courts have not, by virtue of statute…been given authority to act effectively in this specific setting" and deferring the resolution of societal problems associated with handgun manufacturing and marketing to the legislative branch)[7]; *City of Philadelphia v. Beretta U.S.A. Corp.*, 277 F.3d 415, 425 (3d Cir. 2002) (similar); *Ganim.*, 780 A.2d at 131 (similar). Section 898-a-e cures that defect and represents the policy judgment that the Court of Appeals in *Hamilton* said the Legislature was the appropriate body to make. 96 N.Y.2d at 239-40. And to the extent that Defendants invoke *Spitzer* for its substantive proximate-cause analysis, that holding has been overtaken by the New York legislature that wrote Section 898 and intervening Fourth Department decisions in *Williams* and *Salter.* Accordingly, these pre-PLCAA lawful-commerce-in-arms cases provide no persuasive reason to dismiss this post-PLCAA statutory violation case.

## II.  ROCHESTER'S COMMON-LAW PUBLIC NUISANCE CLAIM MAY GO FORWARD.

Neither PLCAA nor New York common law is a bar to Rochester's common-law public nuisance claim, and this claim should also be permitted to go forward.

---

[7] Both *Hamilton* and *Spitzer* are distinguishable from this case for the additional reason that both decisions rested in part on the failure of plaintiffs in those cases to allege "that specific groups of dealers play a disproportionate role in supplying the illegal gun market." *Hamilton,* 96 N.Y.2d at 238; *see also Spitzer*, 309 A.D. 2d at 101. Here, by contrast, Rochester has specifically alleged that a small, known, and knowable group of New York dealers is responsible for a disproportionate share of crime guns recovered in the City.

29

As a threshold issue, because Rochester has adequately pleaded a predicate violation under Section 898, the action falls within PLCAA's predicate exception, and Rochester's common-law public nuisance claim—itself predicated on the same statutory violation—proceeds free of PLCAA's bar. *See* 15 U.S.C. § 7903(5)(A)(iii) (exempting "an *action* in which" a manufacturer knowingly violated a predicate statute) (emphasis added); *see also Salter*, 230 A.D.3d at 1386-87 (permitting common-law negligence and public nuisance claims to move forward after determining that plaintiffs had satisfied the predicate exception as to their claims under GBL §§ 349 and 350); *Williams*, 100 A.D.3d at 152 (finding one applicable PLCAA exception and permitting entire case to go forward without addressing other exceptions as to remaining common-law claims). Defendants do not make a separate PLCAA argument regarding the common law public nuisance claim.

Because PLCAA is not a bar, the Court need only look at New York law to determine if the elements of the claim are satisfied. Rochester's common-law public nuisance claim is governed by the framework the New York Court of Appeals articulated in *Copart Industries, Inc. v. Consolidated Edison Co. of N.Y.*, 41 N.Y.2d 564 (1977), and reaffirmed in *532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Center, Inc.*, 96 N.Y.2d 280 (2001). The Fourth Department has twice held that the very kind of unlawful firearm-industry conduct Rochester alleges here states a public nuisance claim under that framework. *Williams*, 100 A.D.3d at 152; *Salter.*, 240 A.D.3d at 1387. Defendants' contrary arguments rest on a Restatement (Third) of Torts formulation New York has not adopted and on *Spitzer*, which is inapposite as discussed above and herein.

A.    The Amended Complaint Adequately Pleads a Public Nuisance Under New York Common Law.

A public nuisance under New York law is "conduct or omissions which offend, interfere with or cause damage to the public in the exercise of rights common to all . . . in a manner such as to . . . endanger or injure the property, health, safety or comfort of a considerable number of persons." *Copart*, 41 N.Y.2d at 568 (citations omitted); *see also 532 Madison*, 96 N.Y.2d at 292 (reaffirming this

30

formulation).[8] Rochester's Amended Complaint alleges that Defendants' refusal to establish or utilize the reasonable anti-diversion controls required by New York law foreseeably causes the diversion of their firearms into the criminal market in Rochester, where those firearms are used in the commission of crimes that endanger a considerable number of residents. FAC ¶¶ 42-46, 53, 81-180, 199-204. The Legislature has, moreover, declared this conduct a public nuisance. Section 898-c.

The Fourth Department has twice applied the *Copart-532 Madison* framework to firearm-industry defendants and held the allegations stated a claim for common-law public nuisance. In *Williams*, the Fourth Department applied this framework to allegations that a gun manufacturer, distributor, and dealer "violated federal and state laws by selling guns to a straw purchaser, who funneled the guns into the criminal gun market, thereby posing a danger to the general public," resulting in the plaintiff's injury. 100 A.D.3d at 152. The court held the allegations "sufficient to state a cause of action for public nuisance," explaining that the plaintiffs had alleged "unlawful conduct that endangered the lives of 'a considerable number of persons.'" *Id* (quoting *Copart*, 41 N.Y.2d at 564); *Baity v. Gen. Elec. Co.*, 86 A.D.3d 948, 951 (4th Dep't 2011). Last year, the Fourth Department reached the same holding based on allegations that a firearm-component manufacturer "violated New York law by manufacturing a lock that was removable, thereby posing a danger to the general public," and that plaintiffs were injured by a firearm from which the lock was removed. *Salter*, 240 A.D.3d at 1387 (applying *Williams* and *Copart*).

Critically, the defendants' nuisance-creating conduct in *Williams* and *Salter* was otherwise unlawful. *See Williams*, 100 A.D.3d at 152; *Salter*, 240 A.D.3d at 1387. As these cases demonstrate,

---

[8] Because Rochester is a governmental plaintiff, it is not subject to *532 Madison*'s "special injury" requirement. Regardless, the complaint alleges that Rochester has suffered distinct injuries—costs to the municipal treasury for increased expenditures on policing, emergency response, victim services, and other municipal functions—beyond those borne by the community at large. FAC ¶¶ 19, 199, 202. And the Legislature has expressly conferred a cause of action on the City for precisely these injuries with Section 898-d.

31

statutory violations provide strong, if not dispositive, evidence of the unreasonable interference with a public right—particularly where the statute declares certain conduct to be a public nuisance. *See* Restatement (Second) of Torts § 821B(2) ("Circumstances that may sustain a holding that an interference with a public right is unreasonable include. . . whether the conduct is proscribed by a statute, ordinance or administrative regulation"); *id.* § 821B cmt. c (nuisance statutes are a "legislative declaration that the conduct proscribed is an unreasonable interference with a public right"). *Spitzer*, relied on by Defendants, is inapposite for this very reason. There, as the court repeatedly emphasized, the gun manufacturers' business practices were "wholly lawful." 309 A.D.2d at 99. Relatedly, that decision emphasized that the appropriate forum for regulating the problem of firearm diversion is the Legislature. *Id.* at 99, 104-05 & n.4 (quoting *Hamilton*, 96 N.Y.2d at 233). The Legislature has now enacted Section 898-b(2) and Defendants' business practices have violated that law—meaning the guns in this case were not, in fact, "lawfully sold" like those in *Spitzer*, and Rochester's common-law public nuisance claim is perfectly compatible with what Defendants describe as "the legislature's statutory prerogatives." MTD at 17.

B.      New York Has Not Adopted the Third Restatement's Narrower Formulation.

Defendants argue that the Restatement (Third) of Torts § 8 cmt. g (2020) forecloses public-nuisance claims arising from product sales. MTD at 17. New York has not adopted that formulation. The *Copart-532 Madison* framework tracks the Restatement (Second) of Torts. *Compare Copart*, 41 N.Y.2d at 568–69; *532 Madison*, 96 N.Y.2d at 292 *with* Restatement (Second) of Torts § 821B. Defendants' position would require this Court to predict that the Court of Appeals will abandon its established formulation, and that the Fourth Department will overrule *Williams* and *Salter*—and will do so even though the Restatement (Third) of Tort's own reasoning, which favors specialized legislative regimes over common-law actions, in fact supports Rochester here, where the Legislature

32

has enacted Section 898-b(2) to address precisely this harm. That is not the role of a federal court applying New York law.

## III.   THIS CASE IS NOT BARRED BY THE SECOND AMENDMENT.

Defendants' final argument is that Section 898-b(2) violates the Second Amendment. MTD at 24-25. The argument fails at the threshold. The plain text of the Second Amendment does not cover the commercial conduct of firearm manufacturers, and certainly does not cover their refusal to comply with state-law anti-diversion requirements. *See N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 17 (2022). Even if the threshold were met, Section 898-b(2) imposes only the kind of "conditions and qualifications on the commercial sale of arms" that the Supreme Court has identified as "presumptively lawful" since *District of Columbia v. Heller*, 554 U.S. 570, 626-27 & n.26 (2008), and it is consistent with the principles that underpin this Nation's historical regulatory tradition.

### A.   Section 898-b(2) Does Not Implicate the Second Amendment's Plain Text.

Under *Bruen*, the threshold question in any Second Amendment challenge is whether "the Second Amendment's plain text covers an individual's conduct." 597 U.S. at 17. Regulations of firearm commerce "only implicate the text of the Second Amendment if they meaningfully constrain the right to possess and carry arms." *United States v. Vereen*, 152 F.4th 89, 95 (2d Cir. 2025). Only if the plain text covers the conduct does the inquiry proceed to historical analysis. *Bruen*, 597 U.S. at 24. Section 898-b(2) does not meaningfully constrain the Second Amendment right. It requires gun manufacturers selling firearms in New York to establish and utilize reasonable controls to prevent unlawful diversion, possession, marketing, or sale. It does not restrict who may purchase firearms, where firearms may be carried, or how citizens may use firearms for self-defense. It applies to manufacturers, not purchasers. The Supreme Court has repeatedly identified "laws imposing conditions and qualifications on the commercial sale of arms" as "presumptively lawful regulatory measures." *Heller*, 554 U.S. at 626-27 & n.26; *accord McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (plurality op.). The Second Circuit

confirmed in *Gazzola v. Hochul*, 88 F.4th 186 (2d Cir. 2023) that "[n]othing in . . . *Bruen* casts doubt on that understanding." *Id.* at 195-97 (holding New York statutes requiring licensed dealers to implement in-store security controls and procedures were not so burdensome as to implicate Second Amendment rights). And the district court in *Arm or Ally* held that Section 898 "fall[s] outside the text of the Second Amendment." *Arm or Ally*, 718 F. Supp. at 335.

Defendants do not seriously rebut the presumption. They identify no provision of Section 898-b(2) that prohibits law-abiding citizens from acquiring firearms or otherwise meaningfully constrains the right to keep and bear arms. They argue only that the statute will impose unspecified compliance costs that may affect the availability of their products. *Gazzola* rejected an essentially identical argument, holding that the specter of compliance costs that are merely "anticipated" or "speculative" does not establish constraint. 88 F.4th at 197. Defendants' contrary authorities are inapposite: Each addressed a broad categorical ban on firearm sales or possession, not a condition on commercial conduct. *See Radich v. Guerrero*, No. 14-CV-20, 2016 WL 1212437 (D. N. Mar. I. Mar. 28, 2016); *Ill. Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d 928 (N.D. Ill. 2014).

When considered properly, it is evident that Defendants are mistakenly claiming that either they or their customers have a right enshrined in the Constitution for gun manufacturers to distribute their guns irresponsibly, in a way that causes a dangerous public nuisance, with criminal elements being able to easily obtain firearms for nefarious purposes.

B.      The Statute Is Consistent with the Nation's Historical Tradition of Firearm Regulation.

Because Section 898-b(2) does not implicate the Second Amendment's plain text, the Court "ha[s] no occasion to engage in the historical analysis at step two." *N.Y. State Firearms Ass'n v. James*, 157 F.4th 232, 250 (2d Cir. 2025). But the statute is in any event comfortably consistent with the Nation's historical tradition. The proper inquiry is not whether the challenged regulation has a "historical twin," but whether it is "consistent with the principles that underpin our regulatory

34

tradition." *United States v. Rahimi*, 602 U.S. 680, 692 (2024); *see also Bruen*, 597 U.S. at 29–30. The principle underlying Section 898-b(2)—that those who sell firearms must take reasonable measures to prevent diversion to those who cannot lawfully possess them—has deep historical roots. Since the Colonial Era, states and local governments have restricted who can sell firearms, and to whom, for the purpose of protecting public health and safety. *Arm or Ally*, 718 F. Supp. 3d at 335 (collecting examples); *see also Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 684-86 (9th Cir. 2017) (collecting additional examples); *Vereen*, 152 F.4th at 100-03. The United States has also enjoyed a long history of using the law of public nuisance to regulate "offensive trades and manufactures," such as the storage and transport of loaded weapons and gunpowder. Heidi Li Feldman, *What It Takes to Write Statutes that Hold the Firearms Industry Accountable to Civil Justice*, 133 Yale L. J. Forum 717, 739-42 (2024) (citing Blackstone and collecting examples). The use of public nuisance law to prevent firearms from being used against the public by criminals is analogous to those earlier measures to prevent loaded guns and gunpowder from causing dangerous explosions and fires. *See id.* Defendants are just wrong that "there is no historical basis" for Section 898-b(2). MTD at 25. To the contrary, Section 898-b(2) is perfectly consistent with "the principles that underpin our regulatory tradition," *Rahimi*, 602 U.S. at 692, and there is no constitutional bar to imposing liability on Defendants.

## CONCLUSION

PLCAA's predicate exception was designed to preserve civil actions exactly like this one: actions in which a manufacturer has knowingly violated a state statute regulating the sale or marketing of firearms, and that violation has proximately caused harm. 15 U.S.C. § 7903(5)(A)(iii). The Second Circuit has held that Section 898 is such a statute. *NSSF*, 144 F.4th at 103. The Fourth Department has held that the New York causation framework applies to such claims. *Salter*, 240 A.D.3d at 1385-86. The Amended Complaint plausibly alleges each element of its Section 898 and common law public nuisance claims. The Motion to Dismiss should be denied in its entirety.

Dated: May 22, 2026                                Respectfully submitted,

EVERYTOWN LAW                                      NAPOLI SHKOLNIK
Eric Tirschwell*                                   Paul J. Napoli
Carolyn Shanahan*                                  Hunter J. Shkolnik
Caroline Zweifach*                                 Rebeca Martínez Sicari*
450 Lexington Ave.                                 Nestor Galarza*
P.O Box 4184                                       1302 Avenida Ponce de León
New York, NY 10017                                 Santurce, PR 00907
(646) 324-8222                                     (787) 493-5088
etirschwell@everytown.org                          pnapoli@NSPRlaw.com
cshanahan@everytown.org                            hunter@NSPRlaw.com
czweifach@everytown.org                            rmartinez@NSPRlaw.com
                                                   ngalarza@NSPRlaw.com

Alla Lefkowitz*
P.O. Box 14780                                     NAPOLI SHKOLNIK PLLC
Washington, DC 20044                               Salvatore C. Badala*
(203) 738-5121                                     Shayna E. Sacks*
alefkowitz@everytown.org                           360 Lexington Ave., Eleventh Floor
                                                   New York, NY 10017
BRADY CENTER TO PREVENT GUN                        (212) 397-1000
VIOLENCE                                           sbadala@napolilaw.com
Douglas Letter**                                   ssacks@napolilaw.com
Philip Bangle*
Jenna Klein*
840 1st St. N.E., Suite 400
Washington, DC 20002
(202) 370-8104
(202) 898-0059-Fax
pbangle@bradyunited.org
jklein@bradyunited.org


*  *Admitted pro hac vice*
** *Pro hac vice application pending*

36